UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

     v.

JOHN DRAGO,

           Defendant.

No. 18 Cr. 394 (SJF)

## REPLY TO MEMORANDUM OF LAW IN OPPOSITION TO JOHN DRAGO'S PRETRIAL MOTIONS

**Mintz, Levin, Cohn, Ferris,
Glovsky and Popeo, P.C.**
666 Third Avenue
New York, NY 10017
(212) 659-7300
*Attorneys for John Drago*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................1

ARGUMENT ...........................................................................................7

I. THE KAYLA WARRANT IS A FACIALLY INVALID GENERAL WARRANT .................7

    A.    The Government Concedes That the Warrant is Fatally Flawed on its Face...........8

        1.    The Kayla Warrant Fatally Failed to Specify the Crimes at Issue and Resorted to Improper Catchall Language ............................................9

        2.    The Government Cannot Save its Warrant By Reference to Extraneous Items...................................................13

        3.    The Government's Argument that No Additional Particularity Could Have Been Achieved Is Meritless ....................................................15

    B.    No "Good Faith" Exception Can Save This Search.............................................19

        1.    No "Good Faith Exception" Exists For Facially Defective Warrants ........................................................19

        2.    No Proof Exists for the Government's Claim of "Good Faith"................21

II. THE SNEDEKER AFFIDAVIT WAS MATERIALLY MISLEADING ................................33

    A.    The Snedeker Affidavit Was, On the Whole, Misleading ....................................33

        1.    Agent Snedeker's Mischaracterizations of Kayla's Business, and Other Omissions and Misstatements, Undermine a Probable Cause Finding ...........................................................34

        2.    Agent Snedeker Improperly Withheld Relevant Exculpatory Information ...................................................40

    B.    The Court Should Hold a *Franks* Hearing ...........................................................42

III. THE GOVERNMENT IMPROPERLY RETAINED AND CONTINUED TO ACCESS MATERIALS BEYOND THE SCOPE OF THE WARRANT........................44

IV. CERTAIN CHARGES SHOULD BE PARTICULARIZED OR DISMISSED ...................47

    A.    Count One Is Duplicitous........................................................................47

    B.    Count Two Should Be Dismissed Because the Second Circuit Has Never Imposed Liability on an Individual for a Violation of 31 U.S.C. § 5318(h)(2) ..............................................................50

    C.    The Government Fails to Justify its Pre-Indictment Delay .................................51

V. THE GOVERNMENT SHOULD BE REQUIRED TO PROVIDE A BILL OF PARTICULARS ...............................................................53

VI. THE GOVERNMENT SHOULD PRODUCE SPECIFIC, IDENTIFIED *BRADY* AND *GIGLIO* MATERIALS NOW ...............................................................58

CONCLUSION ..................................................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Coolidge v. New Hampshire*,
  403 U.S. 443 (1971)................................................................18

*Groh v. Ramirez*,
  540 U.S. 551 (2004) ........................................................ *passim*

*Maryland v. Garriso*n,
  480 U.S. 79 (1987)................................................................31

*Rivera v. United States*,
  928 F.2d 592 (2d Cir. 1991)................................................43

*United States v. Awadallah*,
  349 F.3d 42 (2d Cir. 2003)................................................42

*United States v. Berganza*,
  No. 03-987, 2005 U.S. Dist. LEXIS 2203 (S.D.N.Y. Feb. 16, 2005)...................57

*United States v. Berschchansky*,
  788 F.3d 102 (2d Cir. 2015)................................................28

*United States v. Bianco*,
  998 F.2d 1112 (2d Cir. 1993)................................................10, 11, 25

*United States v. Buck*,
  814 F.2d 588 (2d Cir. 1997)................................................9, 20

*United States v. Butt*,
  No. 18-CR-00087 (NSR), 2018 U.S. Dist. LEXIS 169739 (S.D.N.Y. Oct. 1, 2018) ................................................................43

*United States v. Calandra*,
  414 U.S. 338 (1974)................................................................32

*United States v. Campino*,
  890 F.2d 588 (2d Cir. 1989)................................................43

*United States v. Cephas*,
  937 F.2d 816 (2d Cir. 1991)................................................58

*United States v. Chen*,
  378 F.3d 151 (2d Cir. 2004)................................................57

*United States v. Christine*, 687 F.2d 749 (3d Cir. 1982) ............................................................16

*United States v. Cioffi*,
  668 F. Supp. 2d 386 (E.D.N.Y. 2009) ...........................................................17, 20

*United States v. Clark*,
  638 F.3d 89 (2d Cir. 2011).........................................................................21

*United States v. Cohan*,
  628 F. Supp. 2d 355 (E.D.N.Y. 2009) ...................................................... 7-8

*United States v. Cwibeker*,
  12-CR-0632 (JS) (ARL), 2014 U.S. Dist. LEXIS 178752 (E.D.N.Y. Dec. 31,
  2014) .........................................................................................................33

*United States v. Facciolo*,
  753 F. Supp. 449 (S.D.N.Y. 1990) ................................................................57

*United States v. Galpin*,
  720 F.3d 436 (2d Cir. 2013).........................................................................7

*United States v. Ganias*,
  755 F.3d 125 (2d Cir. 2014)................................................................. *passim*

*United States v. Ganias*,
  824 F.3d 199 (2d Cir. 2016) ........................................................................46

*United States v. George*,
  975 F.2d 72 (2d Cir. 1992)..........................................................18, 20, 25

*United States v. Gigante*,
  979 F. Supp. 959 (S.D.N.Y. 1997) ...........................................................11, 17

*United States v. Gross*,
  165 F. Supp. 2d 372 (E.D.N.Y. 2001) ...................................................... 52-53

*United States v. Hawit*,
  No. 15-cr-252 (KPC), 2017 U.S. Dist. LEXIS 23391 (E.D.N.Y. Feb. 17, 2017)...................55

*United States v. Heyman*,
  794 F.2d 788 (2d Cir. 1986)..................................................................... 50-51

*United States v. Hickey*,
  16 F. Supp. 2d 223 (E.D.N.Y. 1998) ...........................................................10, 13

*United States v. Hurst*,
  No. 12 CR. 19, 2012 U.S. Dist. LEXIS 105167 (N.D. W. Va. July 30, 2012)......................24

*United States v. Irving*,
    432 F.3d 401 (2d Cir. 2005) ........................................................................21

*United States v. Jones*,
    No. SS85 Cr. 1075-CSH, 1986 U.S. Dist. LEXIS 24969 .......................................58

*United States v. Kearney*,
    451 F. Supp. 33 (S.D.N.Y. 1978) ................................................................50

*United States v. Kow*,
    58 F.3d 423 (9th Cir. 1995) ......................................................................20

*United States v. Krajas*,
    11 CR 202S, 2012 U.S. Dist. LEXIS 151516 (W.D.N.Y. 2012) ....................... 42-43

*United States v. Kushner*,
    256 F. Supp. 2d 109 (D. Mass. 2003) ............................................................50

*United States v. Lahey*,
    967 F. Supp. 2d 698 (S.D.N.Y. 2013) ......................................................40, 43

*United States v. Leary*,
    846 F.2d 592 (10th Cir. 1988) ...................................................................20

*United States v. Leon*,
    468 U.S. 897 (1984) ....................................................................19, 20, 24

*United States v. Lorenzano*,
    No. 03-1256 (S-6) (JFK), 2005 U.S. Dist. LEXIS 7312 (S.D.N.Y. Apr. 26,
    2005) ..............................................................................................57

*United States v. Luna*,
    No. 3:05-cr58 (SRU), 2006 U.S. Dist. LEXIS 28947 (D. Conn. May 9, 2006) .....................55

*United States v. Lustyik*,
    57 F. Supp. 3d 213 (S.D.N.Y. 2014) ..............................................................33

*United States v. McDarrah*,
    No. 05 Cr. 1182 (PAC), 2006 U.S. Dist. Lexis 48269 (S.D.N.Y. July 17,
    2006) ..........................................................................................21, 30

*United States v. Metter*, 860 F. Supp. 2d 205 (E.D.N.Y. 2012) ............................. 44-47

*United States v. Mitlof*,
    165 F. Supp. 2d 558 (S.D.N.Y. 2001) ............................................................57

*United States v. O'Connor*,
    237 F.2d 466 (2d Cir. 1956) ......................................................................55

*United States v. Pena*,
   961 F.2d 333 (2d Cir. 1992)..................................................................22

*United States v. Persico*,
   621 F. Supp. 842 (S.D.N.Y. 1985) ........................................................57

*United States v. Regan*, 706 F. Supp. 1102 (S.D.N.Y. 1989) ......................................16

*United States v. Riley*,
   906 F.2d 841 (2d Cir. 1990)..................................................................18

*United States v. Robinson*,
   16-CR-545 (S-3)(ADS), 2018 U.S. Dist. LEXIS 193350 (E.D.N.Y. Nov. 13,
   2018) ................................................................................. 22-23

*United States v. Rollack*,
   90 F. Supp. 2d 263 (S.D.N.Y. 1999)........................................................20

*United States v. Romain*,
   No. 13 Cr. 724, 2014 U.S. Dist. LEXIS 166500 (S.D.N.Y. Dec. 1, 2014) ...........................33

*United States v. Rosa*,
   626 F.3d 56 (2d Cir. 2010).......................................................... *passim*

*United States v. Ryan*, No. 2:07-CR-35, 2009 U.S. Dist. LEXIS 53644 (D. Vt.
   May 26, 2009)....................................................................28

*United States v. Salazar*,
   485 F. 2d 1277 (2d Cir. 1973)................................................................58

*United States v. Simmons*,
   771 F. Supp. 2d 908 (N.D. Ill. 2011) ...................................................43

*United States v. Torres*,
   901 F.2d 205 (2d Cir. 1990)..................................................................57

*United States v. Triumph Capital Grp., Inc.*,
   544 F.3d 149 (2d Cir. 2008)...........................................................16, 58

*United States v. Vilar*,
   No. S3 05-CR-621 (KMK), 2007 U.S. Dist. LEXIS 26993 (S.D.N.Y. Apr. 4,
   2007) ...........................................................................13, 17, 20

*United States v. Wagner*,
   989 F.2d 69 (2d Cir. 1993)..................................................................33

*United States v. Walters*,
   963 F. Supp. 2d 125 (E.D.N.Y. 2013) ....................................................57

*United States v. Washington*,
   No. CR 146, 2012 U.S. Dist. LEXIS 159863 (S.D.N.Y. Nov. 7, 2012)............................22, 32

*United States v. Wey*,
   256 F. Supp. 3d 355 (S.D.N.Y. 2017)............................................................................ *passim*

*United States v. Zemlyansky*,
   945 F. Supp. 2d 438 (S.D.N.Y. 2013)........................................................................... *passim*

**Statutes and Rules**

31 U.S.C. § 5313.................................................................................................................. 49-50

31 U.S.C. § 5318(h)(2) ...........................................................................................................50

Fed. R. Crim. P. 16 ................................................................................................................54

Fed. R. Crim. P. 29 ................................................................................................................7

John Drago, by his attorneys, Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C.,

submits this reply memorandum of law in further support of his pretrial motions to: (a) suppress

evidence seized pursuant to a search warrant executed on or about August 6, 2013 at the office of

Kayla Check Cashing Corp.; (b) dismiss the Indictment (or certain counts) on various grounds,

including for duplicity, failure to state an offense, and for pre-indictment delay; and (c) obtain

from the government a bill of particulars and *Brady* and *Giglio* materials.[1]

## PRELIMINARY STATEMENT

The government's opposition to John's motion merely confirms that the 2013 search of

John's business violated his constitutional rights, and accordingly, the fruits of that search should

be suppressed.  The government effectively concedes that the Kayla Warrant violated the

Particularity Clause of the Fourth Amendment on its face, because it acknowledges (as it must)

that, among other core defects, the Warrant failed to describe the crimes under investigation.

This Warrant was so plainly defective that no law enforcement agent could reasonably have

relied on it.  Moreover, to the extent the law would even permit the Court to consider the

government's assertion – despite the Warrant's facial defects – that the search could be saved

because its agents acted in good faith, that assertion fails because the government offered *no*

*factual support* for that claim.  According to the settled law, this Court simply cannot uphold the

search on that basis.

The government appears to suggest (wrongly) that, absent proof negating law

enforcement agents' good faith, this Court is obligated to *presume* they acted in good faith.  But

---

[1] John initially moved also to suppress any evidence obtained from a cell phone seized from his residence on the date of his arrest (August 1, 2018).  *See* Opening Br. at 54 – 64.  In response to John's motion, the government returned the phone to John on or about January 9, 2019, and claimed in its opposition brief that it never actually searched that phone for evidence.  This appears to have mooted John's arguments related to the cell phone, and accordingly, this reply does not address those issues.  If it turns out that the government did obtain evidence from that cell phone, however, John reserves the right to challenge the use of any such evidence, and any of its fruits.

the law is exactly to the contrary:  execution of a search based on a Warrant that violates the

Fourth Amendment's Particularity Clause *requires* suppression, at least in the absence of a

credible explanation for why the agents ignored its defects.  But even if a facially defective

Warrant could be saved on a "good faith" claim by law enforcement, the law is clear that the

burden *rests on the government* to prove facts supporting the good faith exception, not the other

way around.  Moreover, that burden cannot be satisfied by mere averments in memoranda of law

by government lawyers.  Rather, supporting facts must be *attested to* by the agents themselves,

and even in that event, a factual hearing would be required to test those assertions.  Because the

government here has offered *no such factual proof*, the Court is bound to reject that argument,

and find the search void.

But even had the government provided some record support for a claim of good faith, that

claim would fail for several other reasons.  For one thing, the agents in this case were made

aware of the defects in the Kayla Warrant at the time of the search, yet chose to proceed anyway.

That completely negates the viability of any claim of good faith compliance with the

Constitution here.   Importantly, *this fact does not appear to be in dispute* – that is, the

government does contest that its agents were actually apprised of the fatal defects in that Warrant

*while they were executing it*.  Nevertheless, they persisted in executing the search, rather than

seek to remedy the violation.  Further, even the unsupported assertions of fact made on key

issues bearing on its "good faith" assertion in the government's legal memorandum are self-

contradictory, such as which agent was in charge of the search, and whether and when any of the

agents on the search team even received and read the Affidavit in advance of the search.  Simply

put, the good faith exception cannot apply in this case to save the 2013 search of John's business.

