UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
UNITED STATES OF AMERICA,

**REPORT
AND
RECOMMENDATION**

                       -against-                              18-CR-394 (SJF)(AYS)

JOHN DRAGO,
                               Defendant.
-----------------------------------------------------------------X

**SHIELDS, Magistrate Judge:**

Defendant John Drago ("Drago" or "Defendant") is charged in an indictment (the "Indictment") with banking and tax crimes arising out of his operation of check cashing businesses known as the "Kayla Companies" ("Kayla").  (See generally Docket Entry ("DE") [1].)  According to the Indictment, Drago violated Internal Revenue laws and regulations by failing to truthfully account for and pay Federal Insurance Contributions Act ("FICA") taxes, failing to file required quarterly Federal tax returns, and by failing to inform the Internal Revenue Service of payment of cash wages.  Drago is also charged with violating the Bank Secrecy Act (the "BSA") by failing to properly file Currency Transaction Reports ("CTR's") with the Financial Crimes Enforcement Network ("FinCEN").  CTR's are required to be filed for each transaction in currency, such as a deposit, withdrawal or exchange of payment, in excess of $10,000.  Drago is also charged with violating the BSA by failing to develop and properly implement an effective money-laundering program "reasonably designed to prevent" a check casher from being used to facilitate money laundering.

Drago moved to dismiss the Indictment and to suppress evidence seized in connection with a search conducted at Kayla's business premises.  (DE [24].)  The District Court referred Drago's motions to this Court for Report and Recommendation.  (See Order of Feuerstein, J.,

1

dated May 28, 2019.)  In a Report and Recommendation dated June 25, 2019, (the "June 25 R&R"), (DE [57]), this Court held, inter alia, that the warrant executed in connection with the search of Kayla (the "Kayla Search") violated the particularity clause of the Fourth Amendment. It was also held that a hearing was necessary to determine whether the asserted good faith of the Government should avoid suppression of the fruits of the search conducted pursuant to the defective warrant.  (DE [57] at 14.)

On July 15, 2019, the District Court adopted the June 25 R&R.  (DE [60].)  Thus, in addition to adopting the other matters referred to therein, the District Court adopted this Court's recommendation that a hearing was necessary to determine the issue of good faith.  That hearing was held before this Court on July 23 and July 24, 2019.  (DE [68]-[69].)  On August 23, 2019, the parties submitted memoranda of law supporting their respective positions as to the requested remedy of suppression.  (DE [70], [71].)  For the reasons set forth below, and upon review of the testimony of witnesses, as well as the submissions of counsel, this Court respectfully recommends that the motion to suppress the evidence obtained via execution of the defective warrant be granted, and that the fruits of the Kayla Search be suppressed.

<u>BACKGROUND</u>

I.     <u>The Warrant</u>

The warrant authorizing the Kayla Search (the "Warrant") was issued in 2013 by then Magistrate Judge Wall.  (<u>See</u> Government Exhibits ("GX") 27 (affidavit submitted in support of request for issuance of the Warrant) and 28 (Warrant).)  In support of its request for a search warrant, the Government relied upon the affidavit of Special Agent Michael Snedeker (the "Affidavit").  (GX 27.)  As set forth in the June 25 R&R, the statements set forth in the Affidavit

were more than sufficient to establish probable cause to search Kayla.  (June 25 R&R, DE [57], at 12-14.)

The Constitutional infirmity with respect to the Warrant was not in the statements made in the Affidavit, nor in the Magistrate Judge's finding of probable cause, but instead, in the language of the Warrant itself.  In particular, the Fourth Amendment was violated by the Warrant's failure to connect the broad list of the items to be seized with any crime at all.  It is worth detailing here the problematic language of the Warrant and, in particular, the attachment thereto that was meant to describe the documents to be seized.

The Warrant itself is a form document entitled "Search and Seizure Warrant."  (GX 28.) The property identified to be searched is the premises of Kayla.  (Id.)  Because of space limitations in warrant forms, the things to be seized from Kayla were – in accord with typical practice – described in a separate attachment.  That document, "Attachment A" to the Warrant, is entitled "Items to Be Seized."  (GX 28.)  It is the language of that attachment that falls short of the Fourth Amendment's particularity requirement.  To demonstrate, the list of documents in Attachment A contains ten separate categories of documents.  The first nine categories make no reference whatsoever to their relation to any crimes.  Instead, they are broadly stated categories of items including, for example:

> Records, documents and materials that memorialize or reflect financial transactions between Kayla and its source(s) of cash, including, but not limited to contracts, receipts, invoices, letter, bank statements, notes, ledgers, cash receipt journals or records cash shipment records, and/or cash delivery records;

> Records, documents and materials that memorialize financial transactions between Kayla and the bank or banks at which Kayla holds accounts, including, but not limited to, bank statements, account summaries, deposit slips, deposit items, and/or cancelled checks;

3

(Attachment A to Warrant, GX 28, at ¶¶ 3-4.)  Like paragraphs 1-9 of Attachment A to the

Warrant, the afore-quoted paragraphs describe broad categories of items to be seized, but make

no connection whatsoever between those categories and any crime or criminal activity.  Indeed,

the only paragraph of Attachment A that makes any reference to criminal activity is its final

category of items, those referred to in paragraph 10 of Attachment A.  Unlike any other

paragraph of Attachment A, paragraph 10 attempts to connect the seizure of documents

described to criminal activity by adding the proviso that the documents to be seized should be

tied to "the illegal transactions *described herein* or who may have knowledge of facts material

such transactions."  (GX 28, Attachment A at ¶ 10 (emphasis added).)

