UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                    **REPORT AND
                                                    RECOMMENDATION**

            -against-                               18-CR-394 (GRB)(AYS)

JOHN DRAGO,
                            Defendant.
----------------------------------------------------------------X

**SHIELDS, Magistrate Judge:**

    Defendant, John Drago ("Drago" or "Defendant"), was charged in an indictment dated

July 31, 2018 (the "Indictment"), with banking and tax crimes arising out of his operation of

check cashing businesses known as the "Kayla Companies" ("Kayla"). (See generally Docket

Entry ("DE") [1].) The Indictment followed an August 2013 execution of a search warrant (the

"Warrant") at Kayla's Farmingdale, New York place of business. Drago challenged the legality

of the Warrant on Fourth Amendment grounds. A suppression hearing was thereafter held by

this Court, upon referral from the District Court. After that hearing and decision by this Court,

the District Court accepted the recommended holding that the Warrant violated the Fourth

Amendment, and that the fruits of the Warrant therefore be suppressed. (DE [75].) In October

2019, Drago was charged in a superseding indictment, the details of which are discussed below.

(DE [77].)

    On February 11, 2020, Drago moved for an order directing that an independent source

hearing be held to determine what evidence the Government intended to introduce at trial, and to

ensure that any such material was obtained from a source independent of evidence obtained as a

result of execution of the Warrant. (DE [103].) On February 12, 2020, the District Court

referred the independent source hearing to this Court.[1]  (DE [106].)  After that referral, the Government submitted to Defendant a list of exhibits that it intended to introduce at Drago's trial.  Counsel collaborated to arrive at a final list of approximately 300 documents that remained at issue for this Court to consider at a hearing (the "Contested Documents").

On October 20, 2020, this Court held a hearing to determine whether any exceptions to the exclusionary rule properly allow the use of any, or all, of the Contested Documents.  On February 5, 2021, counsel submitted their post-hearing submissions.  Thereafter, on March 25, 2021, Drago submitted an additional letter in support of his position.  In that letter, Drago did not request to recall the agent who testified at the hearing; nor did he request to call any new witnesses.  The Government responded thereto on April 9, 2021.  Upon review of the hearing testimony and submissions of counsel, and for the specific reasons set forth below, this Court respectfully recommends that the District Court allow the Government to use all of the Contested Documents at trial.[2]

---

[1]    The present motion was referred to this Court by the Honorable Sandra J. Feuerstein, who was originally assigned to this action.  Upon Judge Feuerstein's passing, the action was reassigned to the Honorable Gary R. Brown.

[2]    Included in the Government's February 5, 2021 briefing was an alternative argument allowing it to offer additional evidence in support of its position at an additional hearing.  This Court ordered that any further briefing on this issue await its decision on the basis of the hearing already held.  In light of the holding herein, the Court recommends denial of any additional hearing as unnecessary.

BACKGROUND

I.     Prior Proceedings

       A.      The Indictment and the Motion to Suppress

       On August 6, 2013, agents of the Government executed the Warrant at Kayla's

business premises (the "Kayla Search").  Drago was not indicted until July 31, 2018.  (DE [1].)

That Indictment charged Drago with violating Internal Revenue laws and regulations by: (1)

failing to truthfully account for and pay Federal Insurance Contributions Act ("FICA") taxes; (2)

failing to file required quarterly Federal tax returns, and (3) failing to inform the Internal

Revenue Service of payment of cash wages.  Drago was also charged with violating the Bank

Secrecy Act (the "BSA") by failing to properly file Currency Transaction Reports ("CTR's")

with the Financial Crimes Enforcement Network ("FinCEN").  CTR's are required to be filed for

each transaction in currency, such as a deposit, withdrawal, or exchange of payment, in excess of

$10,000.  The Indictment also charged Drago with violating the BSA by failing to develop and

properly implement an effective anti-money laundering program "reasonably designed to

prevent" a check casher from being used to facilitate money laundering.

       Drago moved to dismiss the Indictment and to suppress evidence seized in connection

with the August 6, 2013 execution of the Warrant.  (DE [24].)  The District Court referred

Drago's motions to this Court for Report and Recommendation.  (See Order of Feuerstein, J.,

dated May 28, 2019.)  In a Report and Recommendation dated June 25, 2019, (the "June 25,

2019 R&R"), (DE [57]), this Court held, inter alia, that the Warrant violated the particularity

clause of the Fourth Amendment.  The Warrant was held unconstitutional not because it lacked

probable cause, but because it failed to properly limit the scope of the search.  This Court also

held that a hearing was necessary to determine whether the asserted good faith of the

Government should avoid suppression of the fruits of the Kayla Search.  (DE [57] at 14.)

On July 15, 2019, the District Court adopted the June 25, 2019 R&R.  (DE [60].)  Thus, in addition to adopting the other matters referred to therein, the District Court adopted this Court's recommendation that a hearing was necessary to determine the issue of good faith.  The District Court referred the good faith hearing to this Court for Report and Recommendation.  That hearing was held before this Court on July 23 and July 24, 2019.  (DE [68]-[69].)  On August 23, 2019, the parties submitted memoranda of law supporting their respective positions as to the requested remedy of suppression.  (DE [70], [71].)  In a Report and Recommendation dated September 19, 2019 (the "September 19, 2019 R&R"), this Court recommended that the motion to suppress the evidence obtained via execution of the Warrant be granted, and that the fruits of the Kayla Search be suppressed.  On September 25, 2019, the District Court adopted the September 19, 2019 R&R.  (DE [75].)

B.      The Superseding Indictment

On October 1, 2019, Drago was charged in a Superseding Indictment – the presently operative charging instrument.  (DE [77].)  The Superseding Indictment charges Drago with: (1) Failure to Maintain an Effective Anti-Money Laundering Program (Count One); (2) Engaging in Unlawful Monetary Transactions (Count Two); (3) Failure to File CTR's (Count Three); (4) Structuring Financial Transactions (Count Four); and (4) Failure to Collect and Pay over FICA Taxes that were due between June 31, 2012 and July 31, 2013 (Counts Five through Nine).  Finally, that instrument alleges two separate criminal forfeiture counts.

II.    <u>The Present Motion</u>

As previously held, the Warrant violated the Fourth Amendment, and the fruits thereof have therefore been suppressed.  Nonetheless, the case against Drago continues in the form of the now operative charging instrument – the Superseding Indictment.  The Government has indicated to Defendant the evidence that it intends to introduce at trial.  Arguing that all such evidence must be suppressed, Defendant states that none can be sourced independently of the fruits of the Kayla Search.  In contrast, the Government argues that each piece of evidence stems from a source independent of the Warrant.  The District Court held that a hearing was necessary to determine whether the argued independent bases exist for admission of evidence and referred that hearing to this Court for a Report and Recommendation.

On October 20, 2020, an in-court independent source hearing was held.  The Government called one witnesses to testify, Internal Revenue Service ("IRS" or the "Agency") Special Agent Heather McCue ("Agent McCue" or "McCue").  It also introduced, <u>inter alia</u>, an exhibit ("Exhibit A") listing documents it intends to introduce at Drago's trial.  As discussed below, there is agreement that many of the documents listed in Exhibit A may be used.  However, there is no agreement regarding the use of approximately 300 documents referred to therein.  Those documents are referred to herein as the Contested Documents.

As discussed below, Agent McCue testified in detail as to the Government's access to each of the documents that it intends to use at Drago's trial.  The Court now turns to discuss that testimony.

III.   The Hearing

    A.   Agent McCue's Background and IRS Investigations of Check Cashers

Agent McCue works for the criminal investigation unit of the IRS.  She has been employed by the Agency for fifteen years.  (Transcript of Oct. 20, 2020 Hearing ("Tr.") 18.) McCue developed and has continued to be involved with an IRS investigatory project known as the "Check Cashing Project" (the "Project").  (Tr. 22.)  At the hearing, McCue referred to materials developed in connection with the development and teaching of the Project to IRS agents between 2008 and 2010.  (Tr. 26; Hearing Exhibit ("HX") 1.)  She testified as to discussions about the Project that she had with now-retired Special Agents Scaringi and Snedecker.  (Tr. 27.)  It was Agent Snedeker who served as the affiant supporting the Warrant upon its 2012 presentation to the Magistrate Judge.  The Court refers herein to that affidavit as the "Snedeker Affidavit," which was entered into evidence at the hearing as HX 3.

The Project was developed by the IRS (and, in particular, by McCue) in approximately 2006.  (Tr. 23.)  It uses CTR's to develop possible tax cases.  (Tr. 22.)  As noted, and as testified to by McCue, CTR's are reports filed by financial institutions for cash transactions in excess of $10,000.  (Tr. 22.)  They are filed within seven to fourteen days of the transaction, (Tr. 28), and they describe the recipient of the cash, who gave cash to a financial institution, and the amount of cash involved.  (Tr. 22.)  Check cashing businesses are required to filed CTR's any time they receive cash or cash is given that is in excess of $10,000.  (Tr. 23.)  Thus, if an individual received more than $10,000 by cashing a check at such a business, that transaction would trigger the filing of a CTR by the check casher.

IRS agents like McCue have access to CTR's via what is currently known as the

"FinCEN" portal, previously known as the Currency Banking Retrieval System (the "CBRS"). (Tr. 27-28.)  They also have access to IRS tax return data.  An agent conducting an investigation of a check casher like Kayla can easily compare the total amount of money cashed by a business or individual using the service with tax return data.  (Tr. 28-29.)  When conducting investigations, IRS agents often consider the nature of businesses cashing checks and the amount of cash they receive from check cashers.  If a business cashing a large amount of checks in exchange for cash is not the type that typically needs to have a great volume of cash on hand, IRS agents would question the need for such large amounts of cash and consider whether to pursue a criminal tax investigation of the business.  (Tr. 29-30.)  Such investigations might be pursued by experienced agents like McCue to determine whether these businesses were obtaining large amounts of cash to pay illegal "off-the-books" payroll.  (Tr. 30.)  Such payments might constitute tax crimes arising under Title 26 of the United States Code.  These crimes are referred to by IRS agents as "Title 26 crimes."  (Tr. 31.)