Accordingly, the government's arguments that the defects in the Warrant were "inadvertent," or that the agents did not intend to seek a deficient warrant, are irrelevant (as well as factually unsupported); its assertion that the Warrant's defects "did not affect the scope of what the agents seized" is baseless and inaccurate; its assertion that, because this Warrant concerns a financial investigation, further particularization was not possible is simply wrong (among other things, the crime(s) under investigation could have been described); its assertion that the missing particularization can be "inferred" from its generic document description categories is untrue and unpersuasive; and its attempt to supplement the Warrant itself by reference to language in extraneous materials, such as a "pre-operational" briefing summary, or the Affidavit offered in support of the Warrant application, is legally precluded.  On this last point, settled law prohibits the Court from considering materials outside the four corners of the Warrant itself in determining whether the Warrant satisfies the Particularity Clause.

No more persuasive is the government's assertion that Agent Snedeker did not mislead Magistrate Judge Wall into issuing the Kayla Warrant, and that a *Franks* hearing (at a minimum) is not required.  Rather than contradict the multiple material misstatements and omissions pointed out by John in his Opening Brief, the government's opposition merely argues that those do not matter because it can still rely on its undercover sting evidence to support the Warrant. So while the government now appears to *concede*: that the check-cashing fee Kayla charged was not, in fact, indicative of any wrongdoing (despite the clear implication in the Snedeker Affidavit that it was); that the check-cashing business is not inherently illegal (despite the clear assertion to the contrary in the Affidavit); that imputing to Kayla (without proof) involvement in the illegal behavior of third-party businesses merely because they happened to use Kayla's services would be improper; and that it misleadingly twisted numerical data about Kayla's business volume to

3

falsely suggest that tens of millions of dollars in transactions should have been, but were not, made the subject of Currency Transaction Reports; it claims all of this does not matter.

Rather than seriously contest these points, the government repeatedly reverts to the undercover recordings, reasserting the broad conclusions it asks this Court to draw from those recordings. But here, too, Agent Snedeker's behavior is subject to serious scrutiny, because he chose to omit from his application paperwork several recordings that, on their face, at the time he made the application, could have been interpreted by the Magistrate Judge as exculpatory of John, and at odds with the larger themes of illegality the agent hoped to convey about Kayla. Notwithstanding the government's self-serving, *post hoc* spin of those omitted recordings, they present a serious basis for questioning whether the agent, recklessly at the least, misled the Magistrate Judge about the strength of the government's core proof offered in support of probable cause. Accordingly, the Court should hold a *Franks* hearing to determine whether sufficient probable cause existed to justify the search of Kayla, given all that is now known about what Agent Snedeker knew at the time he made his application on July 29, 2013.

Also, by failing to address John's argument concerning his motion to suppress the electronic evidence seized in this case, the government's opposition further confirms that, at a minimum, the Court should grant that motion too. Since the August 2013 search, the government has retained every single piece of evidence seized at Kayla, returning nothing. In particular with respect to the electronic data, there can be little dispute at this point that the government failed in its obligation to review and cull within a reasonable time after the search that electronic evidence, and to purge itself of any electronic evidence not responsive to the Warrant. Instead, the government admits that it has continued to review the *entirety* of the seized electronic data in pursuit of its investigation *to the present day*, a violation of the principles set

forth by the Second Circuit in *United States v. Ganias*, 755 F.3d 125 (2d Cir. 2014) ("*Ganias I*") and its progeny.  The law does not permit the government to retain the entirety of someone's electronic data and rummage through all of it in perpetuity, never undertaking to separate the responsive from the unresponsive, as a permanent library for investigating its owner.  Having offered no excuse or explanation for its brazen retention and review of that full set of data for five-plus years, that evidence (and its fruits) should be suppressed.

The government's arguments for saving the Indictment from dismissal also fail.  The government fails to rebut John's argument that Count One – which charges John with failing to file "one or more CTRs" – is duplicitous.  Whether or not such a charge could be maintained as a "scheme" (and the government offers no authority for that assertion) does not obviate the need to ensure that jurors considering Count One be in agreement on what specific transaction or set of transactions they are voting on – a basic requirement of any criminal trial (*i.e.*, that the jury be put in a position to come to a unanimous verdict on an agreed upon set of charged conduct).  The government's response on this dismissal point confusingly conflates Count One with Count Three (charging structuring, for which the law is different), and thus it misses the point entirely.  Nor does the government address the lack of precedent in the Second Circuit for charging an individual for an institution's failure to maintain an effective anti-money laundering ("AML") program.  The dismissal motions with respect to Counts One and Two should be granted.

The government also provides no viable explanation for its unreasonable pre-indictment delay, instead opting to inject (in violation of a written limited-immunity agreement) into the record the contents from a proffer session that were wholly gratuitous and unnecessary to "rebut" anything in John's motion.  Putting aside the government's improper reliance on the proffer (which is the subject of a separate, side motion fully briefed as of January 25, 2019, the

government's assertion that its five-year delay was excusable because it was engaged in plea negotiations simply collapses of its own weight.  As attested by John's prior counsel, no such "negotiations" ever really existed, and even to the extent there were communications on the topic of a potential plea, those scant interactions could not legitimately justify *five years* of delay. Lacking a credible justification from the government for its delay, the Court should dismiss the Indictment in its entirety now, or at the least, revisit the issue at trial on the issue of prejudice to John.

Finally, the government offers no legitimate basis for denying John a bill of particulars in this case, or for failing to supply the discrete *Brady* material specifically identified by John. Here, where the government suggests it may pick and choose, right up until the day of trial, any number of transactions, from among literally tens of thousands of transactions that took place over a period of more than three years at six storefronts, for its charges of, *inter alia*, failing to file CTRs and structuring, John is entitled to know which transactions will be at issue.  Similarly, where the government seeks to prove him guilty of failing to collect and pay over FICA, again over a period of years for businesses that employed dozens of people during that time frame, more particulars are required.  The government's retort that it has already provided detail in the form of, *inter alia*, the search warrant affidavit must be rejected because, among other things, those facts cannot constitute the alleged transactions at issue for the BSA counts at trial.  The search warrant affidavit covered only transactions that are beyond the statute of limitations (*i.e.*, primarily undercover recordings from *2012*), so it is clear *those* transactions cannot constitute the transactions the jury will be asked to vote on.[2]  Nor does providing back to John a copy of the

---

[2] In defense of its Warrant, the government places great weight on its undercover sting operation from 2012.  Of course, since the Indictment was not returned until July 31, *2018*, many, if not all, of those undercover transactions are beyond the statute of limitations.  Of course, John reserves the right, at the appropriate time and depending on

full set of transactions his businesses processed during the three-year period provide him with any useful guidance at all.  Finally, requesting that the government provide to the defense exculpatory third party statements confirming John's efforts to comply with the law does not constitute an unreasonable burden on the government, nor any sort of fishing expedition by John. Those are appropriately requested, and should be turned over now.

Accordingly, John's motion should be granted in its entirety.

## **ARGUMENT**

## **I.**

## **THE KAYLA WARRANT IS A FACIALLY INVALID GENERAL WARRANT**

As John explained in his Opening Brief, the Kayla Warrant was an unconstitutional general Warrant that failed to "particularly describe[e]" the "things to be seized," because, among other things, it failed to describe the crime or crimes under investigation.  Opening Br. at 25.  Despite acknowledging that the Kayla Warrant "omitted the statutory references," the government nevertheless asserts that the Kayla Warrant was "fully compliant with the Fourth Amendment."  Opp'n at 29.  The government is simply wrong.  Its attempt to minimize the core, irredeemable flaws of the Warrant is contradicted by settled law.  The government cannot escape the fact that the Kayla Warrant is, on its face, constitutionally invalid.

To satisfy the Fourth Amendment's particularity requirements, a search warrant *must* (i) "identify the specific offense for which the police have established probable cause"; (ii) "describe the place to be searched"; and (iii) "specify the items to be seized by their relation to designated crimes."  *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013); *see also* Opp'n at 7-8 (acknowledging these requirements).  A warrant must also be supported by probable cause to

---

the government's ultimate proof, to move to dismiss some or all of the charges against him as time-barred by the statute of limitations.  *See, e.g.,* Fed. R. Crim. P. 29.

support the breadth of the search authorized.  *See United States v. Cohan*, 628 F. Supp. 2d 355, 359 (E.D.N.Y. 2009).  The Kayla Warrant fails to satisfy both of these requirements.

The government offers several meritless arguments in opposition to John's motion to suppress.  It argues that:  (i) the Warrant, although it fails to describe (by words or statutory reference) the crimes under investigation, was somehow "otherwise particularized"; (ii) the Warrant was saved from its flaws by other materials outside the Warrant; (iii) the agents were allowed to seize the majority of records anyway, so their seizure was not overbroad; and (iv) the search can otherwise be saved by dint of the "good faith" exception.

These arguments all fail: nothing in the language of the Warrant itself fixes its fatal flaws, including its failure to describe the crime(s) under investigation; the law precludes reference to extraneous materials to cure the lack of particularity in the Warrant itself; nothing about the Warrant or the application for it justified the agents' execution of an unconstitutional general search, or obviated the requirements of the Particularity Clause in this case; and no "good faith" by agents can save a facially defective warrant, but even if the law permitted that, here, there is no proof of any "good faith," and indeed, the facts belie that claim.  As a result, the Court should suppress the fruits of the Kayla Warrant.

**A.    The Government Concedes That the Warrant is Fatally Flawed on its Face**

The government concedes – as it must – that the face of the Kayla Warrant contains no mention of the crimes under investigation.  No statute or law is cited, nor does the Warrant include descriptive words explaining what crimes the records sought should relate to.  This is despite the fact that "Attachment A" to the Warrant makes the cryptic reference (in its final numbered paragraph) to "the illegal transactions described herein" – a tacit, contemporaneous acknowledgment that such description was necessary (but was left out).

8

Further, the Kayla Warrant was not limited by subject matter, document category, or any other discernible characteristic (save for a time period of more than three-and-a-half years).  The Warrant purports to rely on what the government describes as "concise, meaningful descriptions" – Attachment A – to provide direction to the searching agents, but as pointed out in John's Opening Brief, those descriptions are anything but concise or limiting.  Rather, they are expansive lists that cover every conceivable business record that could be kept at a check cashing business (and more), irrespective of its relationship to some unidentified crime.  At bottom, the Kayla Warrant operated as a general warrant, which is precisely what the Constitution prohibits.

1. *The Kayla Warrant Fatally Failed to Specify the Crimes at Issue and Resorted to Improper Catchall Language*

The Kayla Warrant's failure to specify the crimes under investigation alone rendered it facially unconstitutional.  *See United States v. Zemlyansky*, 945 F. Supp. 2d 438, 453 (S.D.N.Y. 2013).  Without reference to the crimes at issue, a warrant does not provide sufficient guidance on what the agents were authorized to seize.  *See United States v. Buck*, 814 F.2d 588, 590-92 (2d Cir. 1997) (warrant authorizing seizure of "any papers, things or property of any kind relating to [the] previously described crime" was insufficiently particularized as it "only described the crimes – and gave no limitation whatsoever on the kind of evidence sought."); *United States v. Rosa*, 626 F.3d 56, 62 (2d Cir. 2010) (stating that a warrant is "defective in failing to link the items to be searched and seized to the suspected criminal activity" because it "lacked meaningful parameters on an otherwise limitless search.").

The government argues that the Court should ignore this core defect because the failure to reference the crimes and statutes was purportedly "inadvertent."  Opp'n at 2.  Even if that were true, it is irrelevant, and cannot justify upholding this Warrant.  The reason for the failure to reference the specific crimes under investigation – whether a "drafting, editing or printing" error,

*see id.* at 9 – does not matter, and the government offers no legal support for the proposition that facial defects in a warrant must be intentional to justify suppression.  The failure to include any reference whatsoever to a crime is fatal.  *See United States v. Bianco*, 998 F.2d 1112, 1116 (2d Cir. 1993) (warrant lacked particularity where it did not describe "the possible crimes involved"); *United States v. Hickey*, 16 F. Supp. 2d 223, 239 (E.D.N.Y. 1998) (invalidating warrants on particularity grounds where "none identified the nature of the suspected wrongdoing triggering the searches").

In any event, the government offers no actual proof that the flaw was "inadvertent," and to the extent any evidence on this point exists in the record, that evidence suggests that the execution of the search based on the flawed Warrant was *not* inadvertent.  Indeed, during the execution of the search, the agents *were actually made aware* of its facial defect, yet they proceeded ahead with their search despite knowing of the Warrant's invalidity.  *See* Drago Aff. ¶ 5.

The government further argues that the omission of a description of the crimes under investigation "did not affect the scope, execution or seizure and review of the evidence," because the Warrant was "otherwise particularized."  *See* Opp'n at 2, 9, 29.  According to the government, the Kayla Warrant is full of "concise, meaningful descriptions of the categories of records that could be seized," such that "the search executed by the agents would have been completely the same even if the warrant made specific reference to the statute."  *Id.* at 35, 37.

This is meaningless nonsense.  None of the "categories" of documents described by the Warrant's Attachment A provide any "meaningful" guidance or description whatsoever to elucidate for the agents – or for that matter, the recipient, *see infra*, Section I.A.3. – what could, and what could not, be seized.  *See United States v. Wey*, 256 F. Supp. 3d 355, 381 (S.D.N.Y.

2017) (noting that a search warrant serves a "high function," including the "prevention of general searches" and "assur[ance] [to] the individual whose property is searched or seized of the lawful authority of the executing office, his need to search, and the limits of his power to search.") (citations omitted).  There simply is no way that any agent could have discerned, from the generic description of document types contained in Attachment A, that the focus of the investigation was structuring or BSA violations, as opposed to any other document-based crime, like credit card fraud, identity theft, or wire fraud (none of which are actually at issue here).

Moreover, the government has not cited a single case to support the notion that a facially deficient warrant can be saved because the agents might be able to "infer" the missing specifics from broad categories of formats of information-storing things.  The government may not bestow upon the Kayla Warrant its own self-serving, *post-hoc* interpretation of generic document descriptors and insist that its agents must have held that interpretation in their heads at the time. Indeed, were the Court to accept the government's argument on this point, it would fully vitiate the law's requirement to specify the crimes under investigation.