Apart from the fact that the final clause of paragraph 10 is not an intelligible sentence, it

further makes no sense because there are *no* illegal transactions "described herein."  Because

neither paragraph 10 nor any paragraph in the Warrant or Attachment A refer to any crime at all,

the Warrant completely fails to pass Constitutional muster for lack of particularity.

II.     The Parties' Positions

In view of the Fourth Amendment violation, Defendant seeks suppression of all fruits of

the search.  Although it recognizes the Constitutional infirmity of the Warrant, the Government

argues that suppression is not the appropriate remedy.  Instead, the Government argues that its

overall behavior with respect to its investigation of Kayla, and the execution of the Warrant,

constitute good faith sufficient to avoid suppression of the fruits of the Kayla Search.

III.    The Hearing

The Government called five witnesses to testify at the hearing.  Those witnesses were

Special Agent Michael Snedeker ("Agent Snedeker" or "Snedeker"), Special Agent Yves

Hunziker ("Agent Hunziker" or "Hunziker"), Suffolk County Detective Joseph Miceli

("Detective Miceli" or "Miceli"), Special Agent David Darjania ("Agent Darjania" or "Darjania") and Retired Special Agent Michael Scaringi ("Agent Scaringi" or "Scaringi").

In addition to witness testimony, the Government introduced several documents detailing the investigation of Kayla, and the search of its premises. Those documents were prepared both before and after the execution of the Warrant and were admitted as evidence at the hearing. Drago did not testify at the hearing. He did, however, continue to rely upon all prior submissions, including his affidavit, which set forth his recollection of events that took place during the Kayla Search (the "Drago Affidavit"). (DE [24-13].) Before detailing the testimony at the hearing, the Court will describe the documents introduced as evidence during the hearing, as well as the facts set forth in the Drago Affidavit.

A.    Documents and the Drago Affidavit

The witnesses at the hearing testified at length about documents memorializing the Internal Revenue Service ("IRS") investigation of Kayla. Many of those documents pre-date the July 29, 2013 submission of Agent Snedeker's Affidavit in support of the Warrant. Those documents consist of several operational plans, and memoranda of witness interviews. They catalogue meticulously the efforts of a team assembled to uncover information in support of probable cause to obtain a search warrant. Such efforts took place over a period of approximately eighteen months and included surveillance of the Kayla premises and enlisting the cooperation of witnesses who had previously pled guilty to financial crimes. (See Tr. 75; GX 1-6, 9-25, 26 (summary of undercover contacts).) The operational plans describe each particular undercover operation in detail. They contain a list of the crimes under investigation, the objectives of the operation, and the background of the investigation. The memoranda of interview are documents prepared after completion of those operational plans that involved the

use of a cooperating witness ("CW").  Such operations included a CW's visit to Kayla, and the placing of monitored telephone calls.  Each memoranda of interview memorializes conversations between the CW and IRS agents (including Special Agent Snedeker) that took place upon completion of the relevant operation.

Among the details contained in each operational plan is, as noted, a list of the crimes under investigation.  Thirteen separate operational plans were drafted in connection with the Kayla investigation.  Those plans detail operations that took place between February and September of 2012.  (Tr. 16; GX 1-6, 9-15.)  The first group of plans were drafted during the month of February of 2012.  (See GX 1-6.)  They refer to the possible commission of crimes arising under Titles 31 and 26.  Title 31 crimes are those arising out of violations of the BSA and include the failure to file CTR's.  Title 26 is the Internal Revenue Code.  Crimes arising thereunder include tax fraud.  The second set of operational plans describing the investigation of Kayla are dated from July 23, 2012 through September 25, 2012.  Those plans include a broader range of possible criminal activity at Kayla.  Like earlier operational plans, they refer to structuring crimes arising under Title 31, and criminal activity under Title 26.  They also more broadly refer to the possibility of obtaining evidence of crimes arising under Title 18, the general Federal criminal code.  (See GX 9-15 (referring to obtaining evidence of structuring transactions to evade CTR filing requirements, as well as evidence proving a conspiracy between targets to impede IRS functions in violation of Title 18); Tr. 112.)

The Warrant was executed on August 6, 2013 – eighteen months after the date of the first operational plan, and two weeks after it was authorized by the Magistrate Judge.  Like prior undercover operations, the plan for execution of the Warrant was outlined in an operational plan (the "August 2013 OP").  (GX 29.)  The August 2013 OP described the background of the Kayla

investigation.  That description refers to Kayla providing assistance to customers on how to structure transactions so as to circumvent CTR reporting requirements.  (GX 27.)  The "primary objective" set forth in the August 2013 OP is stated as searching the premises of Kayla to seize evidence "as stated in the Appendix A."  This is a reference to the list of items in the Warrant, which, as noted above and in the June 25 R&R, failed to refer to any crime.