In addition to uncovering evidence of companies paying off-the-books payroll, the Project was also aimed at investigation of check cashing companies like Kayla.  (Tr. 30.)  With respect to such companies, the Project focused not only on tax crimes, but also on possible violations of the Bank Secrecy Act in the form of what is known as "structuring."  (Tr. 30.)  Structuring occurs when a person takes over $10,000 in cash, whether depositing or receiving, and they break it up into smaller amounts so that a CTR is not filed.  (Tr. 31.)  With respect to CTR's, investigators would look at the volume of cash transactions and compare that information to other known information.  (Tr. 34.)  Violations of the Bank Secrecy Act in the form of structuring crimes arise under Title 31 of the United States Code.  These crimes are referred to by IRS agents as "Title 31 crimes."  (Tr. 31.)

Agent McCue has been involved in the investigation of both Title 26 and Title 31 crimes. (Tr. 31-32.)  In addition to the review of CTR records (maintained by the CRBS and, now, FinCEN) and tax records, McCue has utilized bank record subpoenas when conducting investigations of check cashing businesses.  (Tr. 32.)  Bank records produced in response to IRS subpoenas typically include all checks that the check casher deposited.  Such records show the volume of cash that is generated from check cashers.  (Tr. 32.)  Records requested from banks pursuant to such subpoenas are produced on a rolling basis over time, allowing IRS agents to determine patterns in activity.  (Tr. 33.)  Agents investigating cash checking companies like Kayla use the entire variety of record production techniques described above to determine whether laws were violated.  Thus, agents review bank records, tax returns and CTR's over time. (Tr. 33-34.)

Agent McCue also testified as to New York State's regulation of check cashing businesses such as Kayla.  She stated that IRS agents have access to information generated by the New York State Department of Financial Services, formerly known as the New York State Banking Department (referred to herein as the "DFS").  (Tr. 34-35.)  Documents required to be filed with DFS include annual financial reports reflecting banking information, personal contact information and anti-money laundering materials.  (Tr. 35.)  McCue testified that in her capacity as the agent who runs the "Suspicious Activity Report Program," she is the federal coordinator for the New York State field office.  As such, she maintains a relationship with DFS.  (Tr. 36.)  All check cashing businesses in New York, whether or not they are under investigation, are required to make DFS filings that include anti-money laundering materials, reports of examinations, and annual reports. (Tr. 37-38.)  These records are made available to the IRS upon request from investigating agents like McCue.

8

In addition to state regulation by DFS, check cashing services like Kayla are also audited by the IRS in connection with its regulation of Money Services Businesses ("MSB's"). In that role, the IRS maintains money laundering materials from MSB's, as well as manuals that check cashing companies distribute to employees. (Tr. 38.) During an investigation of a check cashing company, it would be common for the IRS to review DFS and MSB materials and, in addition, to subpoena records directly from the check casher and its bank. (Tr. 39.)

Decisions to prosecute a check casher for possible structuring are typically based upon information that the check casher is involved in more than a single event of structuring. Thus, an IRS investigatory decision is usually based upon information that a check casher has engaged in multiple instances of structuring, often coupled with possible tax offenses. Such tax offenses might include cases of charging excess fees to agree to structure transactions. Those fees might amount to unreported income. (Tr. 40-41.) To uncover these tax offenses the IRS would (in addition to using the investigatory techniques described above) review tax returns of employees suspected of assisting in structuring for instances of unreported income. (Tr. 41-42.) In addition to the many documentary tools of their investigations, agents like McCue obtain additional information by conducting interviews of people with knowledge of investigated businesses. (Tr. 34.)

To summarize, McCue's general background testimony detailed her role in the creation of the Project, and the Agency's enforcement of crimes related to check cashers and check cashing businesses. Her testimony described the broad variety of tools at the Agency's disposal when investigating possible Title 26 and Title 31 crimes. These tools include review of: (1) CTR's (available from the CBRS and, now, through FinCEN); (2) tax return information of individuals and businesses; (3) materials supplied in response to bank record subpoenas; (4)

review of business filings made with the New York State DFS; (5) review of MSB filings with the IRS; and, (6) witness interviews.

The Court now turns to discuss McCue's testimony as to the particular uses of these tools in connection with the investigation of Kayla, which began well in advance of the 2013 execution of the Warrant.

      B.    <u>The Kayla Investigation: Information Obtained by the IRS Prior to the Warrant</u>

          1.    <u>McCue's Knowledge</u>

The IRS investigation of Kayla began in approximately February 2012. The Warrant was presented to the Magistrate Judge on July 29, 2013 and was executed on August 6, 2013. This was approximately three years prior to McCue's involvement in the Kayla investigation. However, it was McCue who developed the Project years before the Kayla investigation, and she was well informed as to the investigatory techniques used in connection therewith. McCue testified as to information and events that took place prior to, and after commencement of, the Kayla investigation. (Tr. 21.) While she had not worked on the Kayla investigation from its inception, McCue testified as to her familiarity with the investigation and her current involvement. (Tr. 18-19.) In particular, McCue's involvement in the Kayla investigation began in 2016, and she has reviewed the entire case file. (Tr. 20.) She testified that Drago ran several check cashing companies, including Kayla. (Tr. 19.) Her familiarity with the investigation is evidenced by the fact that she personally interviewed witnesses and analyzed evidence with respect thereto. (Tr. 20.) Additionally, she has also spoken with the retired special agents who originally worked on the Kayla investigation. (Tr. 21.)

2.    The Investigation Begins: Former Tax Defendant's Knowledge of Structuring at Kayla

The investigation of Kayla was a Title 26 tax and a Title 31 banking investigation. (Tr. 33, 42.) It began when a former tax defendant came forward to the IRS with information regarding structuring taking place at Kayla. (Tr. 43; HX 3.) That individual was sent to Kayla with a recording device on him when he cashed checks. He started by cashing checks under $10,000, and gradually increased the amount of each check. (Tr. 43.) He approached Kayla employees Marty Chiffriller ("Chiffriller") and Kenny Hendricks ("Hendricks"). (Tr. 44.) The Snedeker Affidavit refers to these individuals and the information obtained by the Kayla customer. (HX 3.) It details the IRS investigation conducted into Kayla prior to the July 2013 submission of the Warrant to the Court. It refers not only to the testimony of the former tax defendant, but also, as discussed below, to records obtained as a result of the IRS undercover investigation of Kayla. (Tr. 47.)

3.    Subpoenaed Records in Possession of the IRS

Among the documents referred to in the Snedeker Affidavit (and in the possession of the IRS prior to application for the Warrant) were subpoenaed Kayla bank records. (Tr. 48.) Those records include bank records from a three-month period in 2010, as well as a three-month period in 2012. (Tr. 48.) The bank records in the possession of the IRS also included those for several entities that cashed checks at Kayla. These businesses were known as: (1) Defiance or Island Rock and Dirt ("Defiance"); (2) George Parsons Roofing or George Parsons General Contracting (the "Parsons Companies"); (3) SG Auto or Collision Concepts ("SG"); and, (4) Steve's Foreign Auto or Joseph's Service Station ("Steve's Auto"). (Tr. 49.)

The Snedeker Affidavit also indicates that the IRS was in possession of Kayla's CBRS (currently known as FinCEN) data for 2010 and 2011. (Tr. 50-51.) This data was requested by

11

former IRS agent Scaringi on or about March 2011. (Tr. 51-52.) Also reviewed in connection

with the Warrant were Kayla's anti-money laundering and check cashing manuals, which, like

the materials referred to above, were in the possession of the IRS prior to application for, and

execution of, the Warrant. (Tr. 55.) These manuals were requested on or about June 5, 2012.

(Tr. 55.)

      4.    <u>Interviews with Witnesses and with Drago</u>

      In addition to documents obtained by the IRS from federal and state

sources, the investigation into Kayla included conversations with witnesses. One such witness,

an individual named Justin Greenfield ("Greenfield"), spoke to the IRS regarding conversations

he had with Kayla employees identified as "John" and "Ken." These two individuals instructed

Greenfield, who had previously pled guilty to tax evasion, as to how to structure transactions.

(Tr. 52-53.) Agent Snedeker was in contact with other IRS agents in an email dated August 8,

2012. That email advised agents of the IRS investigation of Kayla and other Drago check

cashing entities. It asked whether any of their targets used the services of any of these

companies. (Tr. 59-60.)

    Also prior to submission and execution of the Warrant was information voluntarily

provided to the IRS by Drago. (Tr. 57.) Drago was first interviewed by the IRS on December

21, 2012. (HX 2 (Memorandum of Interview ("MOI") of John Drago conducted by IRS agents

Meehan and Chandler, hereinafter the "December 2012 MOI".)) That interview was conducted

in connection with a separate investigation into the activities of Kayla customer Thomas Bohm

("Bohm"), one of several Kayla customers referenced in the Warrant. (Tr. 58-59; HX 2 at 1.)

Among other things, Drago told the IRS that he explained structuring financial transactions to Kayla employees.  (Tr. 63; HX 2 at.)[3]

The December 2012 MOI recounts Drago's description of the ownership structure of his check cashing business.  (Tr. 60; HX 2.)  He stated that those several businesses (for which he took responsibility) were operated under an entity known as "Hogwarts."  (Tr. 60-61.)  Drago stated that he was assisted at Kayla by individuals named Ray Holtzwarth ("Holtzwarth") and Victoria Torres.  (Tr. 61.)  He identified Carolina Suarez ("Suarez") as the person who gathered Kayla information responsive to IRS subpoenas.  (Tr. 61.)  Drago described two Kayla salesmen – Hendrick and his father, Mike Hendrick – who were both formerly employed by a then-closed check casher, discussed in greater detail below.  The discussions described in the December 2012 MOI and IRS interviews with witnesses make clear that Hogwarts, Holtzwarth, Hendrick and Suarez were described to the IRS prior to application for and execution of the Warrant.  At or around the same time, in December 2012, Drago said that he was advised by Hendrick that a Kayla customer was under investigation by the IRS.  (Tr. 82.)  Information regarding Hendrick was particularly important to the ongoing IRS investigation of crimes involving check chasers and Kayla.