The government's argument in this regard flies in the face of the settled law cited in John's Opening Brief.  *See, e.g.*, *Bianco*, 998 F.2d at 1115-16 (warrant authorizing seizure of "[n]otes, [l]edgers, [e]nvelopes, [p]apers and [r]ecords containing [i]nitials, [n[ames, [a]dresses, [d]ollar amounts, [c]odes, [f]igures, and the like" insufficiently particularized because they were not tied to particular crimes); *see also United States v. Gigante,* 979 F. Supp. 959, 966 (S.D.N.Y. 1997) (warrant lacked particularity where it permitted seizure of "financial, banking, safe deposit, investment, asset, tax, bookkeeping, and accounting records" with "underlying, supporting, and related documentation, of or referring or relating to" certain individuals).

In addition to the missing crime references, the Kayla Warrant also employed impermissible catchall language further expanding its scope, essentially infinitely.  The government disingenuously attempts to mislead the Court about the scope of the Warrant's expansive language by quoting mere snippets of each numbered paragraph of Attachment A, attempting to make it appear as if the Warrant's language was concise and targeted, when in truth it was anything but.  *See* Opp'n at 32-33.  Notably omitted from the government's self-serving cropping of its Warrant language in its brief is a full recitation of the enumerated items in the lengthy paragraphs, as well as the expansive language like "including but not limited to" and "all."  *Compare* Opp'n at 32-33 (describing paragraph 1 as seeking "records, documents and materials regarding the identity of corporate customers of Kayla...") *with* Attachment A itself, Siegal Decl., Ex. 2 at Att. A, ¶ 1 ("Records, documents and materials regarding the identity of the corporate customers of Kayla, *including but not limited to*, customer lists, customer files, notes, date books, calendars, phone books, Rolodexes, or ledgers that reference customers, corporate certifications or similar documents, correspondence between Kayla and its customers, and other records, documents and materials concerning or reflecting the identity of the individual representatives of Kayla's customers, including, but not limited to, addresses, social security numbers, driver's licenses, driver's license numbers, tax identification numbers, and telephone numbers.") (emphasis added).  This is but one example in a list of several, similar misleading edits by the government in its opposition brief.  The government's intentional cropping of its own Warrant language should be seen for what it is: a further concession that the actual language of the Warrant is unconstitutionally general and unparticularized.

Indeed, as John made clear in his Opening Brief, the repeated use of catchall language throughout Attachment A is yet another ground for finding this Warrant to be in violation of the

Particularity Clause on its face.  *See* Opening Br. at 29, 33-35; *see also Wey*, 256 F. Supp. 3d at

386-86  (stating that warrants lack particularity "without ... any meaningful content-based

parameter or other limiting principle"); *United States v. Vilar*, No. S3 05-CR-621 (KMK), 2007

U.S. Dist. LEXIS 26993, at *66-67 (S.D.N.Y. Apr. 4., 2007) ("[W]arrants will frequently lack

particularity where they include a general, catchall paragraph or provision..."); *Hickey*, 16 F.

Supp. 2d at 237-41 (warrant authorizing seizure of all business records, "including but not

limited to" approximately 50 individually generic terms, lacked particularity).  In short, the

Kayla Warrant violated, on its face, the Particularity Clause in multiple ways, and was, for all

intents and purposes, a general warrant.

       2.    *The Government Cannot Save its Warrant By Reference to Extraneous Items*

       The government argues that certain items extraneous to the Warrant itself, such as the

Snedeker Affidavit and a pre-operational briefing plan, may suffice to supply the particularity

missing from the Warrant itself.  The Supreme Court has made clear, however, that the Fourth

Amendment "requires particularity in the warrant, *not in the supporting documents*," and

therefore, "the fact that the [warrant] application adequately described the 'things to be seized'

does not save the warrant" from failure to satisfy the particularity requirement.  *See Groh v.*

*Ramirez*, 540 U.S. 551, 557 (2004).  Of course, the Second Circuit follows this rule as well.  *See,*

*e.g.*, *Rosa*, 626 F.3d at 64 (government "may no longer rely on unincorporated, unattached

supporting documents to cure an otherwise defective search warrant.").

       Because the Snedeker Affidavit was not incorporated or attached to the Kayla Warrant, it

is irrelevant to the issue of the Warrant's validity.  *See Wey*, 256 F. Supp. 3d at 381-82

("Accordingly, 'a court may construe a warrant with reference to a supporting application or

affidavit' only 'if the warrant uses appropriate words of incorporation, and if the supporting

document accompanies the warrant.'"); *see also Groh*, 540 U.S. at 557 (the Fourth Amendment

"by its terms requires particularity *in the warrant*") (emphasis added).[3]  In short, the Warrant must rise or fall on its own merit.

     Similarly, the government cannot rely on the pre-operational plan, because it too was neither attached to the Kayla Warrant nor approved by Magistrate Judge Wall.  *See Zemlyansky*, 945 F. Supp. 2d at 475 (stating that agents' reliance on information learned at briefing session cannot cure a deficient warrant because "the extremely broad [sic] warrant was executed by officers on the basis of a general sense of the investigation, not on the basis of an affidavit that had been presented to a neutral, detached magistrate"); *Wey*, 256 F. Supp. 3d at 401 (pre-operations briefing session does not cure lack of particularity in warrant).  It bears noting, however, that the plan, which states that one "primary objective" of the search is to seize evidence as stated in "Appendix A," does not actually attach an "Appendix A."  Thus, even if the agents were provided with this plan (and it is not clear from the record whether they were), the pre-operational plan lacks the list of evidence that was intended to give the agents instruction on what they were permitted to seize.  Accordingly, the existence of a pre-operational search plan is irrelevant, and cannot save this Warrant.

     Finally, the government ignores that the particularity requirement also protects the *searchee*.  *See Groh*, 540 U.S. at 561  (internal citations omitted) (stating that the particularity requirement also "assures the individual whose property is searched or seized of the lawful

---

[3] Even if the Court could consider the Snedeker Affidavit as a supplement to the Warrant – and it cannot – the government has not demonstrated that the executing agents were actually apprised of its contents at the time of the search.  While the government's opposition brief makes several inconsistent assertions concerning whether and when the agents were provided with that Affidavit (*see* Opp'n at 9 (the agents were "provided" with the affidavit at the pre-operational briefing session); *Id.* at 34 (the "alleged criminal conduct" was "covered in detail with the search warrant team at the pre-operational briefing"); *Id.* at 36 (agents "were notified and advised of the contents of the affidavit" . . . "in sum and substance"); *Id.* ("copies were available at the search site")), notably, the government has submitted *not a single sworn attestation* from any of the approximately 20 agents who participated in the search stating that they were provided with the Affidavit, much less that they read it, in advance of the search.

authority of the executing officer, his need to search, and the limits of his power to search."). When the government executed the warrant, John did not have access to Snedeker's Affidavit or the pre-operational plan. Neither document accompanied or was attached to the Warrant, and neither was provided to John at the time of the search. The Warrant did nothing to apprise John of the crimes at issue, and therefore deprived him of his constitutional right to be apprised of what the agents were authorized to take (and what they were *not* authorized to take). This is but another reason why the Constitution protections simply cannot be remedied by the government's *post-hoc* resort to extraneous materials to justify its search. Those other items could not have supplied the requisite notice to John, because he never saw them.

3.     *The Government's Argument that No Additional Particularity Could Have Been Achieved Is Meritless*

The government also appears to argue that it was absolved from abiding by the Fourth Amendment's Particularity requirement due to the nature of Kayla's business. Conceding (as it must) that the Kayla Warrant "calls for the seizure of *many* documents and records," indeed, "the *majority* of [Kayla's] records," the government asserts that the Kayla Warrant "is not unlike any other financial warrant" and, thus asserts that the records sought were "needed to establish an accurate replication of [Kayla's] financial transactions . . . in relation to their reporting requirements . . ." *See* Opp'n at 29, 32-34. Accordingly, the government takes the surprising (and unsupportable) position that, "due to the nature of the business and type of violations, no additional particularity would have been reasonably possible." *Id.* at 34. In other words, where the subject of an investigation is a financial services business, the government asserts that it has

the right to scoop up anything "financial" because all the documents are – in the government's terms – "relevant."[4]

To support this novel position, the government misleadingly cherry-picks quotes from various cases to weave a legal narrative nowhere supported in the law. *See id.* at 31 (citing, *e.g.*, *United States v. Triumph Capital Group*[5] for the proposition that the particularity requirement "requires only 'reasonable specificity' and not 'surgical precision'"; and citing *United States v. Christine* for the proposition that "flexibility is especially appropriate in cases involving complex schemes spanning many years . . ."). But all the cases cited by the government for this proposition are inapposite for various reasons and none support the assertion by the government here, effectively, that general warrants are permitted in "financial investigations." Most notably, those cases involve warrants that *actually specified* the crimes at issue, which immediately makes the warrants at issue in those other cases more particularized than the Kayla Warrant. By contrast, the Kayla Warrant suffers from a gaping hole that undercuts any argument that it could

---

[4] In any event, even this assertion is factually unsupported. The Kayla Warrant sought far more than just financial books and records needed to "establish an accurate replication of financial transactions." Opp'n at 33. It included directives to seize multiple types of non-financial records as well, such as employee information, customer social security numbers and telephone numbers, and correspondence with regulators.

[5] In *United States v. Triumph Capital Group*, the government obtained a warrant to search a laptop computer, and the warrant specified (whereas the Kayla Warrant does not) that the government could search for evidence relating to specified crimes: conspiracy, bribery concerning programs receiving federal funds, mail and wire fraud, theft of honest services, and obstruction of justice. The warrant also specified, among other things, the parties alleged to be involved. The defendant moved for suppression, but the court held that the parameters of the search – which contemplated technically complex searches for deleted files – required the agent to retain some flexibility. 544 F.3d 149 (2d Cir. 2008).

Similarly, in *United States v. Regan*, the court held that a warrant that *specified the tax charges at issue* could allow for seizure of evidence of both legal and illegal transactions without running afoul of the particularity requirement, since evidence of both was necessary to reconstruct the defendant's true financial and tax posture. 706 F. Supp. 1102 (S.D.N.Y. 1989). *United States v. Christine*, also cited by the government, is inapposite. The Third Circuit considered whether the government's warrant, which the government argued came under the "all business records" doctrine – a doctrine neither invoked nor supportable in the instant case – was unconstitutionally overbroad. Rather than decide if the warrant was a general warrant, the Third Circuit remanded the case to the district court for a determination of which individual paragraphs could be "redacted" – *i.e.*, struck from the warrant because they were invalid for lack of probable cause or generality. 687 F.2d 749, 754 (3d Cir. 1982). The *Christine* decision does not purport to dispense with the particularity requirement for financial warrants.

not have been made more particular:  it fails to set forth what the crime(s) to which the evidence is "relevant."  Under the government's warped formulation of the Particularity requirement, any financial record would be "relevant" to any investigation pertaining to a financial services business.  That is, the government is essentially asserting that the Particularity Clause may be dispensed with in the context of investigations of financial services businesses, because all its financial documents are "relevant" to its business.

This argument is nonsense, and wholly unsupported by the law.  To avoid being a general warrant, at a minimum, the *warrant* must specify what crimes the evidence sought pertains to, and it did not do that here.  Courts in this Circuit routinely find such warrants insufficiently particularized.  *See, e.g.*, *Gigante,* 979 F. Supp. 966 (warrant for "telephone records, rolodexes, personal phone books, correspondence, applications, memoranda, notes, and [other documents] . . . relating to (a) bribery of public officials and others . . . and other illegal activity which the bribe recipients have been, are, and/or will be aiding and abetting" was "bereft of meaningful limitation" because it failed to specify what was meant by "other illegal activity.").  The suggestion that no further particularity was possible here ignores the obvious – that the Warrant could have specified (but did not) the crimes under investigation.  And indeed, contrary to the government's suggestion, courts do require Warrants to specify the crimes under investigation, even in the context of "financial warrants."  *See, e.g. United States v. Cioffi*, 668 F. Supp. 2d 386, 396 (E.D.N.Y. 2009); *Vilar*, 2007 U.S. Dist. LEXIS 26993, at *66-67; *Gigante*, 979 F. Supp. at 966.  None of these cases endorsed a view that the requirement to specify the crimes at issue does not hold in financial investigations, and the government cites not a single case actually supporting such an illogical proposition.

Thus, the government's repeated assertion that the Warrant sought only "relevant" records (financial or otherwise) begs the question: "relevant to what?" Wire fraud? Credit card fraud? Identity theft? Structuring? The Particularity clause requires the government to specify that on the face of the Warrant. To suggest that agents may take any financial records from a financial services company because all such documents are "relevant" to its business (or, in the government's words, are necessary for an "accurate replication of financial transactions," *see* Opp'n at 33), asserts precisely what the Fourth Amendment explicitly precludes – that the government has the right to grab all the records it wishes on the subject of a company's business, for purposes of conducting a generalized rifling through those records for evidence of *some* crime, any crime. *See Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971) (stating that law enforcement agents are barred from executing warrants that purport to authorize "a general, exploratory rummaging in a person's belongings."); *United States v. George*, 975 F.2d 72, 74 (2d Cir. 1992) (stating that general warrants, which "permit[] police agents to ransack one's personal belongings, [have] long been considered abhorrent to fundamental notions of privacy and liberty."); *United States v. Riley*, 906 F.2d 841, 844 (2d Cir. 1990) (stating that the Fourth Amendment prohibits leaving "to the unguided discretion of the officers executing the warrant the decision as to what items may be seized.").

Accordingly, the notion that "the agents would not have benefitted from purposefully seeking access to items unbound by a listed criminal offense," and "with a specific offense listed, or without, the search... [and seizure] would have been the same," (Opp'n at 37), simply ignores settled constitutional law. Whether or not the agents would have "benefitted" from searching outside the scope of the Warrant (which they did) is irrelevant. What matters is that the Warrant failed to provide the agents with constitutionally required guidance about the scope of their

search authorization.  Accordingly, the Court should reject the government's unsupported (and insupportable) assertion that the agents would have been permitted to scoop up everything anyway, had the Warrant been facially correct.[6]

**B.     No "Good Faith" Exception Can Save This Search**

Notwithstanding the serious violations of John's constitutional rights visited on John by this search, the government seeks to save the search by asserting that its agents acted in good faith.  The good-faith exception does not apply here for several reasons, including that (i) the law precludes "reasonable reliance" by law enforcement agents on a facially unparticularized warrant, so no "good faith exception" can apply to save this search; and (ii) even if it could, any such claim is not merely factually unsupported, but indeed belied in this case by the uncontested facts.