The personnel taking part in the Kayla Search included nineteen individuals.  "Entry Team 1" included Special Agents Snedeker and Scaringi, as well as Detective Miceli.  The team also included Agent Darjania.  Members of the team executing the Warrant were referred to as being part of "entry" teams, "interview" teams and "surveillance" teams.  The titles of four members of the team included the title "search."  Of those four, only Agent Hunziker, who appears to have been the lead searcher, was called to testify.

The Drago Affidavit refers to the conduct of the Kayla Search from the point of view of the Defendant.  It states that Drago was not present when the search began, but was alerted to the search, and appeared at the Kayla premises while the search was ongoing.  Drago states that upon his arrival, he spoke with an agent who he can only identify as "David."  (DE 24-13 at ¶ 5.) Drago asked to be shown a copy of the Warrant, which he reviewed.  After reviewing the Warrant, he asked David why the search was being conducted (since the Warrant did not make this clear to Drago).  David is said to have responded in "words to the effect of, 'It's in the warrant.'"  (Id.)  David is also said to have reviewed the Warrant, and to have called over another agent, whom Drago believes to have been Agent Scaringi.  Drago states that David said to Scaringi "words to the effect of, 'it's not in there.'"  (Id.)  Scaringi is then said to have reviewed the warrant and to have "said aloud, 'BSA violations.'"  (Id.)  Whereupon, the search continued.

A post-enforcement written summary of the Kayla Search (the "Summary") was prepared by the Kayla team, and admitted at the hearing as GX 32.  The Summary states that the Kayla Search began at 5:45 P.M. and concluded at 11:21 P.M.  In addition to the team conducting the search, four Kayla employees were noted to be present. Upon entry, the agents videotaped the premises. That video was not intended to capture the entire search, but was only intended to record the condition of the premises upon entry, and to establish that it was in the same general condition when the search was concluded.  (Tr. 143.)  Although a search is ongoing to date, the Government has been unable to produce that videotape.  (Tr 142, 191.)  Also upon the Government's entry to the Kayla premises, Agent Darjania made a detailed sketch of the premises.  (See GX 34.)  Consistent with the Drago Affidavit, the Summary states that Drago was not present when the search began, but arrived at the Kayla premises at 6:45 P.M.  (GX 32.) The Summary states that Drago was provided with a list of items seized pursuant to the Warrant, but makes no reference to any conversation between Drago and any member of the Kayla team. Drago is stated to have conducted a post-search walk-through of the Kayla premises and to have secured the premises when exiting at the conclusion of the search.

      B.     <u>Witness Testimony</u>

      1.     <u>Special Agent Snedeker</u>

Agent Snedeker is an IRS agent.  The Kayla investigation was the first undercover operation where he served as the lead investigator.  (Tr. 75.)  Snedeker acknowledged that the operational plans described above state a broad range of possible criminal activity, including crimes arising under Titles 26 and 18.  (Tr. 75-76.)  He agreed that crimes arising under Title 26 include tax fraud, and that IRS agents like himself would likely be involved with the investigation of crimes arising under the tax code.  (Id.)  IRS agents might also be involved in

investigations of crimes arising under Title 18. (Tr. 83.) Despite the broad range of crimes referred to in the various operational plans, it was Agent Snedeker's position that the Kayla Search was limited only to Kayla's role in violating Title 31 by routinely failing to file CTR's and advising customers as to how to evade filing by breaking down transactions into parts smaller than $10,000. (Tr. 15.)

This description of the scope of the Kayla Search is consistent with Snedeker's Affidavit submitted in support of his application for a search warrant. Indeed, it was only the structuring crimes that were described in the affidavit that was ultimately submitted to Magistrate Judge Wall. Thus, that affidavit begins by stating that there is probable cause to believe that the property sought to be seized will "constitute evidence, fruits and instrumentalities of violations of" Title 31. (GX 27 at 1.) The "Background of the Investigation" section of Snedeker's affidavit also refers only to Title 31. (GX 27 at ¶¶ 4-7.) Details of information gleaned from the CW likewise refer only to conduct in violation of Title 31. (GX 27 at ¶¶ 11-18.)

The carefully limited Snedeker Affidavit falls in sharp contrast to the Warrant. As described above and in the June 25 R&R, the Warrant failed the particularity clause of the Fourth Amendment because it did not limit the search to the commission of any crime at all. When asked whether he intentionally omitted reference to any crime in the Warrant, Snedeker replied "Absolutely not." (Tr. 47.) Instead, he testified that it was his intention that the search authorized by the Warrant be limited to those documents relating to crimes arising under Title 31. (Tr. 98.) He explained that at the time that he prepared the paperwork for the Warrant, he had already repeated the statute so many times that "at the time of drafting the attachment as well it did not come to [his] attention that [he] had left it out." (Tr. 100.)

Snedeker's Affidavit and the Warrant (including the defective Attachment A) were subject to several layers of institutional review prior to submission to Magistrate Judge Wall. See Tr. 26, 81, 101.)  Snedeker agreed that there was no rush, and that he had "plenty of time" in which to prepare his paperwork before submitting it to the Magistrate Judge.  (Tr. 81.)  At no level of the extensive institutional review process was it ever pointed out to Snedeker that Attachment A failed to refer to any particular crime.  (Tr. 26-28.)  Thus, despite having well over a year to investigate Kayla and prepare the Affidavit and proposed search warrant, the Warrant presented to the Magistrate Judge failed to mention any crime, and the team went on to execute the defective Warrant.