> 5.   Kayla Employee Hendrick and His Former Employer: MTE

Drago told the IRS that prior to Hendrick's employment at Kayla, he worked at a check cashing business known as Armor Check Cashing, which was also known as MTE Capital or Oak Street Check Cashing (collectively herein, "MTE").  (Tr. 61-63.)  MTE

---

[3]   As discussed below, Drago continued to voluntarily provide information to the IRS after execution of the Warrant, as well as after the 2019 Superseding Indictment.  (Tr. 58.)  Although represented by counsel, there were times that Drago chose to discuss Kayla with the IRS outside of the presence of his counsel.  (Tr. 58.)

closed in approximately August 2010. (Tr. 62.)  Prior to that closing, the IRS subpoenaed bank records from MTE's JP Morgan Chase bank account. (Tr. 63.)  Those subpoenas sought records of every check cashed by MTE Capital from 2006 through January of 2009. (Tr. 64; HX 12 (selections of MTE data obtained by the IRS prior to application for the Warrant).)

After production of the MTE subpoenaed bank records, MTE checks were entered into the IRS database.  This allowed the IRS to prepare reports identifying customers, payees, payors, and the banks used. (Tr. 64.)  Like all of the information referred to above, this bank data was in the possession of the IRS prior to submission and execution of the Warrant. (Tr. 64.)  The IRS was also in possession of CTR's that MTE filed in or about 2010 thorough 2013. (Tr. 64-66; HX 8 (MTE CTR's for 2010); HX 57-60 (CTR's 2010-2013).)  Those CTR's include records reflecting transactions of the Parsons Companies, SG and Steve's Auto. (Tr. 66.)  In 2010 and 2011, the IRS had also obtained copies of CTR's filed by Kayla, and those requested by Agent Scaringi. [4]  (Tr. 67.)

Building upon knowledge: (1) regarding a tax defendant who did business at Kayla; (2) that Hendrick worked at MTE; and, (3) of the IRS CTR documents already in its possession, the IRS compared the data culled from MTE documents with Kayla documents.  This allowed the Agency to determine which companies, if any, the two companies had in common. (Tr. 67.) There were approximately sixty-two such common customers. (Tr. 68; HX 11.)  Bohm (the individual referred to above who pled guilty to tax crimes) was an MTE customer. (Tr. 62.) After MTE's closing and Kendrick's transition to Kayla, he brought over Bohm as a Kayla

---

[4]     Ultimately, those CTR's included reports filed by Kayla through 2018. (Tr. 67.)

customer. (Tr. 63.)  Also common to the two companies was Greenfield, an individual under IRS investigation since 2011.  (Tr. 69.)

The Parsons Companies were also MTE customers that came over to Kayla.  (Tr. 69; HX 11.)  Agent McCue testified as to the amount of cash obtained by the Parsons Companies via check cashing.  Between 2006 and 2010, the Parsons Companies cashed checks in excess of $1 million.  (Tr. 70.)  That large amount of cash would, in the opinion of McCue, raise suspicion and likely lead to an IRS investigation.  (Tr. 71-72.)  The total amount of CTR's filed from 2010 through 2013 was only $164,000, which, in Agent McCue's opinion, led to the conclusion that the Parsons Companies were cashing checks under the amount that would trigger the filing of a CTR, i.e., under $10,000.  (Tr. 72; HX13.)

As a further investigative tool of the Parsons Companies, the IRS considered their tax returns.  Amounts listed on those returns would be considered in light of the large amount of cash obtained from Kayla, versus income and costs reported.  In the case of the Parsons Companies, suspicions arose because the gross receipts reflected in the tax returns for 2000, for example, didn't square with low labor costs reported.  Specifically, for the year 2000, the Parsons Companies reported gross receipts of $2.6 million, with labor costs of only $9,100.  This raised a suspicion of unreported labor costs and payment of off-the-books payroll.  (Tr. 73.)  The Parsons Companies' structuring activities were confirmed during an IRS interview with one of its employees who provided checks to Kendrick for cashing.  (Tr. 85.)

Similar suspicions regarding the amount of checks cashed when compared with reported income arose with respect to Kayla customer Steve's Auto.  (Tr. 74; HX 14.)  Investigatory decisions with respect to Steve's Auto were made by the IRS when considering the amount of cash that an auto repair business would be expected to need on hand, amounts reported on tax

returns, and whether the business used a check cashing company that was under investigation for assisting this activity.  (Tr. 75-76.)

Agent McCue also testified as to suspicious check cashing activity by SG – also a common customer of MTE and Kayla.  Like Steve's Auto, SG had an unusually large amount of checks cashed by MTE and Kayla, when compared with the amount of cash that would normally be needed by a company engaged in the auto repair business.  (Tr. 78-79; HX 15.)  Comparison of SG's tax returns with the amount of cash obtained by cashing checks at Kayla raised suspicion as to illegally under-reporting income.  In fact, SG reported income in 2010 of $325,000, but cashed checks at Kayla in the amount of $1.6 million.  (Tr. 80.)

All of the materials described by Agent McCue with respect to IRS investigations of the companies referred to above were in the possession of the IRS prior to the submission and execution of the Warrant, at a time when the IRS was actively investigating Kayla as being involved in illegal structuring activities.  (Tr. 81-82.)  Indeed, all of these documents suggested to the IRS that these companies were using Kayla (and previously used MTE) to evade the payment of taxes to the IRS.  (Tr. 82.)

    C.    <u>Information in Possession of the Government Both Before and After the Warrant</u>

        1.    <u>Tax Return Information</u>

Agent McCue testified that in addition to personal interviews, it would have similarly been standard operating procedure to review the tax returns of individuals in connection with any IRS investigation.  (Tr. 95.)  The IRS requested and reviewed tax information for Kayla employees as early as 2013, prior to seeking the Warrant.  These efforts continued after its execution.  (Tr. 97.)  McCue testified that IRS pursuit and review of tax information took place without regard to the outcome of the Warrant.  (Tr. 98.)

McCue identified tax return information that the IRS reviewed during the course of its Kayla investigation. These documents are included in the exhibits sought to be used by the Government. They include tax returns as well as documents referred to as "transcripts of account." A transcript of account is the IRS official notice that sets forth the date that the return is accepted by the IRS and any action taken by the Agency on the account. (Tr. 134.) These tax documents were always in the possession of the IRS and were not uncovered during the execution of the Warrant. (Tr. 135.)

Pursuant to its usual investigatory role, the IRS also reviewed tax return information of Hogwarts, the corporate entity identified earlier by Drago that held Kayla and Drago's other check cashing businesses. (Tr. 96-97.) In addition to interviewing the Kayla employees referred to above, the IRS reviewed their tax returns, as well as tax returns filed by Hogwarts. (Tr. 96.) These returns appear as Exhibits 15.1-15.9 of Exhibit A. Memoranda of individual interviews are part of the documents at issue. (Exhs. 26.1-26.4 (Hendricks Transcripts of Account); Exhs. 27-33.2 (Hendricks' tax returns); Exhs. 34.1-34.7 (Drago Transcripts of Account).) So too are tax returns of Drago and Kayla employees. (Exhs. 35-41(Drago tax returns); Exhs. 42.1-42.4 (Suarez Transcripts of Account); Exhs. 43-47 (Suarez tax returns); Exhs. 48.1-48.4 (Chiffler Transcripts of Account); Exhs. 49-54 (Chiffler tax returns); Exhs. 55.1-55.4 (Holzworth Transcripts of Account); Exhs. 56-59 (Holzworth tax returns); Exhs. 298.1- 302 (Hogwarts Tax forms and Transcripts of Account); Exh. 303 (Suarez tax return); Exhs. 304-05 (Holzwarth tax returns); Exh. 306 (Drago amended tax return).)

The majority of these documents, including, in particular, tax return information for Drago, Hendrick and Chiffriller, were requested for review prior to 2013, and in the course of the IRS investigation of Kayla's check cashing business. (Tr. 96-97.) Review of such tax return

information is standard operating procedure for agents conducting investigations, and such returns were always in the possession of the IRS. (Tr. 98.)

          2.    <u>CTR's and MSB Filings</u>

Agent McCue testified about CTR's that were in the possession of Kayla prior to application for the Warrant. (Tr. 91 (Exhibit A at Exhibits 126 -130).) CTR's are maintained by FinCEN and were available for the IRS to access both before and after execution of the Warrant. (Tr. 91.) CTR's at issue here include those going through 2018. However, CTR's from 2010 through 2013 were available to IRS investigators prior to application for the Warrant. (Tr. 91.) Such documents were requested by the Agency prior to application for the Warrant. (Tr. 92.) They would, as a matter of course, be reviewed by the IRS in connection with investigation of crimes such as structuring and failing to operate an effective money laundering program – crimes that Drago has been under investigation for that form the basis of the present indictment. (Tr. 92.)

Exhibit A at Exhibits 167-170 are filings made by money service businesses. (Tr. 93.) Specifically, they are the type of filings required to be made with the IRS by businesses, like Kayla, that are engaged in check cashing. (Tr. 93.) Businesses that make such filings do so because they are engaged in businesses required to do so. (Tr. 93.) The filings have been in the possession of the IRS both before and after execution of the Warrant. (Tr. 94.) The purpose of these filings is to show that the business entity making the filing is required to file CTR's. (Tr. 93.) Exhibits 171-175 are CTR's filed against various witnesses discussed during Agent McCue's testimony who used Kayla's check cashing services. (Tr. 94.) Like the other CTR documents, these were in the possession of the IRS or FinCEN both before and after application for the Warrant. (Tr. 94.)