*1.     No "Good Faith Exception" Exists For Facially Defective Warrants*

As a threshold matter, the law simply does not recognize the availability of the "good faith exception" in the context of facially defective warrants – *i.e.*, like the Kayla Warrant, which "fail[s] to particularize the place to be searched or the things to be seized."  *United States v. Leon*, 468 U.S. 897, 923 (1984).  The Supreme Court has held "that the executing officers cannot reasonably presume [a warrant] to be valid" where it is facially deficient.[7]  The Kayla Warrant,

---

[6] The government makes passing reference in its opposition brief to the notion that there was "systemic fraud," and a "broad" scheme at Kayla.  *See* Opp'n at 20, 32.  It does not, however, explicitly seek to invoke the "all business records" doctrine.  But even if it did, that assertion would fail for several reasons.  *First*, the government did not expressly ask Magistrate Judge Wall for such authority, nor did it set forth sufficient factual evidence of fraudulent activity from which he could infer that "those activities are just the tip of the iceberg," which is a requirement for an "all business records" warrant.  *See Wey*, 256 F. Supp. 3d at 388-89; *see also Zemlyansnky*, 945 F. Supp. 2d at 461 (stating that for the "all records" exception to apply, the affidavit submitted in support of the warrant had to contain detailed information that would provide reason to believe that "all or nearly all of the business under investigation was illegal.").  *Second*, Magistrate Judge Wall did not authorize an all-business records warrant.  *Third*, the government sought more than business records.  When the business is a financial institution, and the warrant authorizes – as the Kayla Warrant purported to – the seizure of every financial record and more, the warrant operates as a general warrant, and thus violates the Constitution.

[7] In this context, the government's subjective good faith is irrelevant.  Rather, the Court must assess the government's "objective reasonableness."  *Leon*, 468 U.S. at 924.

which failed to identify *any* crime under investigation, by words or code section, fits this category.

In 1987, the Second Circuit put the government on notice that it could not reasonably rely on an insufficiently particularized warrant.  *Buck*, 813 F.2d at 593 n.2.  Following *Leon* and *Buck*, in *United States v. George* the Second Circuit confirmed that a warrant that allows the seizure of materials "without mentioning a particular crime or criminal activity to which the evidence must relate is void under the Fourth Amendment," and cannot be relied on in good faith. 975 F.2d at 77-78.  Courts in this Circuit continue to agree that the good-faith exception is inapplicable to facially deficient search warrants.  *See, e.g.*, *Zemlyansky*, 945 F. Supp. 2d at 454, 457; *Cioffi*, 668 F. Supp. 2d  at 392; *Vilar*, 2007 U.S. Dist. LEXIS 26993, at *76-77; *United States v. Rollack*, 90 F. Supp. 2d 263, 274, 277 (S.D.N.Y. 1999); *see also United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995); *United States v. Leary*, 846 F.2d 592, 602-10 (10th Cir. 1988).

Indeed, as John explained in his Opening Brief on this motion, the law makes clear that agents are not permitted to "reasonably rely" on an insufficiently particularized warrant.  *See* Opening Br. at 31 n.8 (collecting cases); *see also Wey*, 256 F. Supp. 3d at 398-99 ("When . . . a warrant plainly fails to comport with well-settled particularity requirements, officers' reliance upon it – especially in the absence of a credible circumstance-specific explanation – can hardly be deemed objectively reasonable.") (collecting and quoting from cases, including *George*); *Zemlyansky*, 945 F. Supp. 2d at 475 ("[L]aw enforcement officers are presumed to know that a warrant which fails to offer particular guidance is unlawful.").

Thus, the government's attempt to save this facially defective warrant by reference to the purported "good faith" of its agents in executing it is unavailing.  Simply put, where the warrant is defective on its face, no agent can argue that, despite its defects, it was entitled to

proceed with the search.  Given that they have not attempted to offer any circumstantial excuse for failing to recognize the Kayla Warrant's facial flaws (*see also* discussion, *infra*, at 29-33), the court cannot save its fruits from suppression based on any claim of "good faith" in its execution.[8]

### 2. *No Proof Exists for the Government's Claim of "Good Faith"*

Even if the law permitted the government to rely on a claim of "good faith" to save its search of Kayla, that argument should be rejected for several reasons: (i) the government has failed to supply the Court with any factual support for that assertion; (ii) the facts in the record negate good faith: the Warrant's defects were raised to the agents, who acknowledged it, *during the search*, and yet they proceeded to search Kayla anyway, despite their then-present awareness of the Warrant's facial invalidity; (iii) any reasonable executing agent should have known that the Warrant was an unconstitutional general warrant on its face; and finally, (iv) as a matter of policy, allowing the government to rely on a defective warrant that so obviously sidesteps the basic tenets of the Fourth Amendment – particularly when its defects were raised and disregarded – will fail to deter similarly unconstitutional conduct.

As a preliminary matter, the government bears the burden of showing that its agents acted in good faith.  *See United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011)*; Wey*, 256 F. Supp. 3d at 395-96  ("The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance on an invalidated warrant.") (internal citations omitted).  Here, in a complete mischaracterization of Second Circuit precedent, the government improperly seeks to shift the burden of proof to John, asserting that "there is no credible or objective sign that the

---

[8] The cases cited by the government in support of its good faith argument are not to the contrary, and cannot save this search on such grounds. The Second Circuit in both *Clark* and *Irving* made clear that neither of the warrants in those cases were facially invalid.  *See United States v. Clark*, 638 F.3d 89, 101-03 (2d Cir. 2011) (holding the warrant was not facially deficient; the defendant's claim was lack of probable cause to support the warrant); *United States v. Irving*, 432 F.3d 401, 415-16 (2d Cir. 2005) (same); *see also United States v. McDarrah*, No. 05 Cr. 1182 (PAC), 2006 U.S. Dist. Lexis 48269, at *28-29 (S.D.N.Y. July 17, 2006) (court held the warrant was not overbroad).

agents acted in anything other than good faith . . . ."  That is, the government argues incorrectly that the burden is on John *to negate* the agents' good faith.  *See* Opp'n at 37.  That is not the law.  If the government wanted to justify its otherwise unconstitutional behavior by arguing that its agents acted in good faith, the government was required to show – *with evidentiary proof* – that its agents acted in good faith.  And by opting to submit no agent attestations, it has completely failed to satisfy its burden.  Accordingly, the Court should reject this argument in its entirety.

Simply put, the government has not shown that its agents acted in good faith.  All it has done is lob unsupported and unsworn conclusory statements about what its agents purportedly did into its memorandum of law.  This is wholly insufficient, as a matter of law.  *See Zemlyansky*, 945 F. Supp. 2d at 474, n. 16 ("[U]nsworn statements of counsel do not constitute evidence sufficient for the government to meet its burden of demonstrating good faith."); *see also United States v. Washington*, No. CR 146, 2012 U.S. Dist. LEXIS 159863, at *24-25 (S.D.N.Y. Nov. 7, 2012) (in a suppression motion, "legal rules require the Court to exclude from its analysis the unsworn statements of fact offered by" counsel because, "to create a factual dispute, a [party] must submit sworn factual allegations from a person with personal knowledge of the underlying facts.").  The Court has no factual basis on which to consider the government's "good faith" argument, and must reject it.

But even had the government provided the Court with factual attestations by relevant witnesses averring their good faith, John would be entitled, at a minimum, to examine those contentions at a factual hearing.  *See United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992) ("[A]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question."); *United States v.*

*Robinson*, 16-CR-545 (S-3)(ADS), 2018 U.S. Dist. LEXIS 193350, at *16 (E.D.N.Y. Nov. 13,

2018) ("Lastly, the Court disagrees with the Government that the good faith exception to the

Exclusionary Rule requires denial of suppression without an evidentiary hearing.. . . the Court

finds a hearing warranted here, because material factual disputes exist regarding the

circumstances underlying the search.").  Under no circumstances could the Court deny John's

motion on the grounds that the otherwise unconstitutional search was justified by the agents'

purported good faith, absent, at the very least, giving John an opportunity to test those affidavits

at a factual hearing.

As currently positioned, however, there is no basis for a hearing.  Rather, the

government's bald "good faith" contention should be rejected, not merely because no evidentiary

support has been presented (although it should be rejected for that reason alone), but based on

the government's failure to contest the facts that *belie* such an assertion.  Critically, the

government here appears to *concede* that the searching agents were actually aware, and

acknowledged their contemporaneous awareness, that the Warrant lacked the constitutionally

required particulars.  As explained in John's Opening Brief, shortly after the agents began their

search of Kayla on August 6, 2013, John asked the agents why Kayla was being searched, and

drew the agents' attention to the Kayla Warrant's shortcomings – particularly, its failure to

specify the crimes at issue.  *See* Opening Br. at 31; Drago Aff. ¶ 5.  Having had the Warrant's

defects presented to them by John at the scene, the agents overtly expressed their understanding

that the Warrant was facially defective, and then attempted, in a ham-handed way, to orally

modify it on the spot.  *See* Drago Aff. ¶ 5.  In spite of this, while knowing full well they were

operating with a bad Warrant, the agents forged ahead and proceeded to search Kayla.  *Id.*

Importantly, *the government does not contest John's account of this sequence of events.* To the contrary, the government apparently acknowledges this happened.  Instead of contesting the facts, the government attempts to minimize the significance of those events, arguing that "even if [the agents] discussed the crimes they were searching evidence for with [John] . . . that does not indicate that they then knew they were without authority to execute the warrant." Opp'n at 37.  Tellingly, the *government has submitted no attestation from the agents* that they knew or believed otherwise.  Indeed, if the agents actually believed they were acting with proper authority (despite the interaction recounted by John), it begs the question why they did not submit affidavits saying so in opposition to John's motion.  In any event, the *undisputed* facts in the record demonstrate that "good faith" simply could not have existed, and thus, that argument cannot save this Warrant.  On the present record, the Court really cannot draw any other conclusion than that the government has failed to satisfy its burden of showing its agents acted in good faith in proceeding with the search.[9]

Moreover, even if the agents had not acknowledged the Kayla Warrant's shortcomings, the good-faith exception does not apply in situations where the agents have no objectively reasonable basis for believing a warrant is valid.  *See United States v. Leon*, 468 U.S. 897, 922-23 (1984).  "Given that the particularity requirement is set forth in the text of the Constitution, no reasonable officer could believe that a warrant that plainly did not comply with [the particularity requirement] was valid."  *Groh*, 540 U.S. 551, 563; *see also Zemlyansky*, 945 F. Supp. 2d at 475 ("[L]aw enforcement officers are presumed to know that a warrant which fails to offer particular

---

[9] The government's reliance on *United States v. Hurst,* No. 12 CR. 19, 2012 U.S. Dist. LEXIS 105167 (N.D. W. Va. July 30, 2012), for the proposition that this Court should suppress evidence only in the event that "the officer knew, or could properly be charged with knowledge" is unavailing.  Indeed, that case *supports* John's argument, because the evidence here is *uncontested* that the agents who executed the Kayla Warrant did, in fact, actually know of its facial invalidity.

guidance is unlawful.").  The Kayla Warrant violates the particularity requirement in multiple

ways, and accordingly, it would not have been objectively reasonable for an officer to execute

the Kayla Warrant.  *First*, the Warrant does not identify the crimes under investigation.  *See*

*George*, 975 F.2d at 77 (holding that a warrant that allows for seizure "without mentioning a

particular crime or criminal activity to which the evidence must relate" violates the Fourth

Amendment and cannot be relied on in good faith); *Wey*, 256 F. Supp. 3d at 398 ("[T]he NYGG

Warrant and Apartment Warrant both on their face plainly violate multiple components of the

Fourth Amendment's particularity requirement... [a]t a minimum, neither identifies in any way

the crimes under investigation.").

    *Second*, as in *Wey*, the Kayla Warrant authorizes seizure of several expansive categories

of records "without any meaningful linkage to the suspected criminal conduct."  *Id.; see also*

*Bianco*, 998 F.2d at 1115-16 (holding that warrant lacks particularity where "highly generalized"

and "broad" categories of documents are not "tied to particular crimes" or subject to "more

particular limiting language.")  Indeed, these defects are so readily apparent from the face of the

three-page Warrant that a layperson – John himself – was able to spot them and point them out to

the agents in minutes.  The government's argument that the agents did not know they were

operating with an invalid warrant not only disregards what actually happened at the scene, but it

also suggests, disturbingly, that those agents were operating in the field without an awareness of

basic constitutional principles that the Supreme Court has consistently presumed that law

enforcement agents know.

    *Third*, without regard to the factual circumstances that the government's memorandum of

law suggests (without testimonial support) could support a good-faith argument, the good-faith

exception does not apply because there is no evidence showing the searching agents relied on

their knowledge of the investigation or the Snedeker Affidavit, rather than the defective, unparticularized warrant. *See Wey*, 256 F. Supp. 3d at 401; *Zemlyansky*, 945 F. Supp. 2d at 473 ("*Groh* prohibits officers from claiming good faith whenever they execute a deficient warrant and insist that they came to learn the contents of the affidavit through some other means."). Here, the government initially avers, "SA Snedeker provided the IRS search team [sic] a copy of the Search Warrant and Affidavit" at a briefing session prior to the search. *See* Opp'n at 9. Later, the government states that the executing agents were sufficiently informed of the search parameters because "each search officer was *notified* and *advised* of the contents of the affidavit in support of the search warrant" at a briefing session held before the search. *See id.* at 36. It then states that "[c]opies [of the affidavit] were available at the *search site*," but does not state that it was available at the briefing session. *Id.* It is not clear from the government's papers whether its position is that the agents actually received or read the affidavit (as opposed to merely having been afforded the *opportunity* to read it, because the government takes inconsistent positions in its own brief, and does not provide a single affidavit from any agent (of the many present at the search) attesting to what happened prior to or at the search.

The government tries to bolster its argument by saying that "SA Shneider [relayed] the sum and substance of the affidavit to each member of the search team at a pre-execution meeting." Opp'n at 36. But there is no "Agent Shneider" listed in their operational plan (*see id.* at Ex. 2), which calls into question who actually led the search, and why someone who neither applied for the Warrant nor participated in the search was in some position to be explaining what the search parameters were. Further, there is nothing to suggest that the other agents received the "sum and substance" to which the government refers – whether from Agent Shneider or someone else – much less what the content of that "sum and substance" was, whether that sum and

substance was accurate, overbroad, or properly cabined to those topics for which probable cause was actually established to the satisfaction of the Magistrate Judge.  That is, if the "sum and substance" were relayed, this still would be insufficient because "a briefing session generates substantial room for slippage between the magistrate's authorization and the searching officers' understanding of their authority."  *Zemlyansky*, 945 F. Supp. 2d  at 473 (citing *United States v. Voustianiouk*, 685 F.3d 206, 211 (2d Cir. 2012)).  More importantly, "the historic notice function served by a lawful warrant" would "fall by the wayside if officers could claim good faith each time they disregarded *Groh's* clear command, so long as they had read or been briefed about the affidavit beforehand."  *Id.* at 474 (citing *Groh*, 540 U.S. at 561).