On August 5, 2013, prior to execution of the Warrant, Snedeker held a meeting to familiarize his team with the contours of the search they were about to conduct.  (Tr. 116.)  At that meeting, the team was presented with the August 2013 OP.  That document was prepared after the Warrant was obtained.  It therefore was never presented to the Magistrate Judge and played no role in that Court's probable cause determination.  (Tr. 117-18.)  While the August 2013 OP refers to violations of Title 31 (and not the previously-investigated Titles 26 and 18), it refers the reader to "Appendix A (items to be seized)" when stating that a "primary objective" of the search was to seize evidence "as stated" in that attachment.  (GX 29.)  This is a direct reference to the Warrant, which specified no crime at all.  Snedeker testified that he distributed the August 2013 OP to his team during the August 5, 2013 pre-operational meeting, (Tr. 119), but agreed that Attachment A was not attached to that document.  (Id.)  He did testify, however, that a copy of Attachment A, which he agreed was the "single most important document for purposes of executing [the Kayla] operation" was separately distributed to each team member at the August 5, 2013 meeting.  (Tr. 119-20.)  In any event, during the Kayla team's pre-operational

meeting, no one brought up the fact that the Warrant did not mention any crimes.  (Tr. 41-43, 126.)

Members of the team executing the Warrant had taken part in the Kayla investigation over its eighteen-month course. While that investigation had, at times, included investigating crimes arising under Titles 26 and 18, they were not told during the August 5, 2013 pre-operational meeting that they lacked authority to search for evidence relating to those crimes. (Tr. 123-24.)  Nonetheless, Snedeker believed that his search team understood the limits of the search to be performed at Kayla.  (Tr. 40.)  He believed that those on the team would draw upon their prior experience in taking part in the Kayla investigation, as well as upon the information set forth in the August 2013 OP to guide their search.  (Tr. 40.)

As noted above, the August 2013 OP listed duties next to the names of individuals taking part in the Kayla Search.  (See GX 29.)  Snedeker did not participate in the actual search of any files or digital data seized during the Kayla search, but he did hand pick every member of the team.  (Tr. 137.)  Although only certain individuals were noted to be part of the "search" team, duties carried out during the course of the search could change, depending upon the needs of the team at any given time.  Thus, even though a team member might not have been designated as a "searcher," that member could be asked to assist in searching if the need arose.  (Tr. 134.)

While the Warrant did not mention any crimes at all, it was limited in time.  Thus, Attachment A to the Warrant states that the search was limited to the years 2010 through the present.  This date is inconsistent with the time frame set forth in the Affidavit presented to Magistrate Judge Wall.  That document sought authority to search for documents from 2008 to the present.  (Compare GX 27 (Affidavit) to 28 (Warrant); Tr. 127-28.)  Snedeker testified that those at the August 5, 2013 pre-operational meeting were told that the search was, consistent

with the Warrant but not his Affidavit, limited to documents from 2010 to the date of the search. (Tr. 128.)

Agent Snedeker was present and available to his team during the Kayla Search. Each member of the team was provided with a copy of the August 2013 OP. (Tr. 155-56.) Each member was also supplied with a copy of Attachment A to the Warrant. (Tr. 156.) Snedeker characterized Attachment A as the document that provided a guide for each team member to consult during the searching process so that "individual items" could be "compared to the attachment" as the search was ongoing. (Tr. 156.) When asked whether Attachment A was the only document to be consulted during the search, Snedeker stated that searchers would also consult the operational plan. (Tr. 157.) Snedeker could not remember any specific conversation with any team member as to whether or not a particular item was properly within the scope of the search. (Tr. 157-58, 159.) While not on-site, the August 2013 OP supplied members of the team with telephone contact numbers of an Assistant United States Attorney who could be called if any legal question arose during the course of the search. (Tr. 138-39.) Snedeker was conducting an on-site interview with a Kayla employee during the first hour and thirty-five minutes of the Kayla search. (Tr. 148.) He was, however, available, along with other supervisory agents on the team, to answer any search-related question that arose during that time period. (Tr. 148-49.) No such questions arose.

Snedeker confirmed the statements set forth in the Summary regarding Drago's presence at Kayla during the execution of the Warrant. Thus, while he stated that Drago was not present when the search began, he did later observe him at the Kayla premises. (Tr. 42.) Snedeker characterized his interaction with Drago as very brief, limited to an introduction and good-bye at the end of the search. (Tr. 42.) He denied Drago ever telling him that the Warrant failed to

12

contain a description of any crime or citation to any criminal statute.  (Tr. 43.)  Snedeker testified

that it was his belief that the agent who greeted Drago upon his arrival was Agent Scaringi.  (Tr.

150.)  This is consistent with Drago's affidavit statement that shortly after his arrival he spoke

with agents who he believed to be Agents Darjania and/or Scaringi.

Snedeker was asked to review a group of documents entitled "Search Warrant

Inventory," which contained descriptions of items seized during the Kayla Search.  (Tr. 54; see

GX 30.)  He expressed his opinion that the documents described in those inventories were within

the scope of the Warrant.  (Tr. 54.)