3.    DFS Records

Agent McCue identified records maintained in the ordinary course of the business of the DFS.  (Tr. 106.)  She testified that such records were related to Kayla's anti-money laundering program and related to potential structuring crimes.  (Tr. 106-07.)  These documents, appearing as Exhibits 60-105, were filed by Kayla and were in the possession of DFS prior to, and after application for, the Warrant.  (Tr. 107.)  Those that came into possession of DFS after execution of the Warrant were not generated as a result of the search incident thereto.  (Tr. 107.)  Instead, they were regularly maintained by DFS and accessible to the IRS.  (Tr. 107.)  Exhibit 310 is a spreadsheet prepared by McCue of all Kayla employee data from New York State DFS data.  The data summarized in this spreadsheet was available to the IRS before, after, and independent of the execution of the Warrant.  (Tr. 136.)

D.    Documents Seized During Execution of the Warrant

During the execution of the Warrant, the Government seized approximately thirty boxes of evidence.  (Tr. 141.)  According to McCue, a "substantial percentage" of the material seized consisted of CTR reports.  (Tr. 141.)  Additionally, the Government seized and imaged Kayla's computers.  (Tr. 141.)  As discussed below, the IRS either declined to review the documents seized or, in the case of seized computers, was not able to secure a program that would allow the agency to review any of the material on the seized computers until, at the earliest, March 5, 2014, approximately eight months after execution of the Warrant.

1.    Boxes of Documents

The paper documents seized were placed in boxes and were described in "inventory sheets" that state the contents of each box.  (Tr. 142.)  Agents pursuing the

investigation would refer to these descriptions to determine whether to review the contents of any particular box.  McCue testified that where an inventory sheet indicated that a box contained CTR's, for example, the IRS would not review the contents of the box.  Instead, the Agency would take the easier route of simply reviewing the CTR's on its own system.  (Tr. 143.)  McCue acknowledged, on cross-examination, that seized documents included files and envelopes with identifying Kayla client information such as corporate resolutions.  (Tr. 143.)  She stated, however, that none of that information was reviewed to identify possible targets for investigation.  In any event, most such customer information was already available to the IRS through the CBRS system or filed CTR's, obviating the need to review such paper folders.  (Tr. 143-44.)  Moreover, McCue testified that, with the exception of feeding CTR's into a machine for scanning, she never physically looked through the contents of the thirty seized boxes of documents.  (Tr. 203.)  She stated that other than commission sheets that were used during a proffer, none of the seized documents were of any real relevance and the items contained in the boxes were essentially duplicative of materials that the IRS already had in its possession.  (Tr. 204.)

      2.   <u>Computers</u>

There is no question that computers were seized and imaged during execution of the Warrant.  It is also clear that the IRS was initially unable to access any of the information stored on those computers.  (Tr. 104 (McCue testifying as to inability to access information).)  However, it now is clear that while McCue testified that the IRS was never able to access such information, after working with the software company that designed Kayla's check cashing software, the Agency was, indeed, able to access information appearing in the seized computers.

McCue's testimony regarding the Agency's inability to access information contained on the computers seized from Kayla described their inability to run a software program used by Kayla, known as "K-soft." (Tr. 109.) Emails referred to in Defendant's March 25, 2021 letter reveal this fact. On October 23, 2013, Agent Scaringi made a specific request to an IRS computer specialist to retrieve checks cashed by a Kayla customer from Kayla's computers. (DE [149-1].) The testimony regarding the difficulty in getting this program to run is clear. Indeed, on November 19, 2013, an IRS computer specialist contacted former Agent Scaringi to report that her team was still working on restoring Drago's server, and was unable to get the computer check-cashing program to run. (DE [149-1]; Ex. 14.) Drago and defense counsel were made aware of the Government's inability to access the data on the seized computers. (Tr. 109.)

While McCue testified that it was not until 2018 or 2019 that IRS agents were able to get the K-soft program to run, (Tr. 109), it is now clear that McCue's testimony regarding timing was not accurate. Instead of 2018 or 2019, the earliest date that the Government was able to obtain information from the seized computers appears to have been March 2014. Indeed, on September 12, 2014, the CEO of K-Soft (who had been contacted shortly after execution of the Warrant to assist the Government in accessing the data contained in the seized computers) sent the Government a spreadsheet containing check cashing data recorded between September 7, 2012 and September 30, 2012. (DE [149-2]; Ex. 13.)

On August 2, 2019, prior to this Court's decision on the suppression motion, and before the October 2020 hearing, the Government informed Defendant that the IRS had been able to extract certain files from the seized computers. This fact was not pursued on cross-examination of McCue, but in his brief, Defendant challenged McCue's testimony. In response, the

Government conducted a renewed search of its files. This search yielded documents that the Government argues strengthen its claim that the computer search resulted in the retrieval of no information that it has relied upon in the current case. The Government further states that the failure to earlier disclose these documents was inadvertent and attributable, at least in part, to the fact that McCue was required to work remotely during the pandemic. Under cover of letters dated January 29 and February 1, 2021, the Government disclosed voluminous pre-trial discovery to Defendant, which included these additional documents. (DE [143] at 38 and n.12.)

It is clear to the Court that information available to the Government in March 2014 played no role in the IRS decision to seek and obtain information from Drago, his employees, and Kayla customers. Indeed, by that date, the Defendant, Holzwarth, Hendrick and Chiffriller had already proffered with the Government. Any subsequently obtained tax information as to Kayla business entities, (DE [142] Exs. 8-11), was not referenced in the 2014 computer records, which concerned only Kayla customers. Upon the Court's review of the documents produced as a result of the belated search of the seized computers, the court exercises its discretion to supplement the record at this time, without taking additional testimony, and to consider these documents in connection with the present motion. See United States v. James, No. 3:15-CR-00049, 2017 WL 56066, at *3 (W.D. Ky. Jan. 4, 2017).

E.     Post-Warrant Execution Investigation of Kayla

The Court turns to discuss below events that took place after the execution of the Warrant, including the gathering of evidence in support of the Kayla investigation. At no point after the execution of the Warrant did the Government put together a "taint" team, or make any effort to determine whether the information gathered post-Warrant was in any way tainted by information obtained as a result of the Warrant's execution. (Tr. 188.) However, Agent McCue

testified that most of the agents involved in the investigation never looked at any of the search warrant materials.  (Tr. 189.)

1.    Hendrick's Commission Sheet

As noted, in December 2012, Drago told the IRS that a salesman (Hendrick) told Drago that a customer was under investigation by the IRS.  (Tr. 82.)  During execution of the Warrant, the IRS recovered a document referred to as a "commission sheet" that described some of Hendrick's activities while employed at Kayla.  (Tr. 83.)  This document reflected commission payments received by Hendrick for customers that he brought to Kayla.  It also stated that Hendrick was being paid commissions off-the-books.  (Tr. 83.)  Agent McCue testified that during her career, which includes over sixty investigations, she had never before seen a commission statement used.  (Tr. 84.)

As discussed below, Drago was shown, and identified, Hendrick's commission sheet during a proffer session with the Government that took place after execution of the Warrant and while Drago was represented by counsel.  (Tr. 106.)  Given that the IRS knew from its previous investigations that Hendrick was involved in structuring activity, the agency had already looked to see whether MTE and Kayla had customers in common.  (Tr. 84.)  This lead in investigation was also spurred because Drago himself told the IRS, in 2012, that Hendrick used to be a salesman at MTE.  (Tr. 85.)

2.    Interviews of Kayla Customers

After execution of the Warrant, the IRS conducted interviews of various agents and employees of the other entities under investigation in connection with the Project and its ongoing investigation of Kayla.  (Tr. 85.)  On April 15, 2014, Parsons Companies employee Kim Stella ("Stella") was interviewed by the IRS.  (Tr. 85; HX 42.)  Stella described structuring

activity when providing checks to Hendrick. During this interview, Stella was not shown any documents recovered during the execution of the Warrant. (Tr. 85-86.) She has agreed to testify at Drago's trial, and the Government has made no promises to Stella in exchange for that testimony. (Tr. 86.)

The IRS also interviewed an individual referred to as George, a principal of the Parsons Companies. This interview took place on or about March 3, 2014. (Tr. 86-87; HX 41.) George, who has been prosecuted and sentenced for tax evasion, has also agreed to testify at Drago's trial. (Tr. 87.) Like Stella, George was not shown any Warrant material during his IRS interview. He too, stated that he engaged in structuring activity with Kayla. (Tr. 87.)

Steven Hoju ("Hoju"), a principal of Steve's Auto, was also interviewed by IRS agents after execution of the Warrant. (Tr. 88; HX 35-38.) Like the other individuals interviewed, Hoju told the IRS, without being shown any material recovered from the Warrant, that he engaged in structuring activity when doing business with Kayla. (Tr. 88.) Like George, Hoju was convicted of tax evasion, and has agreed to testify against Drago. (Tr. 88.) Hoju has been promised nothing by the IRS in exchange for that testimony. (Tr. 88-89.)

Boris Klerer, a principal of SG, also admitted to the IRS, without being exposed to material recovered during execution of the Warrant, that he engaged in structuring activity with Hendrick at Kayla. (Tr. 89; HX 30.) He has been convicted of tax evasion, will testify against Drago, and has been made no promises in exchange for his testimony. (Tr. 89.)

Michael Pasquaretto ("Pasquaretto"), a principal of Defiance, was also interviewed by IRS agents. (Tr. 90; HX 34.) While he learned that checks he cashed had been structured, he has been charged with no criminal conduct, but has also agreed to testify against Drago in

connection with this case.  (Tr. 90.)  Like other company principals interviewed, Pasquaretto was a customer of Hendrick.  (Tr. 90-91.)