 *Fourth*, suppression of the evidence here serves the purpose of the exclusionary rule:  to deter law enforcement misconduct.  The government has offered no basis to suggest that its agents' conduct was "insufficiently culpable" nor that it does not "implicate deterrence concerns."  *See Zemlyansky*, 945 F. Supp. 2d at 472.  The government does not actually dispute that its agents recognized the Kayla Warrant's shortcomings.  Instead, it argues that the agents – who were told that the Warrant did not specify the crimes at issue, examined the Warrant at the scene, and reacted with an expletive (*see* Drago Aff. ¶ 5) (presumably in surprise at the Warrant's glaring error) – nevertheless may not have known that they did not have the requisite authority to search Kayla.  The suggestion that the agents were not culpable, despite their deliberate search in the face of an invalid warrant, is not supported by the record and is indeed contrary to the uncontested facts and settled law presuming agents know basic constitutional principles.

 The benefits of deterrence in this case are significant.  The government will have no incentive to comply with the Fourth Amendment's requirements of particularity and probable

cause if it is allowed to offer evidence *that it actually knew at the time* it did not have the authority to seize.  *See United States v. Berschchansky*, 788 F.3d 102, 113 (2d Cir. 2015) ("Exclusion is proper here 'to compel respect for constitutional guaranty.'") (citing *Elkins v. United States*, 364 U.S. 206, 217 (1960)); *accord United States v. Ganias,* 755 F.3d 125, 140 (2d Cir. 2014) (reversing denial of motion to suppress evidence on the grounds of good faith, reasoning that "benefits of deterrence ... are great" where the government violated precedent on the handling of computer records).

Even if the Warrant's shortcomings were not raised to the agents at the time, however, any reasonable officer examining the Warrant should have known that it was invalid and that he did not have authority to proceed.  To condone such a violation – whether the flagrant, knowing type that occurred at Kayla, or a more reckless (but still unreasonable) one – would be to countenance unacceptable, unconstitutional behavior, and would effectively eviscerate the Fourth Amendment's protections.  As the court found in *United States v. Ryan*, suppressing evidenced seized pursuant to a facially invalid warrant serves a significant deterrent effect because "[a] warrant lacking particularity will no doubt be brought promptly to the attention of the United States Attorney's Office for correction."  No. 2:07-CR-35, 2009 U.S. Dist. LEXIS 53644, at *14 (D. Vt. May 26, 2009).  The government easily could have cured the Kayla Warrant's defects before its execution, but its agents affirmatively, willfully elected not to do so. To deter similar deliberate misconduct in the future, the Court should suppress the evidence.

In light of the above, the government's heavy reliance on the decision in the child exploitation and pornography production case of *United States v. Rosa*[10] is wholly unavailing. *Rosa* does not stand for the proposition that a presumption of good faith exists that will "likely"

---

[10] 626 F.3d 56, 62 (2d Cir. 2010).

or "usually" save a plainly defective search warrant, nor that agents may ignore plainly obvious, curable defects in search warrants in the normal course. *See generally*, *Rosa*, 626 F.3d 56. Indeed, *Rosa* is an outlier case that has been distinguished "on what has aptly been described as [] 'highly unusual facts'" by multiple subsequent court decisions, *see Zemlyansky*, 945 F. Supp. 2d at 468; *Wey*, 256 F. Supp. 3d at 396, and bears little relevance to the facts of *this* case. Indeed, the *Rosa* court itself pointed to several fact-specific considerations unique to that case that drove the result there, none of which are present here.

The decision in *Rosa* was based largely, if not entirely, on that court's focus on the unusual hurried, highly pressurized and time-constrained context in which those agents were operating, in an effort to stop a very serious offense and prevent the further sexual abuse of children by an armed man. The police first learned from a 911 call of the molestation of two boys "late" one evening. By 2:00 a.m. that same night, they contacted a specialized computer forensics investigator, and within approximately two hours after that, applied for and obtained a warrant, which they then executed within the hour – *i.e.*, at 5:00 a.m. 626 F.3d at 58-59. The search resulted in seizure of thousands of images and hundreds of hours of video footage of child pornography (including of the two boys), a gun and ammunition, and drugs and drug paraphernalia. The defendant was sentenced to 120 years in prison. *Id.* at 59-61. Given the seriousness of the crimes and the imminent danger involved, the exigent time pressures under which those agents were operating, and the severe harm to the public that overturning Rosa's conviction would have caused, that court was understandably willing to extend the benefit of the

doubt to *that* particular investigation.[11]  This case and this investigation bear no resemblance whatsoever to *Rosa*.

*First,* as noted, in *Rosa*, the entire investigation and search process – from warrant application to issuance, and execution – all  occurred (as it had to) between 2:00 a.m. and 5:00 a.m., under intense "time pressures."  *See Rosa*, 626 F.3d at 64-66.  No such remotely similar exigency or time pressure existed in the investigation of Kayla or John that could excuse any of the instant investigation's errors and abuses.  Indeed, by the government's own admissions here, it began investigating Kayla in 2011, and then conducted a several-months-long undercover operation in 2012.  *See, e.g.*, Siegal Aff. Ex., 1, ¶¶ 12-17 (multiple undercover meetings and calls between at least February and August 2012).

The government here then spent the next *full year* assembling its investigation before applying for the Kayla Warrant, at the end of July 2013.  *See id.*; *see also* Opp'n at 3, 5-6.  In short, the government agents in this case had ample time, opportunity, and resources to comply with the Fourth Amendment's requirements in their search process, yet failed woefully to do so.

Thus, this case is far more similar to those of *Zemlyansky* and *Wey*, which distinguished the result in *Rosa* for these very reasons (among others).  *See Wey*, 256 F. Supp. 3d at 396-409, 408 (distinguishing *Rosa* and suppressing evidence based on facially unparticularized warrant where exigency was "entirely absent," in context of a "long-running, well-resourced investigation" where agents "took weeks or months to draft proposed warrants that [among other things] were plainly lacking the basic features called for by the Fourth Amendment's particularity requirement," and where the government had been investigating "for a substantial

---

[11] For the same reason, to the extent the government cites *see also United States v. McDarrah*, 2006 U.S. Dist. Lexis 48269 for the proposition that the courts, when in doubt, should favor the warrant, *McDarrah,* too, was a child sexual exploitation case.

period of time prior to the [s]earches," and discussing *Zemlyansky's* distinguishing of *Rosa*); *Zemlyansky*, 945 F. Supp. 2d at 470 ("The rush of events in *Rosa*, as officers raced in the middle of the night to capture an active sex offender, called for application of the exigency-based principle articulated in *Garrison*[12] and *Groh*. *Rosa* thus recognized that the officer's culpability constituted negligence *under these frenzied circumstances*.") (emphasis added).  By contrast to the circumstances in *Rosa*, the misconduct of the agents in the case at bar is imminently deterrable.  *See Wey*, 256 F. Supp. 3d at 400, 409 (finding that agents' actions, which "cannot credibly be attributed to some reasonable oversight or accident made under time pressure or otherwise driven by exigency," were sufficiently deliberate such that exclusion could meaningfully deter those actions in the future), and *Zemylansky*, 945 F. Supp. 2d at 467 (same).

*Second,* in *Rosa*, the application's affiant led the execution team.  Here, the government's brief simply asserts (without proof) that the case agent (presumably Agent Snedeker, although even that is not clear from the government's memorandum of law) "was physically present and in charge of every step of the investigation and search."  Opp'n at 36.  But then a few sentences later, the government contradicts itself, stating that "SA Shneider" led the pre-execution meeting. *Id*.  The government has not submitted an affidavit from either agent about what he or she did to "lead" the search, what he/she said to his/her team members, when he/she said whatever he/she said to the team, or other critical details.  *Id.*  Nor has it submitted a single affidavit (from any of the 20 other agents who were at the pre-operational meeting) about what "sum and substance" was relayed to them, whether they were provided with Snedeker's Affidavit (and if so, when), whether they read Snedeker's Affidavit (and if so, when), or whether they relied on the Affidavit over the defective search warrant.  Accordingly, there is no basis for any assurance that the

---

[12] *Maryland v. Garriso*n, 480 U.S. 79 (1987).

investigating agents here acted within an reasonable bounds, guided by their own, intimate understanding of the scope of the investigation and any limitations on the grant of search authority.

*Third*, there was no evidence in *Rosa* that those searching agents relied on the defective warrant (as opposed to their knowledge of the investigation, personally obtained over the prior several hours – the entirety of the investigation – which they themselves had conducted).  By sharp contrast, in this case, the only real evidence in the record concerning what the searching agents' understood about the scope of their searching authority is the face of the Kayla Warrant itself, which is indisputably defective.  And as noted above, the government's unsworn assertions in its brief concerning purported extraneous bases for the agents' purported knowledge cannot be considered.  *See Zemlyansky*, 945 F. Supp. 2d at 474, n. 16; *United States v. Washington*, 2012 U.S. Dist. LEXIS 159863, at *24-25.  Finally, nothing in the record before the *Rosa* court suggested that the agents seized any items beyond those for which probable cause had been established.  *See Rosa*, 626 F.3d at 65.  Here, by contrast, the agents seized more than 20 boxes of hard copy materials, including materials wholly unrelated to what was called for by the Kayla Warrant.  *See* Opening Br. at 37 (seized records include utility payment documentation, DMV records for a separate store, and daily activity reports from Kayla's predecessor entity by 20 years).

Accordingly, in light of the clear facial invalidity of the Kayla Warrant detailed in Section I.A. and the lack of any showing of good faith, the fruits of the search should be suppressed.  *See United States v. Calandra*, 414 U.S. 338, 347 (1974) (stating that the primary purpose of the exclusionary rule "is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures.").

If the Court believes that the government has somehow carried its burden of production, John should at least be afforded the opportunity to examine the agents that purportedly exhibited "good faith" in securing and executing this Warrant.  *See, e.g.*, *United States v. Wagner*, 989 F.2d 69, 76 (2d Cir. 1993) (government may raise claims of good faith at a suppression hearing).[13]

## II.

## <u>THE SNEDEKER AFFIDAVIT WAS MATERIALLY MISLEADING</u>

**A.     The Snedeker Affidavit Was, On the Whole, Misleading**

As John's Opening Brief made clear, the Snedeker Affidavit is replete with inaccurate statements and omissions that painted an unfairly nefarious portrait of Kayla.  While the government in its opposition attempts to minimize those inaccuracies and omissions, the government fails to cure these concerns.  Instead, it cherry-picks statements from Snedeker's Affidavit that it touts as "substantially correct," (Opp'n at 20), or extrapolates what occurred in a handful of undercover recordings to the rest of Kayla's operations, and attempts to supplement the misleading statements in Snedeker's Affidavit with new spins on what it thinks Snedeker said and thought more than five years ago.

None of this fixes or excuses the misleading nature of the Snedeker Affidavit.  In the end, the government simply does not refute that several core allegations in Snedeker's Affidavit were and remain highly misleading.  Accordingly, a serious question remains whether Magistrate

---

[13] The cases cited by the government are not to the contrary, because (among other things),those courts held evidentiary hearings on the "good faith" issue.  *See United States v. Lustyik*, 57 F. Supp. 3d 213, 226-227 (S.D.N.Y. 2014) (referencing the agent's testimony on how his team of agents reviewed email evidence); *United States v. Romain*, No. 13 Cr. 724, 2014 U.S. Dist. LEXIS 166500 at *11-14 (S.D.N.Y. Dec. 1, 2014) (citing hearing transcript on issue of good faith); *United States v. Cwibeker*, 12-CR-0632 (JS) (ARL), 2014 U.S. Dist. LEXIS 178752, at *7-10 (E.D.N.Y. Dec. 31, 2014) (referencing agent's testimony at hearing on issue of good faith).

Judge Wall would have found that probable cause existed to support the search application, if those errors and omissions had been avoided.  John submits he would not have.

1.   *Agent Snedeker's Mischaracterizations of Kayla's Business, and Other Omissions and Misstatements, Undermine a Probable Cause Finding*

The Snedeker Affidavit unfairly sought, through rumor and innuendo, to stigmatize check-cashing activity in general (and Kayla in particular) as inherently illegal and/or improper. For instance, Agent Snedeker alleges that "Kayla is known . . . for routinely assisting customers to evade income and payroll taxes"; that "Kayla's customers choose to pay the extraneous two to three percent fee rather than cash the checks through their respective banks at no charge"; and that those customers use Kayla's services to conceal their income and evade CTR filings.  Siegal Aff., Ex. 1 at ¶¶ 8, 9, 12.  Agent Snedeker later also alleges that Kayla "engaged in approximately $97 million in cash transactions in 2011," but "only filed $24 million in CTRs." *Id.* ¶ 30.

The cumulative implication from these assertions is clear:  criminals go to Kayla to hide their income, Kayla helps them for a fee that no legitimate business would pay, and as a result, Kayla failed to report at least some significant portion of $73 million in transactions.  Yet as John demonstrated in his Opening Brief, Agent Snedeker had scant proof that Kayla (or John) knew of, or had any control over, its customers' evasion of their own tax obligations.  In fact, Agent Snedeker knew or should have known that the fee collected for Kayla's services – providing instant liquidity for a variety of customers with few alternate options – was perfectly legal and routine.  And the Agent knew or should have known that he had no basis for insinuating that Kayla was not legally obligated to have reported anywhere near $73 million in transactions.

The government has no real answer for any of these points.  Instead, the government notes that Agent Snedeker did aver other non-nefarious facts about Kayla, such as that Kayla operated as a registered money services business and (interestingly) that Kayla had an AML program in place.  *See* Opp'n at 21 (quoting Snedeker Aff. at ¶¶ 8, 28).   But those statements are entirely irrelevant to any of the points above, and do nothing to wash away the misleading taint left by the Agent's stilted assertions described above, that were gratuitously designed to besmirch Kayla and the check-cashing industry.  Nor do they provide context such that the rest of the statements are rendered less misleading.