Approximately two months after the Kayla Search, Drago wrote a letter to Magistrate

Judge Wall.  (GX 31.)  That letter stated that since the search of his business, Drago remained

uninformed as to the violations that led to the issuance of the Warrant, and the search of his

business.  It references Attachment A to the Warrant, and states that nowhere within the Warrant

could Drago find "any description of the nature of the illegal activities" referred to by the

reference to "the illegal transactions described herein."  (GX 32.)  When asked about this letter,

Snedeker was asked whether anything in the document made reference to Drago having pointed

out to any of the searching agents, during the search, that the Warrant was defective.  Snedeker

responded that nothing in that letter referred to any such conversation.  (Tr. 62.)

2.    Special Agent Hunziker

Agent Hunziker is an IRS agent who worked with Agent Snedeker during the entire

course of the Kayla investigation.  (Tr. 212.)  Thus, he was aware of the development of BSA

structuring charges via the cooperation of the CW.  (Tr. 214.)  He was also aware of the earlier

phases of the investigation, including possible Title 26 violations.  (Tr. 252.)  Like other

members of the Kayla team, Hunziker attended the August 5, 2013 pre-operational meeting to go

over the execution of the Warrant authorizing the Kayla Search.  (Tr. 215.)  At that meeting, he was provided with, and read copies of the August 2013 OP, and Attachment A to the Warrant. (Tr. 215.)  Although he was a designated "searcher" for the Kayla Search, (Tr. 219), Hunziker did not notice that Attachment A failed to refer to any crimes.  (Tr. 261.)  Had he been made aware of this defect in the Warrant, he believes that the Assistant United States Attorney would have been called and, with the management team, the issue would have been fixed.  (Tr. 219.)

Hunziker testified that the parameters of the search he conducted were guided by his knowledge of the Kayla investigation, including his knowledge of the August 2013 OP and his work with Agent Snedeker.  (Tr. 230, 231.)  Upon review of the items referred to on the Kayla Search inventory sheets, Hunziker stated his belief that the items seized were within the scope of his authority as set forth in Attachment A.  (Tr. 240.)

Hunziker characterized the August 2013 OP as making him aware of the logistics of the search.  (Tr. 261.)  He also testified that this document "outlined the violations and background of the case, a case [that he] was familiar with."  (Tr. 262.)  In contrast, Hunziker referred to Attachment A to the Warrant as defining the "types of items" that he would be looking through during the actual search.  (Tr. 262, 264.)  He stated that he would "physically" have Attachment A with him throughout the search and would refer to it to "make sure it's within the scope, the timing, and then the documents are responsive."  (Tr. 275.)  In summation, he stated that Attachment A was a "good reference material as a searcher."  (Tr. 275.)

Agent Hunziker denied having any personal interactions with Drago during the Kayla Search.

14

3.      Detective Miceli

Detective Miceli is a Suffolk County detective who was assisting with maintaining safety upon entry to the Kayla premises. (Tr. 293.) He took no part in the actual search of the Kayla premises. (Tr. 297.) Detective Miceli spoke with Drago in the Kayla lobby when Drago arrived. The conversation was casual and did not include any discussion about the Warrant. (Tr. 294-95, 296.)

4.      Special Agent Darjania

Agent Darjania took part in the Kayla Search. He was responsible for drafting a sketch of the Kayla premises, and for interviewing some witnesses. (Tr. 299.) Darjania spoke with Drago in the lobby of the premises. (Tr. 299.) That interaction lasted approximately one minute. (Tr. 299.) During that conversation, Drago made no mention to Darjania about the lack of crimes listed in the Warrant. (Tr. 301.) If Drago had made that observation, Darjania would have acted in accord with protocol and advised the team leader, who would have taken appropriate measures. (Tr. 302.)

Darjania also testified that as a result of his conversation with Drago, he asked one of the agents to speak to Drago. (Tr. 300.) Darjania recalled that Agent Scaringi was one of the agents assigned to speak with the Defendant, and that Scaringi thereafter appeared in the lobby and spoke with Drago. (Tr 301.) Darjania was in the Kayla lobby during Scaringi's conversation with Drago, but he does not recall overhearing anything of substance of that conversation. (Tr. 301, 309.)

5.      Special Agent Scaringi

Special Agent Scaringi was senior to Snedeker. For purposes of the Kayla investigation, Scaringi was Snedeker's OJI – an acronym for "on the job instructor." (Tr. 75.) Scaringi

15

participated in the Kayla Search but did not have a role as a searcher.  Instead, he was overseeing

three trainees, including Snedeker and Hunziker.  (Tr. 320.)  Scaringi was present during the

August 2013 pre-operational meeting.  (Tr. 328.)  He did not remember whether the Warrant was

read aloud during the meeting, but said that such a reading probably took place since that would

have been in accord with protocol.  (Tr. 328.)  When asked to comment on the Warrant's

references to crimes "herein" and the fact that it did not mention any crimes, Scaringi testified

that he thought the references to crimes "described herein" referred to the Affidavit.  (Tr. 331-

32.)