Giovanni Russo ("Russo") was a principal with S&G Auto.  (Tr. 139.)  He has proffered with the Government, (see HX 40), and has pleaded guilty to tax evasion.  He has already been sentenced and has agreed to testify at Drago's trial.  He has not entered into any cooperation agreement with the Government.  (Tr. 139.)

3.    Interviews/Documentary Investigations of Drago and Kayla Employees

Agent McCue testified as to interviews with Drago and Kayla employees. She stated that it would have been standard operating procedure to also conduct interviews with these individuals as part of an IRS investigation.

On the day that the Warrant was executed, Agent Snedeker interviewed Holzwarth.  (HX 19 (MOI dated 8/6/13).)  Holzwarth is a former NYPD officer who was employed by Kayla.  (Tr. 98.)  He was likely interviewed by Agent Snedeker in the car of one of the agents executing the Warrant.  (Tr. 171.)  At that interview, Holzwarth indicated that he was paid on-the-books. (Tr. 172.)  He later indicated that this was not the case.  (Tr. 172, 177.)  Holzwarth was later interviewed by McCue during a 2018 proffer session, where he was represented by counsel.  (Tr. 99.)  During the course of his interviews, Holzwarth provided information to the IRS about activities occurring at Kayla.  (Tr. 99.)  Holzwarth has not been charged with engaging in criminal activity and has agreed to testify at Drago's trial.  (Tr. 100.)

McCue testified that in connection with the investigation of Kayla, interviews would have, and did, also include requests to interview Hendrick, Chiffriller, and Suarez.  (Tr. 95.) These individuals were implicated in possible criminal behavior based upon, inter alia,

statements made by Drago to the IRS.  (Tr. 95.)  Hendrick took part in a proffer session with the Government in 2013, several months after execution of the Warrant.  At that 2013 session, he did not admit to structuring at Kayla or to Drago's involvement in any such activity.  (Tr. 180.)  As noted above, he later agreed to testify regarding such conduct.

4.    Drago's Post-Warrant Email to Snedeker and his August 2013 Proffer

Drago sent an email to Agent Snedeker a day after the execution of the Warrant.  (Tr. 100; HX 21.)  That email referred to a "future box," which held checks to be cashed at a future date.  Agent McCue found the reference to a future box relevant to her investigation because all checks are to be deposited within twenty-four hours of receipt.  (Tr. 100-101.)  This holding back of deposits was consistent with the IRS's experience during the Kayla investigation, i.e., consistent with the procedure of checks being deposited over a period of several days.  (Tr. 101.)

On or about August 27, 2013, Drago entered into a proffer agreement with the United States Attorney's office.  (HX. 21; Tr. 102.)  That agreement states that to the extent that Drago provided truthful information to the Government, such information would not be used against him at any stage of a criminal investigation.  (Tr. 102.)  The agreement also states that any statements made by Drago could, however, be used as leads to other evidence that may be used by the Government at any stage of a criminal proceeding, including, but not limited to a detention hearing or sentencing.  (Tr. 103.)  Information obtained as a "lead" would be information that could lead to evidence that could be used at trial.  Thus, the Government's use of proffered information as a lead would not violate the proffer agreement. (Tr. 103.)

At his proffer, Drago recognized Hendrick's commission statement and stated that he had been paying his employees off-the-books wages.  (Tr. 103-04; HX 24 at 3-4.)  Drago also

acknowledged that Kayla was regulated by the New York State Banking Department.  He identified Suarez as the Kayla employee responsible for responding to subpoenas.  (Tr. 106.)

5.    <u>Kayla Employee Proffers</u>

On March 1, 2016, Chiffriller proffered with the Government.  (HX 28.) During that proffer, he revealed that he had been paid in cash.  While he did not originally report such income, he filed amended tax returns.  He also stated that while employed at Kayla, he never received any anti-money laundering or BSA training.  As to structuring, Chiffriller stated that if a customer asked to structure checks, he would have to ask Drago or Hendrick if that were possible.  He recalled being asked to structure on only one occasion.

Suarez proffered with the Government in January 2018.  (HX 43.)  She stated that Drago completed payroll.  She created envelopes with employee names on them.  Paystubs were made on scrap.  All payroll was made in cash, and the money in each envelope exceeded the amount reflected in the paystub, by about half.

Jerold Dreskin ("Dreskin") was Kayla's accountant.  As such, it would be within his duties to audit Kayla's anti-money laundering policies.  (Tr. 137.)  It would be standard IRS practice to interview someone in Dreskin's position as part of an investigation of a check casher.  (Tr. 137.)  Dreskin proffered with the Government on January 22, 2020.  (HX. 39.)  During his proffer, Dreskin stated that he instructed Drago about making proper determinations as to whether employees were W-2 workers or 1099 workers.  He was never told by Drago of any off-the-books payroll at Kayla.  Dreskin has agreed to testify at Drago's trial.  He has been made no promises in connection with that testimony.  (Tr. 138.)

6.    <u>Documents Provided by Drago's Counsel in April 2016</u>

In April of 2016, Stuart Kaplan – who was then Drago's lawyer – chose to provide the Government with selected transactions that were offered to show Drago's innocence. Specifically, on April 5, 2016, Kaplan provided a thumb drive to McCue containing daily transaction history at Kayla and CRT reports for April and May of 2013. (Tr. 114; HX 46.) These documents were not provided pursuant to any request by the Government. Instead, they were provided by counsel in an effort to demonstrate that Kayla maintained an effective anti-money laundering program. (Tr. 115.) They are the documents that appear in Exhibit A as Exhibits 209.1 through 261. Exhibits 262 and 263 are spreadsheets created by McCue that summarize these documents. (Tr. 116.) As testified to by McCue, these documents would have been accessible to the IRS had the Agency been able to access the seized computer information. (Tr. 115.) In addition to having been provided this information by defense counsel, the IRS could also have accessed the material via FinCEN. (Tr 115.) The IRS could also have had access to these documents had they been subpoenaed from Kayla's bank. (Tr. 116.) Moreover, these documents were not duplicative of documents that were contained on Defendant's computers. (<u>See</u> <u>e.g.</u>, Ex. 214.1 (claiming that a CTR was improperly filed against the defendant's business); Ex. 230 (referring to filing of certain CTR on a "computer error"); Ex. 241 (referring to a teller's "mistake").)

In or around 2016, the Government provided an executable image of the Kayla computers back on to a hard drive provided by Drago so that he could upload and access that information. (Tr. 109-10.) At approximately the same time period, the Government issued a subpoena to Kayla for records that may have been accessible to the Government in 2013, if it had been able to immediately access the computers seized from Kayla in 2013, with respect to the

check cashing activities of Kayla customers.  (Tr. 111, 113.)  Drago's counsel accepted service of that subpoena and it was complied with by Kayla.  (Tr. 111.)  The documents appearing as Exhibits 209.1 through 263 are the documents provided to the IRS by Drago's counsel in 2016. These documents became accessible to Drago after the IRS provided the image of the hard drive that, for years and to this day, is inaccessible to the Agency.  (Tr. 150.)  McCue testified that the data requested by that subpoena was the same data that the IRS could have accessed by service of a subpoena on Kayla's bank.  (Tr. 111-12.)  Service of such a subpoena on Kayla's bank would have also included additional information – not less.  (Tr. 112.)

All such data was relevant to determining whether or not Drago's businesses were engaged in structuring or other crimes.  (Tr. 112.)  It supported what the IRS already knew about the structuring activities of the Parsons Companies, Steve's Auto, Defiance, Greenfield and SG. (Tr. 113; HX 13-16.)  According to McCue, that data alone would have been sufficient to conduct additional investigations as to these entities that did business with Kayla.  (Tr. 113.)

That imaged computer was provided to Drago's lawyer, Stuart Kaplan, who then provided the Government with records that were identified at the hearing as Exhibits 209-263. (HX 150.)  These were Kayla check cashing summaries from April through May of 2013. While Kaplan knew of the Government's inability to review material on the seized computers at the time, he was not aware that such information would never be available for the Government to review pursuant to further efforts.  (Tr. 148-49.)

The information provided by Drago's counsel in 2016, when coupled with information obtained by the IRS from Kayla customers, allowed McCue to create calendars demonstrating that Kayla's CTR's were inaccurate.  (Tr. 133-34; Ex. A 296-297.)

7.    <u>Evidence Obtained by Review of Additional Kayla Customers</u>

As discussed above, the IRS was investigating several Kayla customers: Greenfield and Bohm, Defiance, the Parsons Companies, Steve's Auto and S&G are referred to above.  Bradford Cebula ("Cebula") is another customer who was under IRS scrutiny for structuring.  (Tr. 129-32.)  During his proffer with the Government, Cebula, who has pleaded guilty to tax evasion, stated that "Mr. D" told Cebula's employees to keep checks they were cashing under $10,000 so that he could cash such checks over several days and avoid the triggering of CTR's. (HX 31.)

8.    <u>Documents Produced by the Government in January and February of 2021</u>

On January 29 and February 1, 2021, the Government produced additional materials to the Defense.  (DE [149] (Drago defense letter to Court dated March 25, 2021) (hereinafter the "March 2021 Letter").)  The March 2021 Letter refers to and annexes that production.  Drago seeks to have these documents considered in connection with the present motion.  He does not request a re-opening of the hearing.  The documents referred to in the March 2021 Letter are as follows:

- 2015 emails relating to the Government's ability to access material on seized Kayla computers (DE [149-1], Ex. A);

- 2015 emails between the IRS and kSoft relating to IRS efforts to access material on seized Kayla computers (DE [149-2], Ex. B);

- 2018 email requesting records from DFS (DE [149-3], Ex. C); and,

- IRS internal requests for tax records for Drago, Hogwarts and certain Kayla customers (DE [149-3], Ex. D).

Upon receipt of the March 2021 Letter, this Court noted that Defendant had therein raised new arguments to consider in connection with the pending motion.  In the interest of fairness, the Government was given the opportunity to respond.  After seeking a short extension of time, the

Government filed its response to the March 2021 Letter on April 9, 2021.  (DE [151].)  In view of the fact that this Court allowed no further briefing, this matter is now ripe for adjudication.