Agent Snedeker's misleading assertions that "Kayla's customers choose to pay [an] *extraneous* two to three percent fee" (emphasis added) to use check-cashers rather than banks, and that these customers do so "in order to conceal their income, and [to] evade having CTRs filed on the transactions," are grossly unfair because they wrongly suggest that Kayla's fees were charged because it knew that its customers were engaging in unlawful activity.  *See* Opening Br. at 44.  The government essentially admits the unfairness of this assertion, arguing now that Agent Snedeker's discussions about the "extraneous fee" are based on the IRS's experience with corporate customers using check-cashers *in general*."  Opp'n at 21 (emphasis added).  Even were that assertion anecdotally true with respect to some *other* check cashing business or businesses, nothing presented in Agent Snedeker's Affidavit shows that he had facts in his possession at that time that such an assertion was true with respect to Kayla.

Nor does anything the government cites now support the notion that it would be appropriate to extrapolate evidence of wrongdoing at one business to that of an independently run and operated *other business.*  Nevertheless, the text of the Snedeker Affidavit asserts precisely the wrong and baseless conclusion – that because other check cashers allegedly disobey

the law, the court should assume Kayla does as well.  Siegal Aff. Ex. 1, ¶ 9 ("*Kayla's customers choose to pay the extraneous two to three percent fee.*") (emphasis added).  Compounding the problem, nowhere in the Snedeker Affidavit does the agent acknowledge that other check cashers charge the same fee, or that the fee is not against the law, and is routinely charged for lawful services.[14]  The government cannot re-fashion Agent Snedeker's words five years after the fact to negate the misleading, stigmatizing theme of the Affidavit.

By contrast, in his Opening Brief, John provides necessary context that is missing from Snedeker's Affidavit:  the fee charged by Kayla (and every other check-casher) is not "extraneous," but rather, a perfectly legal charge for providing valuable, legitimate services to its customers.  *See* Opening Br. at 4-5.  These valuable services include providing liquidity to its customers on the same day, which was particularly important for Kayla's corporate customers.  For instance, contractors sometimes receive large checks for their services and need funds immediately to pay their workers.  The government suggests that in "*[t]he IRS's experience . . .* business customers[] [have] no need to use Kayla" because "they maintained regular checking accounts at commercial banks."  Opp'n at 4 (emphasis added).  Whether some customers might maintain regular checking accounts is of no moment; even if some do (and many, undoubtedly, do not), those funds may very well not be as immediately available as they are from a check-casher like Kayla.  Moreover, the IRS's "experience" that customers maintain bank accounts is irrelevant in the face of established bank protocol that requires banks to hold funds in excess of one day and sometimes up to 10 business days before making cash funds available.  *See* Theresa

---

[14] The government also conclusorily states that, because in the IRS's "experience," check cashers provide an opportunity for criminal conduct, "[f]or this reason, it is all the more important that check-cashers be [scrupulous] in dealing with their customers in order to avoid structuring deposits and accurately reporting all transactions."  Opp'n at 22.  The government cites no authority for its invented assertion that check-cashers must adhere to some higher standards or "scruples" than other financial services businesses.  The law and applicable regulations set the standard of care for check cashers, not some malleable notion of what those standards ought to be, arbitrarily asserted by an individual prosecutor or law enforcement agent.

Kim, *The Time It Takes for a Check to Clear at Top Banks*, MY BANK TRACKER (Dec. 18, 2018)

https://www.mybanktracker.com/news/long-takes-check-clear-top-10-banks (stating that the time

for a check to clear varies on the average balance maintained by the customer and that banks

may hold a check for up to 10 business days).

Thus, as John explained in his Opening Brief, his customers use check-cashers to obtain

funds instantly because they cannot do so using their banks.  This information is not "self-

serving, unnecessary, and immaterial" as the government contends (Opp'n 22), but rather, it is

necessary to explain why customers pay the fee – context that was left out of Snedeker's

Affidavit, because it would not have supported his thesis.

The government next contends that "what sets Kayla apart" from other check-cashers was

Kayla's "reputation of aiding corporate customers in structuring financial transactions . . . ."

Opp'n at 22.  It adds that Agent Snedeker supported his view of Kayla's "reported reputation" by

way of reference to "at least a half-dozen" corporate customers who were under investigation for

tax evasion schemes.  *Id.*  The government notes that these Kayla's *customers* had "motive" to

pay the check-cashing fee and "willingness to accept Kayla employees['] assistance."  *Id.*  The

government's analysis consists of one significant speculative leap:  certain individuals were

under investigation for tax-related offenses, these individuals cashed checks at Kayla, and

therefore, Kayla must have helped these individuals to structure their transactions.  This overly

simplistic, guilt-by-association logic is belied by critical facts that Agent Snedeker omitted from

his Affidavit.

As John argues in his Opening Brief, Agent Snedeker omitted information that was in the

Agent's possession at that time, but that tended to show that Kayla did *not* in fact try to help at

least four of these "half-dozen" customers evade taxes.[15]  As John explained, Kayla filed CTRs covering millions of dollars' worth of transactions for customers referenced in the Snedeker Affidavit.  *See* Opening Br. at 49 (summarizing CTR filings for James G. (38 CTRs covering about $1.8 million); for Kevin C. (36 CTRs covering over $600,000); for Thomas B. (8 CTRs covering $102,000); Mark H. (five CTRs covering about $120,000)).  Moreover, Agent Snedeker misstated data on the filings of another customer, J.G.  *See* Opening Br. at 48-49 (Kayla filed 60 CTRs covering more than $1.14 million in transactions, not "less than $711,000" as Agent Snedeker claimed).  At the time that Agent Snedeker submitted his Affidavit, he had access to the list of CTRs that Kayla filed on each customer, including the "half-dozen" customers referenced in his Affidavit.  At the very least, Agent Snedeker was reckless in not informing Magistrate Judge Wall that Kayla filed numerous CTRs on the five customers listed above whom Kayla was supposedly assisting to structure, because the filing of CTRs clearly undermines the notion that Kayla was complicit in helping these individuals evade detection.  That is, the act of filing CTRs directs regulatory attention *at* such customers, not *away* from them. [16]  This would have been a critically important fact for Magistrate Judge Wall to know.

    Agent Snedeker also was reckless in misreporting the amount of check-cashing activity covered.  John's argument here about these omissions is not "factually unsupportable and

---

[15] John cannot perform an analysis of how many CTRs were filed for "W1" and "W2," since their identities are unknown at this time.

[16] As John explained in his Opening Brief, Kayla also voluntarily filed suspicious activity reports ("SARs") when it suspected that a customer was engaged in irregular or suspicious monetary transaction activity.  *See* Opening Br. at 9.  The government suggests that Kayla is *required* to file SARs as a licensed money transmitter.  But that is incorrect.  Kayla is actually a money services business – not a money transmitter.  Thus, its filing of SARs was completely voluntary.  *See* MSBs SUBJECT TO SAR REQUIREMENT, FCEN https://www.fincen.gov/msbs-subject-sar-requirement ("[t]he SAR requirement does not apply to the following types of [money services businesses]: Check casher...").

misplaced," but rather, well founded based on information that Agent Snedeker had access to at the time he swore to his Affidavit.

The government has no answer for the above facts.  While *conceding* Agent Snedeker's statistical analysis was materially wrong, it attempts to distract the Court from those errors by asserting that "[a]ny errors or inaccuracy as to the number of CTRs filed" for a given customer "[does] not negate the fact that Kayla advised customers to split deposits . . . to avoid the CTR reporting requirement."  Opp'n at 23.  This utterly misses the point.  Agent Snedeker's misleading statistics sought to paint a picture of a systemic, widespread CTR avoidance as a supplement to the handful of undercover recordings the Agent had for one sting operation, when in fact, he knew (or should have known) that statistical support did not exist or could not legitimately be established.  In fact, the information Agent Snedeker failed to include *shows that CTRs were filed* for more than half of these customers. Accordingly, there is every reason to believe Magistrate Judge Wall was actually misled concerning the purportedly widespread nature of the alleged CTR avoidance.

John also argued that Agent Snedeker presented statistics in a misleading way to suggest that Kayla routinely violated the law, when other omitted statistics rebutted such a sweeping conclusion (and therefore, such a broad Warrant).  To illustrate this point, John referred to Agent Snedeker's statement that Kayla "engaged in approximately $97 million in cash transactions in 2011," but "only filed $24 million in CTRs," which meant that more than $73 million in transactions that year, or more than $200,000 per day, were in denominations of $10,000 or less."  *See* Opening Br. at 44.  As John explained, when this statement is considered along with other false and misleading statements, the misleading implication is that Kayla must have intentionally failed to file CTRs on some substantial portion of the $73 million.  *See id.* at 44.

39

The government also suggests that John's math is wrong.  It is not.  At the time of the investigation into Kayla, Kayla maintained six (6) storefronts.  The government alleges that Kayla did not report around $200,000 in transactions per day, which means, on average, that each storefront engaged in about $33,333 in transactions daily.  If each storefront averaged a minimum of four customers, then on average, each transaction would have been $8,333 – *i.e.*, below the CTR filing requirement *every time*.  In reality, each storefront averaged far in excess of four customers, which means that the average transaction size was well below the $10,000 mark, and thus, the average transaction simply would not have required *any* CTR filing.

Taken together, Agent Snedeker's multiple misleading statements and omissions recklessly (at least) painted a false picture that Kayla was engaged in a broad-sweeping enterprise to assist bad actors avoid reporting requirements.  The government already effectively conceded that the above statements were material to Magistrate Judge Wall's probable cause analysis (*see* Opp'n at 22 ("What was material to [Magistrate Judge Wall] [was] how Kayla dealt with transactions over $10,000 in cash.")), and there can be little doubt they were.  Accordingly, at the least, the Court should hold a *Franks* hearing to determine whether the Affidavit can justify the issuance of the Kayla Warrant.  *See United States v. Lahey*, 967 F. Supp. 2d 698, 723 (S.D.N.Y. 2013) (granting motion to suppress after considering "cumulative effect of all the omissions") (internal citations omitted).

### 2.   *Agent Snedeker Improperly Withheld Relevant Exculpatory Information*

As John explained in his Opening Brief, and as the government's opposition papers confirm, the core evidence the IRS proffered to Magistrate Judge Wall to support the Kayla Warrant was the undercover recordings made by the cooperating witness.  *See* Opening Br. at 47; *see also, e.g.*, Opp'n at 27, n.14, 40.  Accordingly, this Court should take particular note of those portions of the undercover recording efforts that Agent Snedeker *chose to omit* from the 2013

Affidavit.  The omitted recordings included several moments that, given what he knew at the time, Agent Snedeker should have understood to be exculpatory (or at least potentially exculpatory).  Agent Snedeker's decision to omit those passages from his Affidavit necessarily prevented Magistrate Judge Wall from making the decision for himself whether probable cause actually existed, given the state of the evidence at the time.  Notwithstanding the government's self-serving and *post hoc* interpretation of those omitted passages as non-exculpatory, the Magistrate Judge might very well have viewed them otherwise.  Precluding the Magistrate Judge from considering them was a tactic that robbed the Court of its ability to fulfill its constitutionally mandated role of acting as an independent check against the authority of law enforcement.

The omitted recordings would have tended to show that the improper actions were cabined to two salespeople, and not in fact condoned by "the boss" – *i.e.*, John – or otherwise endemic to Kayla's business.

- On August 30, 2012, Mr. H told the CW that "I can do it for you every once in a while, but sometimes when my boss is here, you know . . ."  Siegal Aff. ¶ 9.

- On September 12, 2012, Mr. C. told the CW that he could not structure his transactions when "the boss" was around, because "it gets tough ... he wants things signed [and] he wants things done the right way.  I don't do things the right way . . ." *Id.* ¶ 10.

- On September 25, 2012, Mr. C told the CW that he could help him structure a transaction, because "when my boss is not in, *not a problem*." *Id.* ¶ 11.

Because these statements tended to exculpate "the boss," they should have been included for purposes of Magistrate Wall's probable cause analysis.

The government responds that Agent Snedeker was not "required" to include relevant portions of the exchanges, because in *the government's view*, those portions are not exculpatory. *See* Opp'n at 23-25.  But it is not the government's prerogative to interpret unilaterally every

recorded interaction in the way most favorable to it, and, having done so, pick and choose what to disclose (and not to disclose) to the Magistrate Judge.  Rather, the government's job is to present a fair, objective set of facts to the Magistrate Judge – including facts that may tend to materially undermine its legal theory – and permit the Magistrate Judge to decide whether probable cause to search exists.

By interpreting every recorded interaction as consistent with its case theory, even when those recordings were fairly susceptible to multiple interpretations (including exculpatory ones), Agent Snedeker denied Magistrate Judge Wall the opportunity to adjudge the meaning himself.

**B.** **The Court Should Hold a *Franks* Hearing**

At the very least, the choices Agent Snedeker made concerning which recordings to include and which to exclude should be subject to an evidentiary hearing.  When stripped of the misleading allegations and the material omissions described above, the Snedeker Affidavit fails to establish "overwhelming evidence that Kayla was involved in systemic fraud" such that the government had probable cause to seize nearly every document at Kayla.  Opp'n at 20.  The government cannot defeat this argument simply by providing its own self-serving view of why the very statements that John challenges established probable cause.  *See United States v. Awadallah*, 349 F.3d 42, 64-65 (2d Cir. 2003) ("It is material when 'the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding.'") (internal citations omitted).

Nor can the government rest on the idea that Agent Snedeker's sworn statements were "substantially correct" and that the government cannot be held responsible for the inferences that Magistrate Judge Wall made from these "substantially correct" facts.  In determining whether probable cause exists, both omitted information and information included in the affidavit must be examined "as a whole."  *See United States v. Krajas*, 11 CR 202S, 2012 U.S. Dist. LEXIS

42

151516, *6 (W.D.N.Y. 2012).  Indeed, if an agent withholds a fact that "is the kind of thing the judge would wish to know [in making a probable cause determination], then there is a reasonable inference that the [agent] acted with reckless disregard for the truth."  *United States v. Simmons*, 771 F. Supp. 2d 908, 917, 921 (N.D. Ill. 2011) (stating that even where there was no direct evidence of the officer's intent to mislead the issuing judge, that the officer had "obvious reasons" for omitting the "critical" facts:  a "potentially adverse impact on the issuing judge's probable cause determination.").