Scaringi testified that no one on the team during the Kayla Search alerted him to the fact

that the Warrant did not mention any crimes.  (Tr. 321-22.)  Nor did anyone on the team

approach him with any questions as to what types of items could be seized under terms of the

Warrant.  (Tr. 343.)  He stated that along with other supervisors on the scene, he could have been

approached with such questions.  (Tr. 343.)  He further stated, consistent with the other

Government witnesses, that if the issue had come to his attention he would have alerted the

Assistant United States Attorney to attempt to have the matter rectified.  (Tr. 321.)  He stated that

delaying the search to resolve the issue would have presented no problem since execution of the

Warrant was not an emergency, and could have been put off to the next day or week.  (Tr. 323.)

Agent Scaringi recalled speaking with Drago at the Kayla premises during the search.  He

explained what was happening and invited Drago to be interviewed.  Scaringi described Drago as

a "complete gentleman" who was polite during the entire process.  (Tr. 324.)  While Scaringi did

not see or hear Drago ask to see the Warrant, he stated that he was sure that someone must have

given Drago the Warrant.  (Tr. 335.)  Scaringi denied that Drago ever told him that the Warrant

was invalid, or that the document lacked reference to any crimes.  (Tr. 324, 336, 340.)  He did

16

testify, however, that at some point he was sure that he advised Drago that the search involved "CTR's, compliance, FinCEN, bank secrecy, words to that effect."  (Tr. 338.)

ANALYSIS

I.      The Good Faith Exception

The Court notes that it need not discuss the Constitutional principles already outlined in the June 25 R&R.  There is no question that the Warrant violated the particularity clause of the Fourth Amendment.  Where, as here, the Fourth Amendment has been violated, the exclusionary rule does not automatically apply.  See Herring v. United States, 555 U.S. 135, 140 (2009) (citing Illinois v. Gates, 462 U.S. 212, 223 (1983)).  Indeed, exclusion of evidence is a court's "last resort" and not its "first impulse."  Herring, 555 U.S. at 140 (quoting Hudson v. Michigan, 547 U.S. 586, 591 (2006)).  Exclusion of evidence is warranted where it will result in "appreciable deterrence" of unconstitutional conduct.  Herring, 555 U.S. at 141.  Since exclusion is necessarily associated with a cost to the system of justice, the benefit of deterrence must outweigh that cost.  Id. at 144.

The Second Circuit has very recently opined as to the parameters of the good faith exception to the exclusionary rule.  See In re 650 Fifth Avenue and Related Properties, No. 17-3258, 2019 WL 3756033, at *1 (2d Cir. Aug. 9, 2019).  As noted by that court, and in accord with the principles outlined above, the question of whether the exception applies is determined by weighing the "deterrence benefits of exclusion" against the "culpability of the law enforcement conduct at issue."  In re 650 Fifth Ave., 2019 WL 3756033, at *9 (quoting Davis v. United States, 564 U.S. 229, 238 (2011)).  The value of deterrence is high where the unconstitutional conduct exhibits a "deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights."  In re 650 Fifth Ave., 2019 WL 3756033, at *9.  On the other hand,

17

if law enforcement officers acted with an objective "good faith belief that their conduct [was] lawful," there is little rationale for deterrence, and good faith avoids exclusion of evidence.  Id.

Exclusion is not the appropriate remedy where officers act pursuant to a warrant that is later held to have been unlawfully issued.  In such a case, the error lies more with the court that issued the warrant, and less with officers who presented truthful facts to that court.  See United States v. Leon, 468 U.S. 897, 916 (1984).  Deterrence is also outweighed when the unlawful conduct at issue "involves only simple, isolated negligence."  Id.

In contrast, exclusion is warranted where the conduct of officers is so clearly and unquestionably in violation of the Constitution as to negate any objective belief in lawfulness. Among the scenarios identified by courts where Government action is unreasonable is "where the warrant is so facially deficient that reliance upon it is unreasonable."  In re 650 Fifth Ave, 2019 WL 3756033, at *10 (quoting United States v. Clark, 638 F.3d 89, 100 (2d Cir. 2011)). This includes cases where the warrant at issue "fail[s] to particularize . . . the things to be seized."  In re 650 Fifth Ave., 2019 WL 3756033, at *10 (quoting Leon, 468 U.S. at 923).  In such cases "the executing officers cannot reasonably presume it to be valid."  Leon, 468 U.S. at 923.

With these principles in mind, the Court turns to consider whether the Government has sustained its burden of showing that the good faith exception to the exclusionary rule applies. See United States v. George, 975 F.2d 72, 77 (2d Cir. 1992) (stating that the burden is on government to demonstrate objective reasonableness of reliance on a defective warrant).

II.     The Good Faith Exception Does Not Avoid Exclusion

This is not a case where there is any question as to the propriety of the Magistrate Judge's determination of probable cause.  Nor is there any claim that Snedker made any intentional

mistatements to the Magistrate Judge.  Here, the court issuing the Warrant properly relied upon Snedeker's truthful statements as to the investigation of Kayla. There was ample evidence provided to Magistrate Judge Wall to support a finding of probable cause to believe that fruits of BSA violations would be found during an appropriate search of Kayla.  Thus, unlike cases involving a judicial officer's determination of probable cause, this is a case where the warrant ultimately issued was deficient because it failed to specify the crimes delineated in the affidavit presented to the Magistrate Judge and, instead, listed no crimes at at.