IV.    Documents at Issue

At the hearing, counsel agreed to the introduction of "Exhibit A."  These documents, in addition to the hearing exhibits, have been discussed above and are described in greater detail below.

**The following 111 documents in Exhibit A are not in dispute:**

- 48 documents appearing as Exhibits 1-14;

- 28 documents appearing as Exhibits 183-208;

- 27 documents appearing as Exhibits 265-292;

- 5 documents appearing as Exhibits 307-309.2; and,

- 3 documents appearing as Exhibits 311-313.

The Court lists next the Contested Documents.  Along with the document numbers, the Court includes a general description of the documents so that they can be more easily grouped for purposes of the legal discussion that follows.

**The 256 Contested Documents**

- Exhibits 15.1-59 (corporate and personal tax returns of Hogwarts, Hendrick, Drago, Suarez, Chiffriller and Holtzwarth from 2010-2018) (together with Exhibits 298.1-306, the "Tax Return Exhibits");

- Exhibits 60-119 (annual reports and reports of examination generated by DFS with respect to Kayla businesses) (together with summary spreadsheets appearing as Exhibits 120-125, the "DFS Exhibits");

- Exhibits 120-125 (summary spreadsheets prepared by McCue of reports appearing as Exhibits 60-119 showing places of employment and employee status of individuals who Drago states to have worked at Kayla) (together with Exhibit 310, the "Employee Summary Exhibits");

- Exhibits 126-129 (2010-2018 certified CTR reports filed by Kayla businesses) (together with Exhibits 130, and Exhibits 171-75, the "CTR Exhibits");

- Exhibit 130 (summary spreadsheet prepared by McCue of certified CTR reports filed during 2010-2018 by Kayla locations) (included in the CTR Exhibits);

- Exhibits 167-170 (certified Registered Money Services Business filings by Kayla businesses) (included in the CTR Exhibits);

- Exhibits 171-175 (certified CTRs filed on businesses that utilized Kayla services) (included in the CTR Exhibits);

- Exhibits 176.1-176.7 (materials provided by customer witnesses during their proffers to the Government including checks cashed on businesses that utilized Kayla services and summary of such checks (together with Exhibits 293-94, the "Customer Witness Exhibits");

- Exhibits 176.8-178.1 (Kayla customer records obtained via IRS subpoenas) (together with Exhibits 295-97, the "Subpoenaed Exhibits");

- Exhibits 209.1-261 (Kayla check cashing customer records for 2013 provided by Drago to IRS through counsel by letter from counsel in or around April 2016) (together with Exhibits 262-62, the "Selected Transaction Exhibits");

- Exhibits 262-263 (two summaries of information appearing in Exhibits 209.1-261 prepared by McCue showing summary for April 1-30, 2013 and May 1-31, 2013) (included in the Selected Transaction Exhibits);

- Exhibits 293-294 (documents provided to IRS by Defiance, Parsons Companies, Steve's Auto and S&G) (included in the Customer Witness Exhibits);

- Exhibits 295-97 (Kayla customer calendars subpoenaed by IRS in or around December 2016) (included in the Subpoenaed Exhibits);

- Exhibits 298.1-306 (corporate and personal tax returns and annual reports of Hogwarts, Hendrick, Drago, Suarez, Chiffriller and Holtzworth for 2010-2018 (included in the Tax Return Exhibits); and,

- Exhibit 310 (summary spreadsheet prepared by McCue based upon employee W-2 and New York State provided information) (included in the Employee Summary Exhibits).

ANALYSIS

I.   Legal Principles: The Exclusionary Rule and Exceptions Argued to Apply

It has already been held that the Warrant, executed on August 6, 2013, two weeks after authorized by the Magistrate Judge, violated the Fourth Amendment.  As explained in this Court's decision with respect to the constitutionality of the Warrant, "[t]he fact that a Fourth Amendment violation occurred – i.e., that a search or arrest was unreasonable – does not necessarily mean that the exclusionary rule applies."  Herring v. United States, 555 U.S. 135, 140 (2009) (citing Illinois v. Gates, 462 U.S. 213, 223 (1983)).  While counsel, as noted above, reached agreement as to the application of the exclusionary rule with respect to many documents, the Government's use of the "Contested Documents" remains at issue.

The Government seeks application of three separate exceptions to the exclusionary rule to allow for use of the Contested Documents.  These exceptions to exclusion, each of which "involve the causal relationship between the unconstitutional act and the discovery of evidence," are: (1) the independent source doctrine; (2) inevitable discovery of the evidence at issue; and, (3) attenuation of the taint of illegality.  Utah v. Strieff, __ U.S. __, 136 S. Ct. 2056, 2061 (2016) (citations omitted).

The independent source doctrine allows trial courts to admit unlawfully obtained evidence if such material was independently acquired from a separate, independent source.  See Murray v. United States, 487 U.S. 533, 537 (1988).  The inevitable discovery doctrine allows for the use of evidence that would have been discovered even without the unconstitutional source.  See Nix v. Williams, 467 U.S. 431, 443-44 (1984).  Finally, the attenuation doctrine holds that evidence obtained in violation of the Constitution will not be excluded if the connection between the unconstitutional act and the evidence is either remote or has been interrupted by some

intervening circumstance, so that "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." Strieff, 136 S. Ct. at 2061.

Application of these exceptions to the exclusionary rule are not intended to condone illegal conduct on the part of the Government. Instead, they recognize the need to balance the interest of discouraging misconduct against that of allowing juries access to information. Importantly, these exceptions seek to guard against putting law enforcement in "a worse position[] tha[n] they would have been" in the absence of misconduct. Nix, 467 U.S. at 443. The burden of proving application of any of the claimed exceptions to the exclusionary rule is on the Government. Although considered in the context of criminal proceedings, such determinations are subject to a preponderance of the evidence standard.

The Court turns now to discuss the legal principles of the doctrines argued by the Government, and to whether they apply to allow use of the Contested Documents at trial.

II.      The Independent Source and Inevitable Discovery Doctrines:  Legal Principles

The independent source and inevitable discovery doctrines are analytically related. Admission of evidence under the independent source doctrine is allowed if there was an independent basis apart from the illegal search to allow a warrant to issue. See Murray v. United States, 487 U.S. at 537. Both the independent source and inevitable discovery doctrines are, as noted, exceptions to the exclusionary rule. See id. (independent source); In re 650 Fifth Ave. and Related Properties, 830 F.3d 66, 103 (2d Cir. 2016) (inevitable discovery); see also United States v. Cyr, No. 2:14-cr-19, 2015 WL 4773099, at * 5 (D. Vt. Aug. 12, 2015) (noting that the inevitable discovery doctrine "is related to and is an extrapolation from the independent source doctrine").

Upon consideration of the facts as developed during the hearing in this matter, this Court deems the inevitable discovery analysis as the proper framework to apply herein.  That doctrine allows unlawfully obtained evidence to be admitted at trial if the government can "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means."  United States v. Eng, 997 F.2d 987, 990 (2d Cir. 1993) ("Eng II") (quoting Nix, 467 U.S. at 444).  "For inevitable discovery to be demonstrable, it must be the case that the evidence would have been acquired lawfully through an independent source absent the government misconduct."  Id. (citations omitted).  Importantly, the Court must view the facts through the lens of "affairs as they existed at the instant before the unlawful search," and inquire as to "what would have happened had the unlawful search never occurred."  Id. (quoting United States v. Eng, 971 F.2d 854, 861 (2d Cir. 1992) ("Eng I") (emphasis omitted).  "[P]roof of inevitable discovery 'involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings.'"  Eng I, 971 F.2d at 859 (emphasis omitted) (quoting Nix, 467 U.S. at 444 n.5); accord Eng II, 997 F.2d at 990.

As explained by the Second Circuit, "whether [the inevitable discovery] exception to the exclusionary rule applies depends on whether the disputed evidence inevitably [would] have been found through legal means 'but for' the constitutional violation."  United States v. Vilar, 729 F.3d 62, 84 (2d Cir. 2013) (citation and internal quotation marks omitted) (second emphasis in original).  When applying the inevitable discovery doctrine, "illegally-obtained evidence will be admissible . . . only where a court can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor."  Id. (quoting United States v. Heath, 455 F.3d 52, 55 (2d Cir. 2006)).  "In

other words, the government must prove that each event leading to the discovery of the evidence would have occurred with a sufficiently high degree of confidence for the district judge to conclude, by a preponderance of the evidence, that the evidence would inevitably have been discovered." Vilar, 729 F.3d at 84. This burden is discharged by pointing to "demonstrated historical facts capable of ready verification or impeachment." Eng I, 971 F.2d at 859 (emphasis omitted). There can be no speculation as to whether the events relied upon by the Government to show inevitable discovery apply. See Nix, 467 U.S. at 444 n. 5. While the Government's burden of proof is the preponderance of the evidence standard, its obligation has been described as one of "certitude" that the evidence would have been discovered. Heath, 455 F.3d at 58 n.6.

It is not enough for the Government to argue that evidence could have been inevitably obtained by way of subpoena. Thus, the mere fact that the Government issues a subpoena is not enough to show that the documents at issue would have been produced. Several circumstances might stand in between issuance of a subpoena and obtaining documents, including invalidation of an overly broad subpoena, withholding of privileged documents, and false concealment or deliberate destruction of responsive documents. See United States v. Roberts, 852 F.2d 671, 676 (2d Cir. 1988). As to material obtained via subpoena, the Second Circuit has held that a subpoena issued at the same time as an unlawful search is not enough to "validate an unlawful search under the inevitable discovery doctrine." Eng I, 971 F.2d at 861 (citation and internal quotation marks omitted). Indeed, that court has "cautioned that[] 'particular care is appropriate where . . . subpoenas are issued after or at the time of the unlawful search." Vilar, 729 F.3d at 85 (quoting Eng I, 971 F.2d at 860-61). Thus, "subpoenas must not serve as an after the fact insurance policy to validate an unlawful search under the inevitable discovery doctrine." Vilar 729 F.3d at 85 (citations and internal quotation marks omitted). However, the mere fact that a

subpoena is issued after an unlawful search does not necessarily require exclusion of materials produced pursuant thereto.  There is no per se rule, and courts are permitted to rely upon the subpoena power when meeting the burden of showing inevitable discovery.  See Vilar 729 F.3d at 85.