Based on the above, the Court can conclude that Agent Snedeker's statements were at the very least reckless.  *See Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991) (recklessness may be inferred where the omitted information was "clearly critical" to the probable cause determination.); *United States v. Campino*, 890 F.2d 588, 592 (2d Cir. 1989) (intentional or reckless omissions of material information may serve as the basis for a *Franks* challenge).  The government may not craft a false narrative through omission, particularly where the information weighs against the finding of probable cause.  *See. Lahey*, 967 F. Supp. 2d at 719  (granting motion to suppress where omitted information, if included, would have "severed the implied link" between a wrongdoer and an uninvolved party).

On this point, John has identified specific portions of the Snedeker Affidavit and explained why they are false and misleading.  *See United States v. Butt*, No. 18-CR-00087 (NSR), 2018 U.S. Dist. LEXIS 169739, at *10-11 (S.D.N.Y. Oct. 1, 2018) (granting *Franks* hearing where defendant provided an "offer of proof" of the specific portions of the affidavit claimed to be misleading and an explanation of why).  Given the nature and amount of erroneous information in the Snedeker Affidavit, the Court should hold a *Franks* hearing to

determine whether sufficient probable cause existed to justify the issuance of the Kayla Warrant. *See id.*

## III.

### THE GOVERNMENT IMPROPERLY RETAINED AND CONTINUED TO ACCESS MATERIALS BEYOND THE SCOPE OF THE WARRANT

In his Opening Brief, John argued persuasively that the government violated his constitutional rights in yet another respect, in particular with regard to its seizure and retention – for *five years* (and counting) – of the *entirety* of his electronic data, in violation of the Fourth Amendment.  In particular, John made the point that, while the search authority granted to the government in 2013 permitted it to seize – temporarily – entire computers or hard drives and bring those items back to its labs for analysis for purposes of identifying items responsive to the Warrant, that grant of authority did not include the right to retain *all of his data* – both responsive and unresponsive to the terms of the Warrant – *indefinitely*.  *See* Opening Br. at 51-54.  The government inexplicably ignored this argument, except to assert that it "returned" to John a copy of some of his data.  This misses the point entirely.  The government *was not permitted to retain for itself* all his data (including unresponsive data), but rather, was required to figure out, within a reasonable time, what among that data was responsive to the Warrant. Accordingly, because the government failed to substantively address John's point, and provides neither an explanation for what it has done with his computer data for the past five years, nor any justification for such treatment, the Court should deem this point conceded, and should grant John's motion to suppress all the fruits of the electronic evidence review.[17]

---

[17] Since the government failed entirely to address this argument, John respectfully refers the Court to pages 51 – 54 of his Opening Brief, for the principles concerning proper Fourth Amendment protocol for seizure, review, and culling of electronic data.  *See* discussion of, *inter alia*, *Ganias I, Ganias II, Metter,* and *Wey.*

Indeed, in addition to providing no explanation for why it held onto John's entire set of electronic data, the government *admits* that it "continued to review the seized records" not only from 2013 to 2015, but further, as late as *2018*.  Opp'n at 12.   The government offers no explanation of what, if anything, it ever did to identify responsive material or cull unresponsive material within the electronic data, or what, if anything, it did to prevent agents from returning to the well of undifferentiated electronic data, years later, to review materials not called for by the Warrant.   This continued review is precisely the type of conduct that merits suppression pursuant to the Fourth Amendment and applicable case law, including decisions notably ignored by the government's opposition papers, such as the two *Ganias* decisions and the *Metter* decision.

The only assertion that the government appears to raise on this point is its claim that it "returned various items at various times," though it fails to submit an affidavit in support of this assertion regarding what was returned, when it was returned, or to whom.[18]  Opp'n at 12.  In reality, the government has not returned any *original* files to John or his attorneys.  All that the government ever did was provide back to John *copies* of customer data, *copies* of employee folders, *copies* of Kayla's database, and *copies* of some CTRs, the originals of all of which, it appears, are still being retained (and potentially being re-reviewed) to this day.  Indeed, the government has resisted requests for the return of other materials.  *See* Affirmation of Stuart Kaplan, Esq. at ¶¶ 3 - 6, Exs. 1-3.  More problematic, however, is the government's continued

---

[18] As noted, *see supra*, n. 1, in response to John's motion, the government returned John's cell phone to him on or about January 9, 2019.

retention of John's computers, which as noted above, it admitted to "continu[ing] to review" into 2018.[19]

In *United States v. Metter*, the court found that the government's 15-month delay in reviewing electronic data seized during a search required suppression of all evidence seized during that search of the electronic devices.  860 F. Supp. 2d 205, 215 (E.D.N.Y. 2012).  This District explained that, had it allowed the evidence into the record, "the Fourth Amendment would lose all force and meaning in the digital era and citizens will have no recourse as to the unlawful seizure of information that falls outside the scope of a search warrant and its subsequent dissemination."  *Id.* at 216.

Here, in light of the government's recent admission confirming not only that it continued to retain, *but also continued to search*, those electronic files effectively in perpetuity, the violation is more egregious.  Notably, the government has not addressed *Metter* at all in its brief. Nor has it addressed *Wey,* 256 F. Supp. 3d at 406 (stating that the government should not be "permitted to return to the proverbial well months or years after the relevant Warrant has expired to make another sweep for relevant evidence..."); or *Ganias I*, 755 F.3d at 127-28 (holding that it is unconstitutional for the government to seize and indefinitely retain every file on a defendant's computer for use in future criminal investigations); or *United States v. Ganias*, 824 F.3d 199, 232 (2d Cir. 2016) ("*Ganias II*") (Chin, J. dissenting) (stating that the government's continued retention of electronic materials "becomes the equivalent of an unlawful general warrant.")

Perhaps the government chose not to respond to this law because it has no response:  the government's conduct in searching the electronic evidence here is exactly the type of conduct

---

[19] Notwithstanding Agent Snedeker's sworn statement, when applying in 2013 for the Kayla Warrant, that electronic materials and equipment would be returned "within a reasonable time" if they were deemed either non-responsive or unnecessary to retain for preservation purposes, *see* Siegal Aff., Ex. 1 at ¶ 43, as far as John and his counsel understand, the government has retained the computer images into the present day.

frowned upon by *Metter*, *Ganias I, Ganias II*, and *Wey* – all of which compel suppression in the instant case.

Indeed, if the affidavit submitted by Special Agent Heather McCue in support of the now-disavowed Phone Warrant is any indication, there is every reason to believe the agents may have unilaterally expanded the scope of their search authority from the limited scope covered by the Snedeker Affidavit that sought the August 2013 Kayla Warrant. *Compare* Siegal Aff. Ex. 4 (2018 McCue Affidavit, seeking authority to search John's cell phone for numerous crimes including conspiracy, theft or bribery concerning programs receiving federal funds, wire fraud, mail fraud, money laundering, and monetary transactions with proceeds of unlawful activity) *with* Siegal Aff. Ex. 1 (2013 Snedeker Affidavit, purporting to attest to probable cause to search the Kayla premises and its computers for violations of the BSA only).

In light of the government's failure to respond to these arguments, the Court should suppress all electronic documents seized from Kayla, and all fruits of the searches of those electronics. *See Ganias I*, 755 F.3d at 138 ("Without some independent basis for its retention of those documents in the interim, the Government clearly violated Ganias's Fourth Amendment rights by retaining the files for a prolonged period of time and then using them in a future criminal investigation.")

## IV.

## CERTAIN CHARGES SHOULD BE PARTICULARIZED OR DISMISSED

### A.    Count One Is Duplicitous

Count One is duplicitous because it combines two or more distinct crimes into one Count and, as a result, prejudices John's ability to obtain a fair trial.  As John made clear in his Opening Brief, Count One charges John with failing to file one or more CTRs as part of a pattern of illegal activity during the period between January 1, 2010 and October 31, 2013.  But Count One

fails to specify the transactions at issue for which John failed to file (or caused to fail to be filed). It is not clear from the Indictment how many CTRs are alleged not to have been filed (or on whose behalf they should have been filed, the dates of the transactions, or the amounts at issue), though the fact that the government alleged it as a "pattern" necessarily means that more than one CTR is at issue.  Therefore, at trial, the jury will be required to determine whether the government has proven John's involvement with respect to multiple failures to file a CTR.

As charged, it would be impossible to know whether a guilty verdict on Count One had actually resulted from a unanimous agreement among 12 jurors to a particular violation of law. By way of illustration, if the Government sought to prove under Count One (as it appears poised to do) that more than one potentially failed CTR was intentionally caused by John, two different jurors could vote to convict John on this Count while having in mind two different transactions. For example, Juror #1 might determine that John caused Kayla to fail to file a CTR for Transaction "A," while Juror #2 might conclude that John was *not* responsible for Transaction A, but instead, that he caused Kayla to fail to file a CTR for Transaction "B."  In this example, both jurors might vote "guilty" on Count One, while actually (though unconsciously) being in complete disagreement as to which transaction John caused to go unreported.  The practical effect of the duplicitous pleading of Count One is that both jurors might vote "guilty," but they would not be unanimous as to any particular transaction.  This prejudices John because it violates his constitutional right to be found guilty beyond a reasonable doubt on the unanimous vote of the jury.

The government argues that Count One is not duplicitous because Congress contemplated charging the failure to file one or more CTRs as a single course of conduct.  The government cites no authority for its argument regarding what Congress "contemplated," but in any event,

Congress did not contemplate it, because quite simply, Congress would not endorse a duplicitous pleading practice (and if it did, it would be the Court's obligation to declare such a law unconstitutional).  In any event, whether or not a violation of Section 5313(a) can be charged as a "course of conduct" does not mean that the government can avoid specifying which transactions constitute that course of conduct.  Here, the government's desire to proceed with a bare-bones, unparticularized indictment count, and maintain its flexibility as to which transactions it will chose to prove up at trial, directly runs afoul of John's right to know the charges against him, and his right to have his fate decided by a unanimous set of jurors all voting on the same charge.

The government does not actually address the duplicitous pleading at issue in Count One, nor does it try to refute the example that John provided in his Opening Brief.  Rather, it conflates the charges in Count One (failing to file one or more CTRs) with those of Count Three (structuring).

As such, the government's argument misses the point.  Count Three charges structuring – an entirely different offense – which, by definition, involves multiple transactions, that is, the act of creating multiple transactions out of what would otherwise be one larger transaction that would trigger a reporting requirement.[20]  Accordingly, the government accurately (but irrelevantly) notes, the "structuring itself" (and not any individual transaction) is the correct unit of the crime.  *See* Opp'n at 42.  So while a charge of structuring can be pled in one count (as

---

[20] Even so, each instance of structuring should be broken into its own count.  The government may not group multiple instances of structuring into one count unless each instance relates to the same "unit" of structuring (that is, the transaction that was broken up to avoid triggering CTR reporting requirements) and same customer.  For instance, the government properly could allege that a defendant structured Customer A's transactions over the course of three consecutive days, but could not argue that the defendant structured Customer A's and Customer B's transactions in the same count, as the latter would result in a duplicitous indictment.  To deal with the potential for confusion with respect to Count Three, John has sought a bill of particulars, which should at a minimum, set forth which sets of transactions constitute one or more events of structuring.  *See discussion, infra* at Section V.

opposed to individual counts that track each individual deposit), that is of no moment with respect to John's motion pertaining to Count *One*, the charge of failing to file CTRs.[21]

Because Count One is duplicitous, the Court should either dismiss Count One, or require the government to specify in a bill of particulars the dates of the transactions at issue, the amounts of the transactions, and the customers on whose behalf a CTR should have been filed. *See United States v. Kearney*, 451 F. Supp. 33, 38 (S.D.N.Y. 1978) (dismissing duplicitous indictment because it failed to set forth the elements necessary to constitute the offense without any uncertainty or ambiguity).

**B.      Count Two Should Be Dismissed Because the Second Circuit Has Never Imposed Liability on an Individual for a Violation of 31 U.S.C. § 5318(h)(2)**

The government does not contest that there is no Second Circuit case holding an individual criminally liable for failing to implement and maintain an effective AML program in violation of 31 U.S.C. § 5318(h)(2), by way of the aiding and abetting statute or otherwise.  It suggests, rather, that *United States v. Heyman*, 794 F.2d 788 (2d Cir. 1986), a case where an individual caused a bank to fail to file CTRs, supports its decision to maintain the uniquely entity-related offense of not maintaining an AML program against an individual.  The Government is wrong, and Count Two should be dismissed.

In *Heyman*, the defendant was held liable under 31 U.S.C. § 5313, which requires a financial institution to file CTRs, because his role in structuring transactions caused the bank to fail to file CTRs.  *Id.* at 792.  Unlike Section 5313, which requires a financial institution to commit a discrete act (*i.e.*, to file a CTR) and therefore can be frustrated by a bad actor's efforts to avoid the filing requirement, Section 5318(h)(2) requires a business to implement and

---

[21] For this reason, the government's citation of *United States v. Kushner*, 256 F. Supp. 2d 109 (D. Mass. 2003) is inapposite, because that case deals with the pleading of structuring violations, not failures to file CTRs.

maintain a program – a wholly different offense that, by definition, does not relate to a discrete act, but rather, concerns an enterprise-wide implementation of a program covering a range of activities over time.  The two statutes are far from identical – the latter being uniquely a creature of institutions.  We have seen no case in this Circuit extending *Heyman's* logic to allow an individual to be charged for a financial intuition's failure to maintain an AML program, and the government fails to point to such a case.   The Court, therefore, should decline the government's invitation to extend *Heyman* to cover Count Two.

## C.    The Government Fails to Justify its Pre-Indictment Delay

The government claims that it did not commit pre-indictment delay here, despite the fact that it did not obtain the Indictment until five years after it searched John's business, and despite that the indictment appears to be entirely premised on information known to the Government, in mid-2013.  The government argues that (1) its delay was not tactical or motivated by prejudice, but rather, was the product of ongoing investigations and plea discussions; and (2) any prejudice is speculative.[22]

The government argues that between the August 6, 2013 and August 1, 2018 period, it opened an investigation into Kayla's customers, staff, and management; took multiple investigative steps, subpoenaed and investigated multiple Kayla customers and interviewed Kayla staff and customers; and then obtained the approval of the Department of Justice before drafting its 10-page Indictment.  *See* Opp'n at 40.  But the government has not submitted any affidavit in support of these claims.  The government offers nothing but unattested conclusory assertions in its memorandum of law concerning when, supposedly, its investigation began and

---

[22] The government also argues that John allegedly provided certain of his employees with access to legal counsel in 2018 and that John supposedly knew in August 2013 what the "essence of the misconduct" was. Opp'n at 40.  None of this explains the five-year delay between August 2013 and August 2018.

ended; when the customers were allegedly subpoenaed; when Kayla's staff and customers were allegedly interviewed; and when it applied for the Department of Justice's approval.  As a matter of law, unsupported factual assertions in counsel's legal memoranda would be insufficient, even if creditable.  But as explained below, the Court has before it bases to question the accuracy of the government's offered reasons.