In support of its argument that the good faith conduct of those executing the Warrant should avoid suppression, the Government has presented witnesses whose collective testimonies show a lack of intention to draft a Constituitonally deficient warrant.  The Court finds credible testimony demonstrating that it was not team leader Snedeker's intent to draft a warrant that failed to mention any crimes.  Nor was it the intent of the United States Attorney's office to attach an invalid warrant to the papers presented to the Magistrate Judge.  Moreover, no person on the investigative or searching team noticed the obviously deficient language of the Warrant. Further, this Court finds credible the statements of witnesses who testified that if someone had brought the deficiency of the Warrant to their attention, they would have made sure the error was corrected.

However, the lack of intent to create a bad warrant (or to cover-up that error) does not automatically translate into a finding of objective good faith belief that the conduct was lawful. Instead, the Court must look to the overall conduct of the search and, in particular, whether those executing the search actually relied on the unlawful warrant.  A review of the testimony reveals that despite the lack of bad intent to create an insufficient warrant, the surrounding circumstances compel a finding that the fruits of the Kayla Search must be suppressed.

First, contrary to the Government's characterization, the error here cannot be described as merely "typographical."  This is not a case where the language of the Warrant misstated the language or citation to a statute.  Nor is it a case where the crime for which evidence sought appeared in one section of a warrant, but not in others.  Thus, unlike the facts present in United States v. Cwibeker, No. 12-CR-0632, 2014 WL 7423106, at *8 (E.D.N.Y. Dec. 31, 2014), where at least the unlawful warrant mentioned a crime in one of its paragraphs, the Warrant here mentioned no crimes at all.  Thus, the Government cannot rely on Cwibeker to support a finding of objective good faith.

Nor can any time pressure save the defective Warrant from the remedy of exclusion.  The clear testimony of at least two witnesses, as well as the eighteen-month length of the investigation make clear that there was no rush to execute the Warrant.  (Tr. 81.)  Thus, the time pressure that the Second Circuit found important for application of the good faith exception in United States v. Rosa, 626 F.3d 56 (2d Cir. 2010), was not present here.  See Rosa, 626 F.3d at 64; see also United States v. Romain, No. 13 Cr. 724, 2014 WL 6765831, at *6 (S.D.N.Y. Dec. 1, 2014) (finding good faith where, inter alia, the application and supporting materials for a warrant were submitted in close temporal proximity to execution).

Most significantly, the Government cannot avoid exclusion by showing that the officers did not actually rely on the defective Warrant, but instead were guided by the August 2013 OP and/or the Affidavit presented to the Magistrate Judge.  Plainly, reliance on such unincorporated documents does not save an otherwise invalid warrant.  See Groh v. Ramirez, 540 U.S. 551, 557 (2004); United States v. George, 975 F.2d 72, 76 (2d Cir.1992).  However, the Court is certainly aware, as the Government argues, "that the presence and use of such documents during a search are relevent to the question of good faith."  See United States v. Lustyik, 57 F. Supp. 213, 227

(S.D.N.Y. 2014) (quoting <u>Herring</u>, 555 U.S. at 66).  Indeed, where it can be shown that officers executing a search did not rely on a defective warrant, their actions may lead to the conclusion that the "requisite levels of deliberateness and culpability justifying suppression are lacking." <u>Cwibeker</u>, 2014 WL 7423106, at *9.  However, the circumstances here show that there was indeed reliance on the defective Warrant sufficient to require exclusion of evidence of the search.

First, while Snedeker may have been mindful of the requirements of the Fourth Amendment when he presented the request for a warrant to the Magistrate Judge, there was no mention whatever of the Affidavit in the Warrant.  While there was testimony that the Affidavit supporting the Warrant was "available" for review during the pre-operational meeting, the Affidavit was neither mentioned in, nor attached to, the Warrant used during the Kayla Search. Nor was the August 2013 OP incorporated into the Warrant presented to the Magistrate Judge or attached to the Warrant.  Thus, cases where the affidavit was mentioned in or attached to a warrant are distinguishable.  <u>E.g.</u>, <u>United States v. Robinson</u>, No. 16-CR-545, 2018 WL 5928120, at *8-9 (E.D.N.Y. Nov. 13, 2018).

The circumstances surrounding the Kayla Search further distinguish this case from those where it is clear that the officers executing the search did not rely on the defective warrant, but instead relied on the supporting affidavit, which was brought to the search.  <u>E.g.</u>, <u>United States v. Szczerba</u>, 897 F.3d 929, 938-39 (8th Cir. 2018).  First, although the hearing established that most officers working on the Kayla investigation knew that they were investigating BSA crimes, it also established knowledge that they were previously investigating a broader range of crimes, including tax crimes and those arising under the general federal criminal code.  Those crimes were never presented to the Magistrate Judge, and were not a basis for his finding of probable cause to search.  Nor do those crimes appear explicitly in the August 2013 OP.  Nonetheless,

there was clearly a danger that those executing the Warrant believed that the scope of the search included crimes well outside of those presented to the Magistrate Judge.