The Second Circuit has laid out a two-step process for deciding whether evidence would have been inevitably discovered.  See Eng I, 971 F.2d at 861-62; Eng II, 997 F.2d at 989-90. First, the court must evaluate the progress of the investigation at the time of the government misconduct to determine whether "an active and ongoing investigation . . . was in progress at the time of unlawful search."  Eng I, 971 F.2d at 862; see also Eng II, 997 F.2d at 989-90.  The government must establish that the investigation was not "triggered or catalyzed by information unlawfully gained" by the illegal search but, rather, that "the alternate means of obtaining [the challenged] evidence" was, "at least to some degree, imminent, if yet unrealized" at the time of the unlawful search.  Eng I, 971 F.2d at 861 (alterations and internal quotation marks omitted); see also Eng II, 997 F.2d at 989-90, 992.  Second, the "court must, for each particular piece of evidence, specifically analyze and explain how, if at all, discovery of that piece of evidence would have been more likely than not inevitable absent the [unlawful] search."  Eng I, 971 F.2d at 862 (citation and internal quotation marks omitted); see also Eng II, 997 F.2d at 989-90.

Put as simply as possible, application of the inevitable discovery doctrine "turns on a central question:  Would the disputed evidence inevitably have been found through legal means 'but for' the constitutional violation?  If the answer is 'yes,' the evidence seized will not be excluded."  Heath, 455 F.3d 52, 55 (2d Cir. 2006); see also United States v. White, 298 F. Supp. 3d 451, 457 (E.D.N.Y. 2018) (noting Government's burden in establishing inevitable discovery is a preponderance of the evidence, and that "in this circuit, the Court must find with 'a high level of

confidence that each of the contingencies required for the discovery of the disputed evidence would in fact have occurred.'") (citations omitted).

III.     Attenuation of the Taint of Unlawfully Obtained Evidence:  Legal Principles

"The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence, which often has nothing to do with a defendant's actions." Strieff, 136 S. Ct. at 2061.  Three factors are to be considered by courts determining whether the evidence at issue is so untainted as to allow its use in a criminal case.  First, courts consider the "temporal proximity" between the unlawful act and obtaining the evidence at issue.  Id. at 2062 (quoting Brown v. Illinois, 422 U.S. 590, 603 (1975)).  The factor can only favor application of attenuation if a "substantial time" has elapsed between the acts.  Strieff, 136 S. Ct. at 2062 (quoting Kaupp v. Texas, 538 U.S. 626, 633 (2003) (per curiam)).  Next, the court considers whether the "presence of intervening circumstances" lessens the taint of the unconstitutional conduct.  Strieff, 136 S. Ct. at 2061 (quoting Brown, 422 U.S. at 603-04).  Finally, courts engaging in the attenuation analysis consider the "purpose and flagrancy of the official misconduct."  Strieff, 136 S. Ct. at 2061 (quoting Brown, 422 U.S. at 604).  The greater the misconduct, the more likely the evidence sought to be introduced will be held to be tainted by the unlawful act.  This factor reflects the exclusionary rule's purpose of deterring government misconduct.  See Strieff, 136 S. Ct. at 2063 (citing Davis v. United States, 564 U.S. 229, 236-37 (2011)).  Attenuation, like inevitable discovery, must be established by the Government, by a preponderance of the evidence.  See United States v. Falley, 489 F.2d 33, 41 (2d Cir. 1973).

IV.    Rulings as to the Contested Documents

    A.    The Documents Would Have Been Inevitably Discovered

As noted, the inevitable discovery doctrine holds that evidence will be admissible if, but for the constitutional violation, the evidence would have been uncovered via legal means. Here, the inquiry requires the Court to consider the progress of the investigation, and whether the type of document at issue would have been a part of that investigation. The Court must consider the steps that the Government would have had to take in order to obtain each type of document. Thus, with respect to each category of documents, it is important for the Court to consider whether the documents were publicly available and/or whether they would be available to the Government upon request from another branch of government, or via subpoenas directed to private entities. As to subpoenaed documents, the Court must consider the likelihood of whether the documents would have been properly obtained via subpoena. As an overall matter, the Court considers whether the Government would have sought out any of the Contested Documents in the absence of documents obtained via the Warrant. This consideration also goes to the issue of whether the documents at issue were tainted by those uncovered as a result of the illegal search so as to require exclusion.

As discussed below, the Government investigation into Kayla and its customers was well underway prior to seeking the Warrant. Early identification of individuals who had engaged in criminal behavior pointed the IRS in the direction of Kayla and its employees. The direction of the investigation inevitably led to check cashing activities already within the broad purview of the Project. As early as the time period when the Agency was investigating MTE, the dots were already being connected, leading to an investigation of Kayla and its employees. Drago himself

proffered with the Government, explaining the structure of his business to the Agency for the first time, in 2012.

Importantly, the vast majority of the Contested Documents were either publicly filed, already in the possession of the IRS, or readily subject to a simple request from a related State regulatory agency. Thus, with respect to most of the Contested Documents, there was only a single step for the Government to take to obtain these documents, i.e., a simple in-Agency request, or the making of a request to a State regulatory agency. The inevitable discovery analysis, which considers the likelihood of a chain of events that leads to Government possession of a document is therefore, with respect to most of the documents, neither complicated nor tortured. Instead, most of the Contested Documents are of the type that are easily and routinely obtained as part of an early investigation. Here, the investigation of Kayla was anything but "early" when most of the Contested Documents were sought. There is little doubt in the Court's mind that these easily obtainable documents would have been sought, whatever the outcome of the Warrant.

The remainder of the Contested Documents would have certainly been produced pursuant to properly issued and responded-to subpoenas. Such subpoenas would have been properly served based upon the actual maturity of the Kayla investigation. Lawful responses would have resulted in production of documents.

The Court rejects Drago's insistence that the fruits of the Warrant formed the roadmap that led to his 2018 indictment; and that the presentation of this "roadmap" requires exclusion of all evidence obtained. While the Warrant was indeed constitutionally deficient, all other parts of the Kayla investigation were proper and each of the Contested Documents would have been inevitably discovered. The Government obtained information via witness proffers both before

and after the Kayla Search. The fact that any given witness was more likely to testify after the search does not make evidence obtained from that testimony inadmissible. See United States v. Ceccolini, 435 U.S. 268, 277 (1978). Evidence unlawfully obtained, while excluded, may be relied upon to show the relevance of other evidence obtained via lawful means. See United States v. Fofana, 666 F.3d 985, 987-88 (6th Cir. 2012); Falley, 489 F.2d at 40 and n.2 (noting that even if illegally obtained evidence helped to facilitate an investigation, that fact was insufficient to be fatal to Government's case); see also United States v. Najjar, 300 F.3d 466, 476-77 (4th Cir. 2002) (finding public records admissible at trial even if such records were uncovered as a result of an illegal search).

The Court also rejects the argument, raised in Drago's March 2021 Letter, that emails among IRS agents as well as those communicated to the K-soft software company demonstrate the critical nature of the fruits of the Warrant to the Government's case and therefore requires suppression. (March 2021 Letter, DE [149] at 4.) Specifically, Drago relies on emails among agents indicating that access to material on seized computers would be "huge," and the Government's repeated attempt to obtain access information from K-soft. These emails, however, are nothing more than what might be expected among colleagues seeking assistance. Access to such materials were certainly a part of the overall IRS investigation of Kayla and other defendants. However, they do not negate McCue's testimony meticulously detailing the Agency's successful efforts to obtain information in a manner completely unrelated to the efforts to view computer files. Importantly, the emails do not take away from the overall holding that the actual evidence sought to be used here would have been obtained through other lawful means, whether or not the Government was actually able to review the contents of seized

41

computers.  The Court turns now to a more detailed discussion of its rationale with respect to its

holding that each category of documents would have been inevitably discovered.

     A.    <u>The Tax Return Exhibits (Exhs. 15.1-59 and 298.1-306)</u>

     The Tax Return Exhibits consist of the corporate and personal tax returns of

Hogwarts, Hendrick, Drago, Suarez, Chiffriller and Holzwarth from 2010-2018.  All of these

exhibits are records that are within the control of the IRS and available to that agency.  Most of

the exhibits were in the possession of and under Agency review prior to application for the

Warrant.  They represent key documents under IRS review pursuant to the Project.  To the extent

that the IRS requested particular records during the investigation, even if those requests came

after execution of the Warrant, there is no doubt that requests for records would have been made

in connection with the ongoing investigations as to non-payment of income and payroll tax.

Once the IRS investigation as to structuring at MTE led the Agency to Hendricks and common

MTE/Kayla customers, there is no doubt that personal income tax records would have been

requested by the IRS as part of its investigation of possible illegal payroll and structuring.  The

information forming the basis for such an investigation was certainly in possession of the

Agency well before the 2013 execution of the Warrant.  The Court reaches the same result with

respect to the tax returns of Hogwarts, which would have inevitably been sought once Drago

identified the structure of his business.  In sum, discovery of this category of documents was

inevitable and these records are therefore admissible.