As the Court knows, the government granted itself the authority to introduce the contents of a proffer session into the record to explain the government's position in the supposed plea negotiations.  *See* Opp'n at 12.  Since the propriety of the government's actions has been the subject of separate briefing, we respectfully direct Your Honor to John's letters of January 11 and January 25 on this issue, rather than restate the entire set of arguments here.  For purposes of this motion, however, there are two critical facts that merit reiterating.  *First*, contrary to government counsel's memorandum assertions, there were no active negotiations during this five year period, as John's prior counsel have attested (*see* January 25, 2019 Letter, Exs. 1-4).  In addition, there were no discussions at all during long chunks of time within those five years. Second, even if there were plea negotiations, under no circumstances would the Court need to be apprised of the *contents* of an immunity agreement-protected proffer as "rebuttal" to John's assertion of prejudicial, unjustified government delay.  Rather, a short affidavit with facts regarding the existence of the purported plea discussions would have sufficed.

The government also argues that any prejudice to John is speculative.  As a practical matter, the government's undue delay has put the ability of at least one witness to testify in grave doubt.  Accordingly, should the Court deem this motion to be insufficiently ripe to merit dismissal, John reserves his right to renew this motion should this witness be unable to testify at

trial or should other prejudice become apparent.  *See United States v. Gross*, 165 F. Supp. 2d 372 (E.D.N.Y. 2001) (finding actual prejudice where delay led to the loss of witness testimony).[23]

**V.**

**THE GOVERNMENT SHOULD BE REQUIRED TO PROVIDE
A BILL OF PARTICULARS**

The government should be required to provide a bill of particulars in this case because the government (i) has not provided sufficient information in the Indictment to put John on notice of the charges against him; and (ii) has not provided discovery that would otherwise supply the necessary particulars.

The Indictment lacks sufficient detail in several ways:  (1) Count One fails to inform John when, in a more than three-year period, he willfully failed to file one or more CTRs; (2) Count Three fails to inform John when and under what circumstances he intentionally structured one or more transactions to avoid filing CTRs; and (3) Counts Four through Eight fail to inform John when, and with respect to which employees, he intentionally failed to collect and pay FICA taxes and in what amounts.  Count Two's allegations that John failed to maintain an effective AML program appear to be based on the allegations in Counts One and Three, such that the lack of detail in those two Counts also renders Count Two improperly lacking in particulars.  Despite repeatedly acknowledging the need to provide particulars (*see* Siegal Aff. ¶¶ 13 - 18, Exs. 7 - 10), the government changed its position, arguing that (1) the government has provided the requisite particulars through other sources, like its Opposition Brief and in discovery produced

---

[23] The government argues that John is not prejudiced because, among other things "the passage of time has [not] changed" certain of its evidence, including its undercover sting evidence and Kayla's books and records.  *See* Opp'n at 41.  To the contrary, the passage of time *has* changed it – *i.e.*, time's passage has rendered, much, if not all, of that evidence irrelevant, as time-barred by the statute of limitations.

pursuant to Fed. R. Crim. P. 16; and (2) bills of particulars should not be used to obtain all the government's evidence.  Both of their arguments are unavailing.

As John made clear in his Opening Brief, the Indictment fails to provide necessary specificity with respect to key facts that John needs to know to prepare his defense, particularly in light of the hundreds of thousands of transactions that occurred at Kayla during the relevant time period.  For example, Count One charges John with causing and attempting to cause Kayla "to fail to file one or more" CTRs as "part of a pattern of illegal activity involving more than $100,000 in a 12-month period."  The government alleges that the offense(s) occurred at some point during the January 1, 2010 through October 31, 2013 period.  Similarly, Count Three charges John with structuring or assisting in structuring "one or more financial transactions" between August 1, 2010 and October 1, 2013.  Count Two, which concerns John's alleged failure to maintain an effective AML program, appears to be based on the alleged misconduct in Counts One and Three.  Without particulars, the defense is left to mine through hundreds of thousands of potentially relevant transactions to identify the "one or more" that the government will, at some point, purport were criminal.  This would be an exercise in futility in any event, because even if the defense could identify transactions on consecutive days that if aggregated, would exceed $10,000 for a particular customer, that would not necessarily indicate that the customer structured to avoid having a CTR filed.

Counts Four through Eight also omit any specifics.  They charge John with failing to collect and remit FICA taxes to the IRS at some point during April 1, 2012 and July 31, 2013, but do not provide details regarding which employees (out of potentially dozens) should have had taxes withheld but did not; when the taxes allegedly were not collected; nor the amounts of the taxes that allegedly were not collected.

The government failed to address any of the authority cited in the Opening Brief where courts granted Bills of Particulars for indictments similarly devoid of information. *See, e.g.*, *United States v. O'Connor*, 237 F.2d 466, 476 n. 10 (2d Cir. 1956) (noting that bills of particulars are often granted in criminal tax cases); *United States v. Hawit*, No. 15-cr-252 (KPC), 2017 U.S. Dist. LEXIS 23391, at *30 (E.D.N.Y. Feb. 17, 2017) (requiring government to provide a bill of particulars where a series of transactions were at issue but no further details were provided); *United States v. Luna*, No. 3:05-cr58 (SRU), 2006 U.S. Dist. LEXIS 28947, at *4 (D. Conn. May 9, 2006) (granting bill of particulars for the list of transactions at issue, including the names of parties involved, the approximate date and location of the transactions, and the nature and amount of drugs at issue).

Rather, the government suggests that it provided the information in other formats, including its Opposition Brief, in discovery, and in informal talks with the defense. The government's opposition does little more than summarize Agent Snedeker's Affidavit, the contents of which cannot possibly sustain any Bank Secrecy Act charges against John because all the events described in the Affidavit occurred before July 29, 2013, and therefore are all barred by the statute of limitations. While it mentions one employee for whom FICA withholding is alleged to not have been collected ("Mr. K."), it is not clear from the opposition whether the government seeks to pursue charges only with regard to this one particular employee, or for others, and if so, for what periods. *See* Opp'n at 10-11. Moreover, to the extent the government purports to rely on the proffer statements it improperly introduced into the record, the Proffer Agreement itself bars the government from using such statements in its case-in-chief, so it may not prosecute John on the basis of his statements unless it has independent evidence of those purported admissions (which it has not provided in discovery or otherwise).

Nor does the discovery provided thus far supplement the Indictment's allegations in any meaningful way. The majority of the discovery produced thus far has consisted of undercover footage from 2012, which Agent Snedeker referenced in his Affidavit, and cannot be the basis of the Bank Secrecy Act claims because the statute of limitations has lapsed.[24] Neither of the search warrant affidavits provide additional relevant information. The Snedeker Affidavit concerns events before July 29, 2013, which is all legally stale; and the McCue Affidavit, which sought permission to search John's cell phone for violations of crimes entirely unrelated to the ones currently at issue, did not provide any particulars for the crimes charged in the Indictment. The memorandum of interview from the proffer session cannot serve as the basis for the government's crimes, because without additional evidence of those crimes (which has not been provided), the government cannot rely on the proffer session in its case-in-chief.

With respect to the tax charges (Counts Four through Eight), the government has produced Hogwart's tax returns, but those do not provide any information at all pertaining to charges of failure to withhold and pay over FICA.

The rest of the discovery provided thus far is similarly unhelpful for clarifying the ambiguities in the Indictment.[25] Even if the government discussed with the defense the "scope

---

[24] There has been no footage provided for acts that would fall within the statute of limitations.

[25] The government has produced the following additional discovery, none of which provide the requisite particulars: (1) daily logs of CTR filings from early 2013, which John provided to the government in response to subpoenas (cannot serve as the basis for the charges because had any violations occurred, they would be barred by the statute of limitations); (2) about 800 pages of one salesman's commission sheets (which do not show any wrongdoing in any event, but which cannot form the basis for charges because the transactions at issue occurred before August 2013); (3) nearly 2,750 pages of customer background files, which consist of photocopied drivers' licenses, company formation documents, and similar documents; (4) IRS audits showing compliance with BSA requirements (one of which was attached to John's Opening Brief); and (5) photocopies of certain documents that the defense requested from the August 2013 search of Kayla, such as CTRs, customer lists, and John's corporate book.

and breadth" of its evidence (which it did not with John's current counsel), the scope and breadth are not relevant – the particulars are.

The government also suggests that John is not entitled to discover the requested particulars, because the Second Circuit has rejected such requests as "impermissible attempts to force the government to particularize all of its evidence." *See* Opp'n at 49.  Notably, while the cases cited by the government provide seemingly relevant sound bites in isolation, that is all they do.  None of those cases remotely resemble the case at bar, because in all of those cases, the government provided far more detail to elucidate its charges.  Indeed, in some of those cases, the government had *already provided a bill of particulars*.[26]  In others, the courts held that the government had provided sufficient details through discovery or other means, which obviated the need for particulars.[27]  None of that is true in the instant case.

---

[26] *United States v. Salazar*, 485 F. 2d 1277, 1277 (2d Cir. 1973) (denying request for supplemental bill of particulars, where government had *already provided in a bill of particulars* 80 dates on which meetings or communications among co-conspirators in a drug scheme occurred, which the court said "detailed as specifically as possible the time and location of these contacts and the participation [of defendants]."); *United States v. Persico*, 621 F. Supp. 842, 868 (S.D.N.Y. 1985) (denying bill of particulars in RICO case where government had *already provided a bill of particulars* and additional "voluminous" discovery, consisting of applications for intercept orders and search warrants; transcripts of tape recordings; and a list of unindicted co-conspirators).

[27] *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004) (defendant did not need bill of particulars where indictment included nature of charges, the timeframe, and the location where the crimes were alleged to have taken place; extensive discovery had been provided, including FBI reports of interviews, grand jury testimony of witnesses, recordings and transcripts from taped conversations; and at oral argument on the bill of particulars, the government distilled its case further); *See United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (denying bill of particulars where government already had identified the specific 12-month period when the criminal drug enterprise allegedly received $10 million in gross receipts, provided a log of electronic intercepts, search evidence, and affidavits); *United States v. Walters*, 963 F. Supp. 2d 125, 134 (E.D.N.Y. 2013) (emphasis added) (denying bill of particulars because indictment provided information on the allegedly fraudulent scheme, including the timing and participants and *the "specific wire transfers giving rise to the wire fraud charges"*); *United States v. Berganza*, No. 03-987, 2005 U.S. Dist. LEXIS 2203, at *19-20 (S.D.N.Y. Feb. 16, 2005) (indictment included the dates of the alleged conspiracy and defendants involved, which was supplemented by further discussion with defense counsel where additional details were provided); *United States v. Lorenzano*, No. 03-1256 (S-6) (JFK), 2005 U.S. Dist. LEXIS 7312, at *9-11 (S.D.N.Y. Apr. 26, 2005) (indictment provided both specific and approximate dates for all robberies charged, the names of participants, adequate data relating to the narcotics and firearms charges, and in most instances, a detailed description of locations of criminal activity); *United States v. Mitlof*, 165 F. Supp. 2d 558, 570 (S.D.N.Y. 2001) (denying bill of particulars where indictment identified the three overt acts performed in furtherance of the purported conspiracy); *United States v. Facciolo*, 753 F. Supp. 449, 451 (S.D.N.Y. 1990) (subsequent history omitted) (government supplied the list of intercepted telephone calls it intended to introduce at trial; copies of the wiretap applications; tape cassettes of intercepted calls and log sheets); and *United States v.*

Accordingly, as noted in John's Opening Brief, the government should be required to specify the missing particulars.  *See* Opening Br. at 81.

## VI.

### THE GOVERNMENT SHOULD PRODUCE SPECIFIC, IDENTIFIED <u>*BRADY*</u> AND <u>*GIGLIO*</u> MATERIALS NOW

Contrary to the government's characterization, the defense did not demand the government's entire investigative interview file.  Rather, the defense requested that the government produce interview memoranda of customers and/or present employees "whose statements would tend to undermine, contradict, or refute the Indictment's allegations."  *Compare* Opp'n at 50-51 *with* Opening Br. at 81-82.

To the extent such memoranda contain statements confirming John's or Kayla's adherence to its compliance program, anti-money laundering initiatives, or John's or Kayla's unwillingness to assist customers in structuring, those are exculpatory evidence as well, to which John is entitled, pursuant to *Brady* and its progeny.  *See e.g., United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 161-62 (2d Cir. 2008) (overturning conviction where government failed to provide interview notes containing *Brady* materials).[28]  The government appears to concede such memoranda exist in its opposition, stating that "many [customers and employees] were not [aware of criminal conduct by Drago, Kayla staff, and employees]."  Opp'n at 50.  The Court should order the government to produce any such statements to the defense.

---

*Jones*,  No. SS85 Cr. 1075-CSH, 1986 U.S. Dist. LEXIS 24969, at *2-3 (defendant received information regarding the time, place, and nature of the charged conspiracy, as well as his involvement in the conspiracy); *Cf. United States v. Cephas*, 937 F.2d 816, 823 (2d Cir. 1991) (in drugs and firearms case, noting that it was "troubling" that the government did not provide defendant with more detail than who was allegedly involved or "more specific information as to particular acts which [defendant] himself had committed").

[28] The government contends that these memoranda "are neither exculpatory nor exculpatory" (*see* Opp'n at 51), which presumably was intended to say that the memoranda are neither inculpatory nor exculpatory.

## CONCLUSION

For all these reasons, John Drago respectfully requests an Order (1) suppressing the evidence and fruits of the 2013 search of Kayla, or at the least, holding an evidentiary hearing; (2) dismissing the Indictment (or certain Counts); and (3) requiring the government to provide a bill of particulars and *Brady* and *Giglio* materials.

Dated:  February 15, 2019

MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO, P.C.

By: /s/ David M. Siegal
     David M. Siegal
     Jason P.W. Halperin
     Amanda B. Asaro
     Chrysler Center
     666 Third Avenue, 25th Floor
     New York, New York 10017
     (212) 935-3000