A close review of the language of the August 2013 OP, as well as the conduct of the pre-operational meeting, make clear that the search was not properly limited.  All members of the team were provided with a copy of the August 2013 OP, and that plan was read aloud.  They were also all provided with copies of the Warrant to guide their search.  As noted, the August 2013 OP mentioned Title 31 crimes, but in describing "items to be seized," it referred to "Appendix A" - which was, in fact, Attachment A to the Warrant.  (GX 29.)  Thus, the August 2013 OP contained conflicting information as to the scope of the search.  On one hand, the "violations" section referred to Title 31 crimes, but the same document relied on "Appendix A" (clearly a reference to "Attachment A" of the Warrant) as circumscribing the scope of the search.  Agent Snedeker's testimony highlighted the importance of Attacment A to the searchers.  Thus, he testified that each team member was provided with a copy of that attachment, and characterized that document as providing a "guide" for the searchers so that "individual items" could be "compared to the attachment."  (Tr. 156.)  This makes clear that the searching agents actually relied on the defective Warrant when choosing items for seizure.

Agent Hunziker's testimony similarly demonstrates that the searchers relied on Attachment A when deciding whether or not items should be seized.  Indeed, his testimony showed that the Warrant was the key document used by the searchers who were looking through Kayla's records for responsive documents.  Importantly, Hunziker, the only designated searcher who testified, stated that a warrant was the document to be consulted during a search to determine whether items were within the scope of the search.  He even went so far as to describe Attachment A as a "good reference material as a searcher."  (Tr. 275.)

Despite his years of experience, Hunziker appeared to have completely misunderstood the reason for a warrant, testifying that it was useful only in determining the *type* of document to look for, and not whether that document related to the crime at issue.  It is clear that the Warrant specifies a broad range of the former, while giving no indication of the latter.  This is the type of conduct (while not showing bad intent) that must be deterred by reinforcing the need for a warrant to specify not only the types of documents within its scope, but also the necessity that the documents show evidence of specified criminal activity. Under these circumstances, neither reliance on the inincorporated Affidavit, nor any operational plan may be relied upon to support a good faith exception to exclusion.  Instead, the testimony of both of the agents tips the balance of the behavior here from mere negligence to recklessness.

Finally, the Court notes that there was much testimony aimed at undermining Drago's affidavit which indicated that he pointed out the deficiencies in the Warrant, and was brushed off by agents who simply stated aloud that the team was searching for evidence of "BSA" violations. Agents testifying at the hearing agreed that at some point Drago was probably provided with a copy of the Warrant, but denied that he pointed out its insufficiencies.  The Court finds the testimony of Government witnesses consistent with Drago's position that he was not at the scene when the search began. The court also finds that some conversation took place between Drago and Agents Darjania and Scaringi. The Court need not make any credibility determination as to whether or not the facts unfolded precisely as Drago recounts in his affidavit, or as testified to by Government witnesses.

It is unnecessary to determine whether or not Drago pointed out the deficiencies in the Warrant.  The Court has already found the conduct of the search sufficiently reckless such that no objective officer could have believed that they were acting in good faith.  While acceptance of

Drago's version of events would add to the reasons for that determination, it is not necessary to that holding. It is not the Defendant's responsibility to alert law enforcement to the Constitutional requirements of executing a search warrant. Viewed objectively, the conduct of the officers acting under the circumstances described above, cannot be found to be in accord with a good faith belief that their actions were lawful. Whether or not Drago pointed out the insufficiency of the Warrant, the facts here show deliberately reckless conduct sufficient to outweigh the costs of suppression.

In sum, bad faith and bad intent are not the only circumstances that can defeat application of the exclusionary rule. If that were the case, good faith would save the friuts of the Kayla Search from exclusion. However, as this case demonstrates, even in the absence of bad intent, the circumstances may show such disregard for the requirements of the Constitution that exclusion must be the only remedy. Here, officers executed what can only be referred to as a general warrant. The testimony shows that the Warrant guided their search. While the plainly unconstitutional language of the Warrant should have raised doubts, no individual in the line of institutional or searching review ever raised a question as to whether or not the Warrant was valid. The Government argues that no questions were raised because everyone on the team knew what they were looking for. The Court may not, however, rely on what may have been in the minds of officers who had long participated in an investigation. Were that the case, there would be no need for any warrant to circumscribe the boundaries of a search. Instead, courts would be required to validate searches so long as there was a general understanding as to the proper scope of a search that existed in the collective recollection of the members of an investigation. Such a rule would swallow the need for any warrant at all. Here, the document against which each item for seizure must have been evaluated failed to limit the search in any meaningful way. Under the

24

circumstances here, there cannot have been any objective belief that the search was legal.  The need for deterrence is high enough to sustain the cost of the remedy of exclusion.

RECOMMENDATION

For the foregoing reasons, this Court finds that the good faith exception to the exclusionary rule does not apply with respect to the search of the Kayla premises.  Therefore, it is respectfully recommended that Defendant's motion to suppress the fruits of that search, appearing at Docket Entry [24], be granted.

OBJECTIONS

A copy of this Report and Recommendation is being provided to all counsel via ECF.  Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of filing of this report.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b).  Any requests for an extension of time for filing objections must be directed to the District Judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections.  Failure to file objections within fourteen (14) days will preclude further review of this report and recommendation either by the District Court or Court of Appeals. Thomas v. Arn, 474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); Caidor v. Onondaga Cnty., 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision").

**SO ORDERED:**

Dated:  Central Islip, New York
         September 10, 2019                              /s/       Anne. Y. Shields
                                                        ANNE Y. SHIELDS
                                                        United States Magistrate Judge

25