     Nothing argued in the Defendant's March 2021 Letter compels a different result.  Drago

argues there, as throughout his motion, that in the absence of the Warrant there would have been

no tax investigation relating to off-the-books payroll, and that Hendrick's commission sheets

acted as a guide to the companies investigated.  This ignores, however, the fact that the

documents relied upon reveal nothing more than an ongoing and developing investigation and not, as argued by Drago, an investigation that took a different turn after execution of the Warrant.  It bears repeating that the companies who followed Hendrick to Kayla were already under investigation in connection with the IRS inquiry of MTE and its customers.  Nothing that might have been reviewed as fruits of the Warrant, including the commission sheets, changes this Court's holding as to the inevitable discovery of all of the tax return information sought to be used at trial.

B.    The CTR Exhibits (Exhs. 126-30, 160-70, and 171-75)

The CTR Exhibits consist of certified CTR's for Kayla and its customers, as well as documents required to be filed by Kayla as an MSB.  These documents are public records that are required to be filed and were in possession of the IRS.  The Agency's investigation prior to application for the Warrant included information gleaned from its investigation of MTE, as well as possible structuring at Kayla.  Independent of anything uncovered during execution of the Warrant (including the numerous CTR's that appear to have been in unopened boxes) the Government was in the process of investigating Kayla customers for possible structuring crimes. That investigation necessarily would have included an ongoing review of all CTR's filed by Kayla and, as discussed above, a comparison of those CTR's with tax return information in light of customer businesses.  There is no question but that the CTR Exhibits would have been inevitably discovered and are, therefore, admissible.

C.    DFS Exhibits (Exhs. 60-119)

Like the Tax Return Exhibits and the CTR Exhibits, DFS records are public

documents.  As stated by McCue, these are public records that are readily available from the State regulator upon request of the IRS.  Indeed, the State agency responsible for maintaining such records routinely supplied them to the IRS, without the necessity of a court order or subpoena.  They include Kayla's annual reports as well as Reports of Examination.  Agent McCue's testimony amply demonstrated that these materials would have been requested in furtherance of the IRS investigation with respect to Kayla's ant-money laundering policies.  (Tr. 35-36.)  Any such requests for these public records would have occurred in the normal course of an IRS investigation of BSA violations without regard to any material uncovered as a result of the Warrant.  This includes McCue's 2018 request for records.

Drago puts much emphasis on the fact that this request came more than five years after execution of the Warrant.  (March 2021 Letter at Ex. C.)  Contrary to Drago's position, such reports are exactly what the Government would request in response to Drago's position that he complied with all audit requirements and maintained an effective anti-money laundering policy. (DE [153].)  As stated in McCue's email, the records were requested as part of the Government's trial preparation for the BSA charge.  The request for these records was inevitable, and they are therefore admissible.

### D.    Customer Witness Exhibits (Exhs. 176.1-176.7, 193-94)

The Customer Witness Exhibits are statements and documents provided to the Government by customers under investigation.  Discovery of these exhibits can be traced directly to the early IRS investigation of tax crimes and related structuring.  Each witness chose voluntarily to proffer after the Government was in possession of records from MTE, and upon review of their tax return information.  The connection between MTE and Kayla was clear when the many proffer sessions between several tax defendants and the Government began, and when

Drago told the IRS, in 2012, of his hiring of Hendrick and of Hendrick's former employment at MTE. Undercover witnesses put the IRS on notice of possible structuring at Kayla. Review of CTR's added to the government's knowledge of possible illegal activity at Kayla. There is no question as to the direction of the IRS investigation of these customers, or the fact that the Government would have inevitably sought and obtained the Customer Witness Exhibits.

E.       The Employee Summary Exhibits (Exhs. 120-25 and 310)

The investigation of Kayla involved investigating the payment of off-the-books payroll. It also involved investigating employee involvement, if any, in structuring activity. As testified to by McCue, any such investigation would likely start with the Agency requesting review of Kayla employee tax returns. Publicly filed documents, including those filed with DFS, would identify these individuals. Their identities were in no way uncovered as a result of execution of the Warrant. Indeed, Drago himself identified key Kayla employees to the Government prior to its application for the Warrant. As stated above, the Court rejects the argument that documents uncovered during execution of the Warrant were responsible for the Government's decision to investigate the payment of off-the-books payroll. This investigation was part and parcel of its investigation of Kayla. The Employee Summary Exhibits would have been inevitably discovered by the Government.

F.       The Selected Transactions Exhibits (Exhs. 209.1-263)

The Selected Transaction Exhibits were provided to the Government by Drago in or around April 2016. Drago's counsel voluntarily provided these documents in an effort to demonstrate Drago's innocence. Drago was able to access these documents after the Government provided him with an executable hard drive from the seized computers. Drago stated that he requested that hard drive so that he could comply with a subpoena issued by a

government entity other than the IRS.  There is no question that Drago voluntarily provided the information to the Government.  He cannot now be heard to complain that he would not have engaged in such a proffer and attempt to prove his innocence had the Warrant not been executed.  The Kayla investigation had been ongoing for years.  Whether or not Drago is ultimately found guilty of any criminal activity – and he continues to profess his innocence – he voluntarily provided documents to the Government in a proffer session.  The Government was entitled, under the clear terms of the agreement, to use these documents as leads in its investigation, which is precisely how they are being used.

      G.     <u>The Subpoenaed Exhibits (Exhs. 176.8-178.1, 295-297)</u>

      These exhibits consist of customer records and calendars.  Like the other exhibits, they undoubtedly would have been requested as part of the Kayla investigation.  Again, the activities of these Kayla customers were part of the overall investigation into tax and structuring crimes at Kayla.  Such documents were a key part of continuing to develop the investigation.  They would have inevitably been discovered by the Government.

V.     <u>No Taint Requires Exclusion of the Contested Documents</u>

      In additional to the holdings above, the facts show that the Contested Documents are not tainted by the illegal search of Kayla.  As noted, to determine whether evidence is sufficiently attenuated from an illegal search, courts consider intervening circumstances, temporal proximity, and the nature of the illegal conduct.  <u>See</u> <u>Streiff</u>, 136 S. Ct. at 2062.  Like inevitable discovery, the burden to establish attenuation is borne by the Government, which must prove attenuation by a preponderance of the evidence.

      Consideration of the factor of intervening circumstances weighs heavily against holding that any of the Contested Documents are tainted by the Kayla Search.  Here, the intervening

circumstances are numerous and took place over a long period of time.  They include statements of several cooperating witnesses and those of Drago himself.  In particular, while Drago declined to speak with the Government on the day of execution of the Warrant, he freely elected to proffer, in the presence of counsel, three weeks later.  See Wong Sun v. United States, 371 U.S. 471, 491 (1963) (finding that return of defendant to speak with the Government days after his release was sufficient period of time to "dissipate the taint.").  The bar with respect to excluding witness statements as tainted is high and has not been met.

As to proximity, there is no question that documents in the possession of law enforcement prior to the execution of the Warrant lack proximity to the illegal search.  This is true even if additional similar documents, such as bank records, were produced on a rolling basis after the search.  See Fofana, 666 F.3d at 988 (holding that bank records in possession of Government were free from any taint).

Statements of witnesses, including Kayla employees and customers, obtained after execution of the Warrant are not sufficiently tainted by its execution to require suppression.  The identities of Kayla employees were known well before execution of the Warrant.  The investigation of Kayla led naturally to investigating key employees identified by Drago.  So, too, did the Government know the identities of Kayla customers that were investigated independent of any documents uncovered in the execution of the Warrant.  These numerous witnesses, represented by counsel, have proffered with the Government and elected, in some cases, to plead guilty and to testify in this matter.  The facts here show the willingness of these witnesses to testify, and the lack of connection between the search and their decisions to cooperate.  See United States v. Leonardi, 623 F.2d 746, 752 (2d Cir. 1980); see also Ceccolini, 435 U.S. at 277 (noting the "serious obstructions to the ascertainment of truth" associated with application of rule

disqualifying knowledgeable witness testimony). Here, witness testimony is untainted by the execution of the Warrant.

The passage of time between execution of the Warrant and the Government's ongoing and thorough gathering of documents militates in favor of a finding of sufficient attenuation of any taint regarding documents. This is true not only of bank and tax records, but also with respect to documents produced by Drago. Thus, in his attempt to show innocence, the Defendant himself elected to provide the selected transaction documents to the Government more than three years after execution of the Warrant.

Finally, as to the nature of the official misconduct, it is true that the Government's good faith did not render the Kayla Search legal. (DE [72], [75].) However, the good faith inquiry underpinning this Court's prior holding does not present the same analysis at issue here. The agent who presented the Warrant to the Magistrate Judge in 2012 set forth the facts of a meticulous investigation prior to presenting the matter to the judicial officer. The affidavit in support of the Warrant recited a detailed search of Kayla's records and discussions with Kayla customers, many of whom had already pleaded guilty to crimes involving check cashing activities at Kayla. As this Court has held, the agent did not intend to draft an unconstitutional warrant. (DE [72] at 19.) Indeed, the Kayla Search was held unlawful not for failure to support a finding of probable cause, but because the attachment to the Warrant failed to narrowly describe the proper scope of the search. It was the broad nature of the attachment that led to the clear conclusion that the Warrant failed because of overbreadth. Under these circumstances, the Court rejects the argument that "the purpose and flagrancy of the official misconduct" weighs in favor of exclusion. Strieff, 136 S. Ct. at 2061 (quoting Brown, 422 U.S. at 604). The Contested

Documents are sufficiently attenuated from any taint of the illegal search as to allow their use at trial.

## RECOMMENDATION

For the foregoing reasons, this Court respectfully recommends that Defendant's motion to suppress, appearing at Docket Entry [103] herein, be denied in its entirety.

## OBJECTIONS

A copy of this Report and Recommendation is being provided to all counsel via ECF. Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of filing of this report. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the District Judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days will preclude further review of this report and recommendation either by the District Court or Court of Appeals. Thomas v. Arn, 474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); Caidor v. Onondaga Cnty., 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision").

**SO ORDERED:**

Dated:  Central Islip, New York
        May 6, 2021                          /s/      Anne. Y. Shields
                                             ANNE Y. SHIELDS
                                             United States Magistrate Judge