**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                                                   :
UNITED STATES OF AMERICA           :
                                                   :
              v.                                   :
                                                   :         Case No. 18-CR-00394-GRB/AYS-1
JOHN DRAGO,                                 :
                                                   :
              Defendant.                     :
                                                   :
-------------------------------------------------------x


## DEFENDANT JOHN DRAGO'S SENTENCING MEMORANDUM

Arthur D. Middlemiss
Lewis Baach Kaufmann Middlemiss, pllc
405 Lexington Avenue
64th Floor
New York, New York 10174
(212) 822-0128
*Counsel for John Drago*

Dated:  October 12, 2022

John Drago is a 58-year-old man, a life-long resident of Long Island, defined by his faith in God and love of country and family. He accepts responsibility for the criminal acts he admitted before this Court on September 9, 2021 and is prepared to accept the Court's judgment regarding the determination of a just and proper sentence. In addition to the forfeiture, restitution and bar from his previous profession included in the plea agreement, Mr. Drago's guilty plea exposes him to a wide range of potential incarceration, from a maximum of ten years jail to a minimum of no jail time. The agreed sentencing Guidelines range in this case is 63 to 78 months.[1] It is realistic to expect that the Court may impose jail time. For the reasons stated herein, however, we respectfully submit that a jail sentence within the Guidelines range would be unduly harsh and ask the Court to depart downwardly from the Guidelines range by imposing a lesser incarceratory sentence of no more than 6 months in jail in addition to the punitive elements contained in the plea agreement.

### A. Procedural History

This matter has a long procedural history. There was a very significant delay in investigating this case, which was indicted near the end of the 5-year statute of limitations. Once indicted, in July 2018, Mr. Drago raised successful constitutional challenges to the Government's execution of a search warrant in August 2013, which spawned additional good faith motion practice regarding the lawfulness of the search. The valid legal issues Mr. Drago brought forward took time to resolve, particularly given the inherent challenges of litigation during Covid. The investigation's sheer length, the subsequent litigation following indictment, and the Court's finding that agents who executed the search warrant were "deliberately reckless," explain and we hope excuse Mr. Drago's expressions of frustration reflected in the Presentence Report ("PSR"), *i.e.,* that he was treated "unfairly," or the subject of "false accusations" (*see, e.g.,* PSR 53, 59).

---

[1] *See* §B, *infra*, for discussion of the Guidelines calculation provided in the Presentence Report ("PSR").

Once the constitutional search warrant-related issues were resolved, an independent source hearing was held, and the matter decided, Mr. Drago forthrightly admitted his guilt and entered the instant guilty plea.  For the Court's convenience, we provide a brief synopsis of the matter's procedural posture below.

On August 6, 2013, IRS agents conducted a search of the premises of Mr. Drago's businesses (collectively, the "Kayla Companies") and recovered documents (many boxes and thousands of pages) and many gigabytes of data from more than a dozen computers (the "2013 Search Warrant"). Later that month, Mr. Drago admitted in a proffer session that he paid an employee, a former New York City Police officer on disability, off-the-books over a several year period. The Government then proceeded to investigate Mr. Drago's business activities for about five years before a grand jury returned an indictment on July 31, 2018. The indictment charged Mr. Drago with tax-related crimes and with crimes related to the operation of the Kayla Companies.

On June 25, 2019, Magistrate Judge Anne Y. Shields, after a hearing, issued a report and recommendation that the 2013 Search Warrant violated the particularity clause of the Fourth Amendment (ECF No. 57). On July 15, 2019, Judge J. Feurstein adopted the Magistrate's report and recommendation and further ordered that a "good faith" hearing be held to determine whether evidence from the 2013 Search Warrant should be suppressed (ECF No. 60).

On September 10, 2019, after the good faith hearing, Magistrate Judge Shields issued a report and recommendation that the Government had not met its burden of qualifying for the good faith exception to the Fourth Amendment and that the evidence seized at Mr. Drago's business locations pursuant to the 2013 Search Warrant be suppressed (ECF No. 72). Additionally, the Magistrate found that the agents' conduct when conducting the search was "deliberately reckless"

and that the testimony of the agents who testified at the hearing "tips the balance of the behavior [
] from mere negligence to recklessness" (*id.* at 23). The Government did not object to this report
and recommendation and, in an order dated September 25, 2019, Judge Feurstein adopted the
report and recommendation and ordered that all of the evidence from the 2013 Search Warrant be
suppressed (ECF No. 75).

One week later, on October 1, 2019, the Government sought and the grand jury returned a
superseding indictment (ECF No. 77).

On October 20, 2020, an "independent source" hearing was held to determine what
evidence, if any, was obtained free of the taint of the illegal search of Mr. Drago's business in
2013 (ECF No. 129).

On May 6, 2021, Magistrate Judge Anne Y. Shields concluded that, despite the illegal
search, the Government would be permitted to introduce contested records at trial. Judge Shields
found that the Government would have uncovered virtually all the contested documents even had
the search not taken place (ECF No. 154).  On July 15, 2021, this Court upheld that conclusion
notwithstanding Mr. Drago's objections (ECF No. 163).

Two months later, on September 9, 2021, Mr. Drago agreed to plead guilty pursuant to the
plea agreement proposed by the Government (ECF No. 168).

### B.  Guidelines Calculation

The Presentence Report ("PSR") provides a 4-level enhancement for Role in Offense
(USSG §3B1.1[a]) and thus calculates the appropriate Offense Level as 29 and concludes that the
appropriate Guideline sentencing range is 87 – 108 months. The Plea Agreement did not include
the §3B1.1(a) adjustment, calculated the appropriate Offense level as 26, and concluded that the
appropriate Guidelines sentencing range is 63-78 months. For purposes of its own Guidelines

calculation, we urge the Court to disregard the PSR calculation, and instead to concur with the Guidelines calculation provided in the Plea Agreement.

We note in this regard that the Government, which is most familiar with the facts, did not insist on the enhancement in the Plea Agreement. This is not surprising because we do not understand the Government's theory to be that Mr. Drago engaged in the charged conduct with five or more individuals, or that five or more individuals are criminally responsible for the conduct for which Mr. Drago stands convicted. We note that one individual, Kenneth Hendricks, pled guilty and could be considered a participant for purposes of the enhancement, but the enhancement applies only if five or more individuals are criminally responsible.

We note further that the PSR indicates that the Government intends to make a motion pursuant to USSG §3E1.1(b) that would result in a one-level reduction in the Guidelines calculation. The defense understands that the Government does not intend to make such a motion.

Accordingly, we respectfully request that the Court conclude that Plea Agreement Guidelines calculation is correct, and thus that the appropriate calculation of the Offense level is 26. Regardless, we respectfully submit when viewed in total for the reasons discussed herein a downward departure is appropriate.[2]

### C.  Significant Jail Time is Not Required

The plea agreement includes multiple punitive elements, each of which mitigates the need to impose a lengthy period of incarceration to punish Mr. Drago for his crimes. The plea agreement requires Mr. Drago to forfeit $253,191, a sum that will require him to sell his house.[3] He has agreed

---

[2] For purposes of the memorandum, the defense refers to the Guidelines calculation contained in the Plea Agreement. Mr. Drago's arguments for a downward departure are equally applicable if the Court determines in its discretion that either the PSR calculation or another calculation is correct.

[3] As the Court is aware from applications by Mr. Drago to delay the date of sentence, Mr. Drago must sell a home to raise the funds for the forfeiture. A sale was not completed prior to the due date contained in the plea agreement (30-days prior to sentence). The house remains on the market. By letter agreement with the Government (Exhibit A), Mr. Drago will inform the Government of the closing date, so that the Government can take delivery of payment of the

to pay restitution in an amount not less than $593,600.32 with respect to his employer and employees' FICA tax liabilities for the years 2010 through the third quarter of 2013, and his personal taxes.[4] Mr. Drago has agreed, and made efforts to, surrender the New York-issued licenses maintained by the Kayla Companies – which Mr. Drago operated for about 35 years.[5] He also agreed never to apply for a New York license or federal registration related to the operation of a financial institution – which will make it impossible for him ever to own a money services business of any type anywhere in the country. Mr. Drago does not dispute that the punishments he accepted in the plea agreement are warranted, but rather that they represent significant punishments in and of themselves, and thus that their imposition mitigates materially the need to impose a severe Guidelines range jail sentence.

Further, Mr. Drago has proved, during the nine years since this saga began, including the nearly four- and one-half-year period since his indictment, that he possesses the ability to comply with the Court's orders to live a lawful life. Thus, he would be an excellent candidate for supervision, another factor weighing in favor of a non-Guidelines sentence. As noted above, Mr. Drago was under government investigation five years when, just prior to the expiration of the statute of limitations, he was charged in an indictment. Since July 2018, when he was charged, Mr.

---

forfeiture amount out of the closing proceeds. The Government has agreed that it will not make a specific sentencing recommendation to the Court based on issues related to Mr. Drago's payment of the forfeiture amount. We urge the Court not to consider the forfeiture issue in determining the appropriate sentence in this case.

[4] With respect to the restitution, the plea agreement (¶ 6) requires Mr. Drago to cooperate with the IRS and to file, as necessary, amended personal and/or corporate taxes for the years before imposition of sentence. As of the date of this filing, Mr. Drago is working with an accountant and expects to file amended returns by the date of sentencing. The defense will report the status of the amended tax filings to the Court at the sentencing proceeding. The defense is further informed that Mr. Drago does not possess the financial assets to make the full restitution payment immediately and that he will, as required by the plea agreement (¶ 7), cooperate with the IRS, and make a complete and accurate financial disclosure to the IRS on forms prescribed by the IRS, including disclosure to the IRS of any and all information and financial statements provided to the Probation Office.

[5] As the prosecution noted at the plea proceeding, the New York Department of Financial Services ("NY DFS") will not accept Mr. Drago's surrender of the licenses until the conclusion of its administrative proceeding against the Kayla Companies (ECF No. 176 at 11). That administrative action remains on-going, as the Kayla Companies and DFS have not successfully negotiated the terms of a consent agreement. As a representative of the Kayla Companies, Mr. Drago has tried without success to surrender the licenses to DFS.

Drago has remained at liberty. The Court has, on multiple occasions, amended his bail conditions to permit Mr. Drago to travel to family events without incident (*see* ECF Nos. 91, 92, 146, 175, 178, 182, and 183). The Court also granted multiple requests by Mr. Drago to adjourn the sentencing date to allow him to sell his house and raise funds to pay the forfeiture and restitution (ECF Nos. 174, 177, and 181). Mr. Drago never let the Court down in its expectation that he would continue to fulfill the requirements of his release.

As the PSR reflects (PSR: 50-51, 53), Mr. Drago sought and accepted treatment provided through Community Counseling Services to deal with issues of depression, evidencing further his ability to take direction and make positive strides under the Court's direction (PSR: 51). The Probation Department concurs (PSR ¶6) that Mr. Drago complied with his Court-ordered conditions of release during the entire post-indictment period.[6] This Court has, what it likely does not have in most cases: a very lengthy track record evidencing Mr. Drago's ability to live a law-abiding life to consider in determining whether a below-Guidelines jail sentence is warranted. The defense respectfully suggests that Mr. Drago's record of law-abiding behavior while under the Court's supervision since his indictment provides the Court with empirical proof that he will comply with the conditions of supervised release, and that a Guidelines-length jail sentence is thus not necessary to achieve the ends of justice.

---

[6] The PSR (¶6) recounts an episode where Mr. Drago allegedly made a comment to a Pretrial Services Officer in which he admitted looking up the personal identifying information of the assigned AUSA and others involved in this case. As stated in his objections and request for amendment of the PSR (ECF No. 186), Mr. Drago acknowledges and regrets the inference made from his comments and specifically denies that he intended to intimidate anyone. Mr. Drago thanks the office of Pretrial Services for their courteous and professional work throughout this matter. We note there were no other reported episodes of similar conduct. Further, the defense notes that Mr. Drago at one point believed, due to the length of the investigation and the finding that execution of the search warrant was unconstitutional, that his prosecution was personal, and vindictive, and it was those mistaken beliefs that prompted him to conduct the information searches to identify potential bias. By his plea, Mr. Drago acknowledges his guilt and accepts responsibility for his conduct.

Likewise, in determining whether lengthy jail time is required, it is relevant that the Government and the New York State Department of Financial Services ("NY DFS") allowed the Kayla Companies to remain operational after the search warrant was executed in 2013 until the indictment was returned and even after the indictment was returned. Per extracts of NY DFS examination reports dated from 2011, NY DFS knew then that the Kayla Companies had failed to file certain Currency Transaction Reports. And, at least as of July 2018, NY DFS knew the scope and significance of Mr. Drago's alleged criminal conduct and could have taken emergency action to suspend immediately the licenses of the Kayla Companies pending a notice of hearing and a hearing to determine whether the licenses should be revoked. But it did not.[7] Instead, the Kayla Companies remained licensed and operational until February 2020. Notably, even in February 2020, NY DFS did not take emergency measures to cause closure of the Kayla Companies. Rather, it issued a detailed press release announcing a Notice of Hearing that included its "findings" regarding Mr. Drago's conduct.[8] Within days of its issuance, the bank servicing the Kayla Companies closed their accounts, effectively putting them out of business.

---

[7] NY DFS has the authority to act quickly to shut down a check cashing business that represents an immediate threat to the financial system. NY Banking Law §373(2) provides, in relevant part, that:

> The superintendent may suspend or revoke any license or licenses issued pursuant to this article if, after notice and a hearing, he shall find that the licensee (a) has committed any fraud, engaged in any dishonest activities or made any misrepresentation;  or (b) has violated any provisions of the banking law or any regulation issued pursuant thereto, or has violated any other law in the course of its or his dealings as a licensed casher of checks;  or (c) has made a false statement in the application for such license or failed to give a true reply to a question in such application;  or (d) has demonstrated his or its incompetency or untrustworthiness to act as a licensed casher of checks;  or (e) is not doing sufficient business pursuant to this article to justify the continuance of the license, or if he shall find that any ground or grounds exist which would require or warrant the refusal of an application for the issuance of the license if such an application were then before him.  Such a hearing shall be held in the manner and upon such notice as may be prescribed by the superintendent.   Pending an investigation or a hearing for the suspension or revocation of any license or licenses issued pursuant to this article, the superintendent may temporarily suspend such license or licenses for a period not to exceed ninety days, provided the superintendent shall find that such a temporary suspension is in the public interest.

[8] Press Release, NY DFS, DEPARTMENT OF FINANCIAL SERVICES TAKES ACTION TO REVOKE THE LICENSES OF KAYLA CHECK CASHING CORP. AND RELATED ENTITIES (Feb. 3, 2020), available at: https://www.dfs.ny.gov/reports_and_publications/press_releases/pr202002031.

Again, Mr. Drago seeks not to excuse, justify, or minimize his conduct, but if that conduct was so severe that it now warrants anything close to the Guidelines range of a 5¼ to 6½ year prison sentence, it is reasonable to infer that NY DFS would have taken immediate steps to close the Kayla Companies, if not when the search warrant was executed in 2013, then certainly directly following the initial indictment in July 2018. Mr. Drago respectfully requests that the Court consider NY DFS's reaction to the indictment in determining the proper sentence in this case.

Mr. Drago guilty plea includes accepting a bar from engaging in business activities that require licensure from New York State or registration by the U.S. Department of the Treasury. And so, there is little threat of recidivism. He has led a lawful life other than the crimes at issue.[9] He is a veteran who was discharged honorably from the military with the rank of 1st Lieutenant.[10]

---

[9] As referenced in Mr. Drago's objections to the PSR, Mr. Drago denies that he was "involved" in a securities-fraud related scheme involving Baltia Airlines ("Baltia"). The U.S. Securities and Exchange Commission (the "SEC") conducted a civil investigation involving Baltia. The SEC never charged Mr. Drago. According to attorney Stefanie J. Lewis, who represented Baltia, the SEC did not interview Mr. Drago during the investigation. The SEC charged an individual named Barry Clare, a Baltia officer, with being an unregistered representative seller of Baltia common stock to investors. Clare settled with the SEC. Mr. Drago was a large investor in Baltia. No one involved in the SEC's Baltia investigation was charged criminally. Ultimately, as with all Baltia investors, Mr. Drago's own investment became worthless.

[10] With respect to Mr. Drago's military service, Mr. Drago respectfully requests that the Court ignore the Government's suggestion that he somehow lied to the Department of Probation about his military service. As noted elsewhere, this is not the forum to debate the accuracy or meaning of 30-year-old handwritten notes made in military records that Mr. Drago never saw before now and has had no opportunity to challenge. Other than the fact that Mr. Drago served and received an honorable discharge, we submit that Mr. Drago's military service should not be at issue. To the extent the Court considers issues related to Mr. Drago's military service, we note that Mr. Drago provided the defense a copy of a signed release for his military records in April 2022 and that, due to an administrative error, the signed release being provided the Department of Probation only on May 31, 2022. We again apologize for the error. Further, we note that Mr. Drago provided information to the Department of Probation from memory, and "recalled" that he was "activated for duty, completed a period of training and was planning to be sent for active duty overseas, but the Gulf War ended prior to the planned deployment" (PSR: 62). Although the Government would argue that Mr. Drago somehow exploited the passage of time to his benefit, that is simply not the case. For example, relying on memory, Mr. Drago told the Department of Probation that he attained the rank of 1st Lieutenant in 1992, contrary to the military records indicating that he had achieved that rank by at least November 21, 1990. In other words, Mr. Drago made a mistake regarding the date he was promoted to his detriment, as it minimized the time he served at a higher rank. Further, the records indicate that Mr. Drago served active duty in the reserves from July 1990 to November 1990 – well prior to his honorable discharge in 1993 and consistent with his memory that he served active duty during the Gulf War and that he had planned to be sent overseas. While Mr. Drago acknowledges that he did not complete successfully certain aspects of this military training, and that that he agreed to leave the military and to return a portion of his ROTC scholarship, he did complete elements of training successfully (as evidenced by his active-duty service and promotion) and he denies having ever "intentionally" failed tests to avoid duty.

The character reference letters attached hereto as Exhibit B portray a steadfast, loyal family man. That is not to say that his crimes were minor, or that he did not help others commit their own tax crimes, but his crimes were not violent, did not involve narcotics, and did not defraud civilian victims. For these reasons, as described more fully below, we respectfully submit that a below Guidelines sentence of no more than 6 months in jail would be the maximum appropriate sentence in this case, combined with the forfeiture, restitution and industry bar outlined in the plea agreement.

## I.     A BELOW-GUIDELINES SENTENCE IS WARRANTED IN THIS MATTER

It is well settled that the Sentencing Guidelines are advisory. *United States v. Booker*, 543 U.S. 220 (2005). A district court can vary from a guideline range solely on policy considerations/disagreements with a guideline and is free to not apply the Guidelines at all should the circumstances warrant a different sentence. *Kimbrough v. U.S.*, 552 U.S. 85, 101, 113 (2007). The Court is empowered with the discretion to grant a downward variance where – as here – it is warranted in light of the factors enumerated in 18 U.S.C. § 3553(a). *United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). Moreover, the absence of a departure does not prohibit the Court from granting a downward variance. *U.S. v. Brown*, 578 F.3d 221, 226 (3d Cir. 2009). A variance is a "discretionary change to a guideline sentencing based on a judge's review of all the Section 3553(a) factors." *Id.* The Court has wide latitude to vary from the Guidelines based upon the factors enumerated in 18 U.S.C. § 3553(a) to ensure that the punishment "fit[s] the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 488 (2011). This Court should exercise that discretion here.

Applying 18 U.S.C. § 3553(a)'s sentencing factors, a strict Guidelines sentence would be overly harsh. Instead, we respectfully submit that a 12-month and one-day jail sentence, coupled with the other punitive measures outlined in the plea agreement, is appropriate here based on,

among other reasons, Mr. Drago's lack of a criminal history, familial responsibilities, his proved ability to live under the Court's supervision, and the other punitive requirements of the plea agreement.

### A.  The Personal History and Characteristics of the Defendant

The "history and characteristics of the defendant," a factor under 18 U.S.C. § 3553(a)(1), supports a below-Guidelines sentence. The character reference letters provided the Court by Mr. Drago's community, which are attached as Exhibit B, paint a picture of a man who is a responsible member of his community, who is admired therein for his generosity, love of family, and steadfast friendship and support.

For example, Gary Slavin, a longtime client of Mr. Drago's, highlights Mr. Drago's financial support of his employees, at his own expense:

> For example, when we were preparing the documents for a company 401k plan, he wanted to make sure he understood how his employees would benefit from the plan. He was concerned about the company match; his options were to only give the employees that defer into the plan a match or do a non-elective contribution for each eligible employee. He chose to give an 3% non-elective contribution to everyone. Most employers chose the other because it is less expensive to the company.
>
> I got to know the employees by enrolling them into the 401k plan. During that time, I heard from several employees that John also helped them when they ran into money trouble due to family emergencies.[11]

Sara Castaneda, a family friend, recalls Mr. Drago's generosity when her home was flooded during Hurricane Sandy:

> During a difficult period of me and my children's life, John demonstrated his compassion and giving heart. My children and I used to live in a basement which flooded when Hurricane Sandy, in 2012, affected New York. John was kind and offered his home, until we were financially stable to move, for us to have a safe

---

[11] Exhibit B at 1.

place to stay. John opened his home to us for about nine months until we moved out of the state of New York to Virginia. Despite having family members who could help us during this hard time in New York, none offered as much aid and care as John. To this day, we thank John and his family for being so kind and loving towards us even when many were not.[12]

Several letters note Mr. Drago's love for his family, and in particular his tireless support of his elderly mother, who suffers from dementia. For example, Diana Vasili-Acevedo, a former employee and friend of Mr. Drago's, writes:

John is a good man, and this has been obvious to me for the past seventeen years. He has always been more than willing to help anyone that needs it, he is very religious and is a responsible son, brother, father, and husband. There is not a time we get together that he doesn't mention his mom who has been diagnosed with dementia and fully relies on him, always speaking lovingly of the challenges that come with taking care of an aging parent.[13]

The defense notes the PSR's reference that Mr. Drago's father was an alcoholic who verbally abused him during his childhood (PSR: 42, 53). As his wife stated, Mr. Drago seeks validation from others and is frustrated when such validation is unforthcoming (PSR: 53). We submit that Mr. Drago's initial denial of guilt and feelings of persecution are borne of that mindset – a need to be right when others say he is wrong. He has now accepted responsibility, counseling, and is committed to leading a law-abiding life going forward.

The facts stated in the PSR corroborate that acceptance of responsibility and provide evidence of Mr. Drago's capacity for such growth. He gave his father a job, despite his father's verbal abuse when Mr. Drago was a child, a factor that likely contributed to Mr. Drago's decision to leave home as a child at the age of seventeen (PSR: 43). He left medical school to help his father-in-law, the man who took him in after he left home. He did so to help his father-in-law run

---

[12] *Id.* at 2.
[13] *Id.* at 3.

the father-in-law's check-cashing business – a decision that put Mr. Drago on the path that will end finally when this Court pronounces sentence (PSR: 44). He was divorced from his first wife when she began to practice witchcraft, and Mr. Drago found her smoking marijuana with their then-teenage son (PSR: 44). Nevertheless, he has subsequently developed a friendly relationship with his ex-wife (PSR: 44). Mr. Drago also is close with both his stepdaughter, whom he treats as his own child, and her father, the ex-husband of his current wife (PSR: 44). Mr. Drago's wife describes him as a beloved husband, father and friend (PSR: 47). In short, Mr. Drago's life is complicated, but it reflects a remarkable capacity to forgive and to grow. It is this capacity – the capacity to change, to move on, to ultimately do the right thing – that we ask the Court to consider when deciding if Mr. Drago has accepted responsibility for his crimes and in passing sentence.

Finally, Mr. Drago notes that – when the Kayla Companies were operational – he considered himself a friend of law enforcement. The defense recognizes the incongruity of this point, given Mr. Drago's admitted criminal conduct. But on the other hand, it should be considered that, during the period from 2008 to 2020, Mr. Drago's companies filed about 18,000 CTRs and about 53 voluntary suspicious activity reports ("SARs"),[14] many of which reported potential structuring activity, including a SAR on at least one person who appeared on the Government's witness list.[15] Although Mr. Drago committed, and admitted, criminal acts with respect to his

---

[14] A SAR is a report made by a financial institution to FinCEN regarding transactions that appear to be unusual or suspicious, such that they may be violations of law. 31 U.S.C. § 5318(g). Under the relevant regulations, check cashers are not required to file SARs. 31 CFR §1022.320(a)(1). Nonetheless, during the period charged in the indictment (August 1, 2010 to May 1, 2016), Mr. Drago caused the Kayla Companies to file eight (8) voluntary SARs, six (6) of which report potential structuring activity. In addition, during the period from May 2, 2016 to February 2019, Mr. Drago caused the Kayla Companies to file some forty-five (45) additional voluntary SARs, many of which report potential structuring activity.

[15] With respect to the SAR filings, we anticipate that the Government may argue that Mr. Drago's actions should be discounted because they were made only after the execution of the search warrant. We note, however, that in the five-year period following the search warrant's execution, Mr. Drago assumed that he would not be prosecuted, and his voluntary SAR filings should be viewed as the efforts of the owner of a licensed and regulated entity to improve its compliance controls and evidence commitment to the letter and spirit of the law.

business, it is also true that the CTRs, SARs and his cooperation with law enforcement when subpoenas were issued requiring the Kayla Companies to produce documents led directly to the successful federal prosecution of multiple individuals for tax fraud. The fact that Mr. Drago caused the Kayla Companies to file CTRs, and thus cannot be said to have ignored wholesale his legal obligations – as do entities that operate on an unlicensed and unregistered basis in violation of 18 U.S.C. §1960 (*see*, *infra*) – warrants consideration in determining his sentence.

In short, Mr. Drago is a complex man. He is loyal to his friends and family, including the father who abused his verbally as a child. He supports his children. Despite his criminal acts he did file thousands of CTRs as required.  But at the same time, he committed crimes by inaccurately filling out a subset of CTRs and recognizes that there are consequences for such conduct. In this context, we ask the Court again to consider Mr. Drago's remorse and his capacity to change, as evidenced by the fact he has lived a lawful life for almost four years under the Court's supervision.

**B.  The Nature and Circumstances of the Offenses**

Mr. Drago's crimes are serious. He caused and assisted the structuring of check cashing transactions at the Kayla Companies by the filing of inaccurate currency transaction reports for certain check cashing customers that did not accurately report the total amount of cash provided to those customers for transactions that occurred on particular business days. Mr. Drago knew that by doing this the Government would be unable to obtain an accurate picture of the cash those customers received through check cashing transactions at the Kayla Companies. He knew and understood that CTRs were required to accurately report the amount of cash received by Kayla Companies that exceeded $10,000 on any given business day.

With respect to the tax-related charge, Mr. Drago knowingly and intentionally failed to withhold FICA taxes of employees at the Kayla Companies and to pay over those taxes to the

Internal Revenue Service. He admitted as much to the Government in August 2013. Mr. Drago admitted that he was responsible for uncollected employment tax in the amount of $196,657.08 and unreported income totaling $1,587,733, which would represent taxes owed in the amount of $396,943.25. His total restitution amount owed, as defined in the plea agreement, is $593,600.32.

### C.  Protection of the Public

18 U.S.C. § 3553(a)(2)(C) requires that, in determining a sentence, the Court should consider what will protect the public. Mr. Drago poses no danger to the public. He is a first-time non-violent offender. He understands what he did wrong. Even more importantly, the plea agreement's requirements make it impossible for him to do it again. The crimes he committed required a license, and he has accepted a life-time bar that will keep him from ever engaging in those businesses again. There is no evidence that he presents a threat to the public at this point. He has lived successfully and without incident under the Court's supervision since his indictment in July 2018. He is remorseful. He does not wish to embarrass his family or his community further. A prison sentence would only remove him from his family, and he would be unable to provide for his mother and the rest of his family – he will never again be responsible for the operation of a licensed financial institution.

### D.  Seriousness of the Offense and Deterrence

A below-Guidelines sentence would adequately reflect the seriousness of the offense and the need for deterrence, as required by 18 U.S.C. § 3553(a)(2)(A)-(B). This is true for several reasons.

The courts have recognized that short, or non-incarceratory, sentences can, and do, send a strong message to potential white-collar offenders. *See United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006), *aff'd*, 301 Fed. Appx. 93 (2d Cir. 2008) (describing the "considerable

evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders"); *United States v. Tomko*, 562 F.3d 558, 573 (3d Cir. 2009) (declining to adopt the government's argument that a probation-only sentence in a complex securities fraud case would harm general deterrence); A. Mitchell Polinsky and Steven Shavell, "On the Disutility and Discounting of Imprisonment and the Theory of Deterrence," 28 J. Legal Studies 1, 12 (1999) (noting that "less-than-maximal sanctions, combined with relatively high probabilities of apprehension, may be optimal" for promoting general deterrence in white collar cases). The shame of this criminal conviction, alone, provides sufficient deterrence. The financial penalties at issue in this case, the agreed upon forfeiture and any fine imposed, will have substantial impact on Mr. Drago. And, he has agreed to consent to Government's forfeiture of the funds that are part of the separate forfeiture actions brought by the Government. For a man of limited means, an incarceratory sentence is not required when the penalty of conviction and impact of financial sanctions send a strong message to others.

Second, a felony conviction is a sufficient punishment in its own right. *See U.S.* v. *Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) (urging sentencing courts to consider the collateral consequences facing a convicted felon). Again, in this situation, there is true punishment in the impact of the conviction, alone, on Mr. Drago. Incarceration is not required to promote the ends of justice on this first-offender.

Finally, below, we note two matters brought by NY DFS against two check cashers that failed to employ adequate anti-money laundering ("AML") compliance controls, at least one of which that engaged in structuring activity. To our knowledge, neither entity nor any of the related individuals was criminally prosecuted by state or federal authorities. In this context, the fact of Mr. Drago's criminal prosecution and conviction serves as an enormous deterrent to others and

provides a stark reminder to check cashers of their legal obligations. A substantial jail sentence is not required to achieve that end, *i.e.*, to send a real and chilling message to anyone inclined to ignore those obligations.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

We acknowledge it is difficult to compare cases without detailed knowledge of the facts and circumstances. However, there are certain cases and circumstances we respectfully submit the Court might look to for guidance.

First, we note that check cashers, such as the Kayla Companies, are defined as money services businesses ("MSBs") pursuant to 31 CFR 1010.100(ff). Upon pain of potential criminal prosecution, 18 U.S.C. §1960, MSBs must register with the U.S. Department of the Treasury and be licensed as required in the states where they operate. Like other types of financial institutions such as banks and broker-dealers, MSBs are required, again upon pain of potential criminal prosecution, to implement and maintain effective AML compliance programs. 31 U.S.C. §5318(h). Often, however, AML-related matters arguably similar in gravity and significance to Mr. Drago's offenses are dealt with as regulatory matters, i.e., the offenders are subjected to civil penalties but do not face jail time or other criminal penalties.[16] This is not to say that Mr. Drago's crimes were

---

[16] It is worth mentioning that sophisticated U.S.- and non-U.S.-based international global financial institutions such as Citibank, JPMorgan Chase, Standard Chartered, HSBC, Wells Fargo, Bank of America, Deutsche Bank – and many more – have been the subject of massive monetary AML-related penalties resulting from failures to maintain effective AML programs (*see, e.g., U.S. v. HSBC Bank USA NA et al.*, No. 12-cr-00763 (E.D.N.Y.) [$1.92 billion settlement relating to failures in HSBC's AML program], *U.S. v. Standard Chartered Bank*, No. 12-cr-00262 (D.D.C.) [$240 million in forfeiture and a fine of $480 million relating to failures in Standard Chartered's AML and sanctions programs], and NY DFS Consent Order Under New York Banking Law §§ 39 and 44, *In the Matter of Deutsche Bank AG et al.* (January 30, 2017) [Deutsche Bank fined $425 million for violations of New York AML laws]). Very few if any of the leaders of those banks responsible for the implementation of AML programs found to be ineffective have faced criminal charges. Again, this is not to say that Mr. Drago's actions can be excused, but it is notable that individuals and entities responsible for subjecting the U.S. financial system to far-greater dollar volumes and far greater risk than the Kayla Companies have escaped criminal prosecution altogether while Mr. Drago faces up to 10 years in jail.

not serious, but it is a relevant in determine the length of an appropriate jail sentence that similarly situated individuals are often subjected to civil rather than criminal penalties.

To the defense's knowledge, since 2012, NY DFS has brought two civil regulatory actions against two check cashing enterprises. On January 31, 2019, DFS entered a consent order with Coney Island Payroll Services, Inc. ("Coney Island"), a check cashing business that operated in two locations in New York.[17] In 2015, NY DFS examined Coney Island and identified "serious and systemic deficiencies in multiple areas of its BSA and AML compliance program as well as numerous violations of New York State and federal laws and regulations."[18] In 2016, Coney Island cashed over 55,000 checks with a value exceeding $256 million.[19] Then, in 2018, NY DFS again examined Coney Island and identified multiple and serious deficiencies in its AML compliance program.[20] As charged in the Drago indictment, it is a federal crime to fail to maintain an effective AML program. 18 U.S.C. §5318(h). Neither Coney Island nor its owners were charged criminally; rather Coney Island received a fine of $75,000 and it was required to hire a third-party compliance consultant.[21]

Likewise, in 2017, DFS entered a civil settlement agreement with NY Community Financial, LLC ("NY Community"), a registered check cashing business that operated 82 branches. NY DFS found that NY Community had "[failed] to provide customers with the entire amount of cashed instruments in cash," citing "instances where NYCF paid partly with cash and partly with a money order or money orders when a customer tendered a check in an amount over $10,000." In other words, NY DFS found that NY Community structured transactions to evade reporting

---

[17] NY DFS Consent Order Under New York Banking Law §§ 39 and 44, *In the Matter of Coney Island Payroll Services Inc.* (January 31, 2019), available at:
https://www.dfs.ny.gov/system/files/documents/2019/02/ea190131_coney_island_payroll.pdf.
[18] *Id.* at 1.
[19] *Id.*
[20] *Id.* at 2.
[21] *Id.* at 6-7.

requirements. Under the terms of the agreement, NY Community agreed to pay a fine of $25,000 and to develop compliance policies and procedures, and related training, to ensure that it complied with all applicable laws and regulations.[22] Neither NY Community nor its owners were charged criminally.

We note that there have been check cashers prosecuted criminally in New York. For example, in July 2009, the Manhattan District Attorney's Office prosecuted Riad Khalil and Neil Goldstein for structuring check deposits and failing to file CTRs at four check cashing companies owned by Goldstein and a co-conspirator, Charles Goldberg. Khalil bundled and cashed checks for dozens of businesses in the construction industry and conducted hundreds of transactions at the four check cashers between October 27, 2006 and July 11, 2008, many of which were structured. The three executed a scheme in which checks to the same payee totaling over $10,000 would be processed on different days or at different companies to evade CTR reporting requirements. In total, the conspirators cashed over $40 million in checks, both structured and non-structured, over the two-year period.[23]

Goldberg pleaded guilty to a criminal information charging Falsifying Business Records in the Second Degree (New York Penal Law §175.05), a misdemeanor, and received a sentence of a one-year conditional discharge.[24] Khalil and Goldstein were indicted on 122 counts of felony Falsifying Business Records in the First Degree (New York Penal Law §175.10), and 64 counts of a failure to make required reports in violation of New York Banking Law §372(7), a misdemeanor. Both Khalil and Goldstein pled guilty to the felony charge but neither received jail time. Instead,

---

[22] NY DFS Settlement Agreement with NY Community Financial, LLC, *In the Matter of NY Community Financial, LLC* (September 20, 2017), available at:
https://www.dfs.ny.gov/system/files/documents/2020/03/ea170920_ny_comm_fin.pdf.
[23] The facts are taken from the New York County District Attorney's Office press release, which is reported in the following articles: https://www.nytimes.com/2009/07/29/nyregion/29checks.html; https://www.bankersonline.com/articles/107522.
[24] New York County Superior Court Information 3290/2009.

Khalil received a conditional discharge and Goldstein received a five-year sentence of probation.[25] In addition, the District Attorney's Office brought a parallel civil forfeiture action against Khalil for $1,355,238, and the four check cashing companies agreed to forfeit a total of $250,000.

Khalil was sentenced in state court on December 10, 2010. The fact that he escaped jail time in state court is even more relevant here given that, months earlier, he was sentenced in federal court to a non-incarceratory sentence for separate but similar conduct, a fact that the state court apparently knew.[26] In 2006 Khalil was indicted in the Southern District of Florida of charges of operating an unlicensed money transmission scheme between New York and Florida, in which Khalil mailed bundles of checks to a confederate in Florida who deposited the checks and transmitted cash back to Khalil in New York. Khalil's case was transferred to the Eastern District of New York, and on May 8, 2009, he pleaded guilty to conspiracy to operate an unlicensed money transmitting business. On August 13, 2010, Khalil was sentenced by Judge Vitaliano to 2 years of probation with 12 months' home confinement, including electronic monitoring. Based on the docket references, Judge Vitaliano was aware of the state court prosecution when he sentenced Khalil.[27] Notably, too, Khalil's co-defendant, Ziyad Awadallah, pled guilty to the same charge in the Southern District of Florida and received a sentence of probation.[28]

In another federal case, on November 5, 2013, Craig Panzera, the owner and operator of Belair Payroll Services Inc., a Flushing-based check cashing business, pleaded guilty to charges relating to the deposit of numerous checks drawn on the accounts of shell corporations. Belair accepted the checks, and provided cash in excess of $10,000 per check, but Panzera and other

---

[25] New York County Indictment No. 3765/2009.
[26] *U.S.* v. *Khalil*, 09-cr-00213-ENV-1 (EDNY) (ECF: 26, August 4, 2010)(motion by Khalil to provide copies of the parties sentencing submissions to the state court judge).
[27] *Id.*
[28] *U.S.* v. *Awadallah*, 06-cr-60332-WJZ (SDF).

Belair employees deliberately failed to collect required identification documentation or information from the individuals depositing the checks. In addition, Belair filed CTRs falsely stating that foreign nationals associated with the shell companies had cashed the checks, and in certain CTRs failed to indicate the full amount given to the depositors. Panzera pleaded guilty to conspiracy to defraud the United States and failure to maintain an effective anti-money laundering program. Like Khalil and the other defendants in the New York County case, he received no jail time. He was ordered to pay $946,841.17 in restitution to the IRS. In addition, Belair forfeited over $3.2 million.[29]

Even in matters where it is alleged that individuals operated MSBs that were not licensed at all, *i.e.,* where the owners and operators flouted entirely the MSB registration and licensing requirements, conducted business absent any AML-related controls or regulatory oversight whatsoever, and further were accused of flat-out laundering massive amounts of criminal proceeds, which Mr. Drago did not and is not so-accused, there are examples of the defendants receiving much less jail time than that suggested by the Guidelines.

For example, in *U.S. v. Chavez Lozano,* (19-CR-00826) (NRB) (SDNY), the defendant pled guilty to operating a money transmission business without a license. There, the Government alleged that the defendant had, in a prior case, laundered drug proceeds and, in the instant matter, obstructed justice by erasing instant messages from his phone after agents handed it to him after his arrest so he could call his family. Despite a prior history of laundering drug money, continuing to operate without proper licensing even after conviction, and actively destroying potential evidence upon his second arrest, the defendant received a sentence of two months in jail.

---

[29] *U.S. v. Goletiani et al.,* No. 11-cr-00591-FB-JXA-3 (EDNY).

In another matter, *U.S. v. Luis Diaz, Jr., and Luis Javier Diaz,* (17-cr-00077)(WHP) (S.D.N.Y.), the defendants were convicted after trial. The indictment charged that, during the period from about 2010 to 2016, the defendants conspired to use a Florida-based company that they owned and controlled to engage in MSB activities without fulfilling the requisite federal registration and state licensing requirements, and in fact used their unlicensed company as an MSB without fulfilling the requisite federal registration and state licensing requirements. Further, the indictment charged that the defendants conspired to launder criminal proceeds that involved the proceeds of an unlicensed money transmission business with the intent to promote their carrying on of an unlicensed money laundering business, and in fact transmitted the proceeds of an unlicensed money transmission business with the intent to promote their carrying on of an unlicensed money laundering business.

On November 15, 2017, following a jury trial, defendant Luis Diaz Jr. was convicted of each count in the indictment, and defendant Luis Javier Diaz was convicted of Count Two and Count Four of the indictment. Defendant Luis Javier Diaz was acquitted of Count One and Count Three of the indictment. The evidence at trial suggested that the defendants moved millions of dollars for corrupt Venezuelan political figures, a fact noted by the Government in its sentencing memorandum:

> As the trial evidence demonstrated, defendants Luis Diaz, Jr., ("Diaz") and Luis Javier Diaz ("Javier"), father and son, used their family-owned business, Miami Equipment & Export Co. ("Miami Equipment"), to operate an unlicensed money transmitting business that sent over a hundred million dollars to individuals and entities all over the world, including shell companies, Venezuelan government officials, and others with whom Miami Equipment had no bona fide business relationship. The defendants also charged fees for this service, amounting to over a million dollars during the relevant period.[30]

---

[30] Government's Sentencing Memorandum, *U.S. v. Luis Diaz, Jr., and Luis Javier Diaz,* No. 17-cr-077 (WHP) (S.D.N.Y. Jun. 11, 2018), ECF No. 97.

Following their trial conviction, the Government argued that the crimes committed warranted a "substantial period of incarceration albeit one that is below the calculated Guidelines range," which in that case was 151 to 188 months in jail.[31] Notably, too, the Department of Probation recommended a jail sentence of 60 months for each defendant. Defendant Luis Diaz Jr. received a jail sentence of 8 months and defendant Luis Javier Diaz received a jail sentence of 4 months. It is hard to imagine Mr. Drago serving more jail time than Messrs. Diaz and Diaz, yet that is exactly what the Guidelines would recommend.

We emphasize again that we do not seek to minimize or excuse Mr. Drago's conduct. However, when viewed in relation to the crimes described above, and in consideration for the relatively short periods of incarceration to which the defendants were sentenced, we submit respectfully that Mr. Drago should receive a below Guidelines sentence of no more than 6 months.

Separately, we address Mr. Drago's tax crime. Here, we note first a matter before this Court. In September 2020, Nikolaos Avgoustidis, the owner and operator of the Rocky Point Town House Diner in Long Island, pleaded guilty to tax charges relating to salary payments made to his employees between 2011 and 2013 employees that he paid in cash and did not report to the IRS, causing a total tax loss of approximately $130,000. According to the Government's sentencing memorandum, Mr. Avgoustidis maintained two sets of books, one he hid from the tax authorities and his accountant, and the other that reflected the true economic state of the restaurant. The Court sentenced Avgoustidis to 6 months in prison and ordered that he pay restitution totaling $130,475.98.[32] We respectfully submit that, given Mr. Drago's forthright admission in his 2013 proffer statement, and the restitution required in the plea agreement, the Court's sentence on the tax crime should be consistent in degree as that imposed in the Avgoustidis matter, and further that

---

[31] *Id.* at 6 (noting that the Probation Department recommended a sentence of 60 months incarceration).
[32] *U.S. v. Augoustidis*, No. 20-cr-00178-GRB-1 (EDNY).

jail time imposed should be concurrent to any jail sentence imposed respect to the crime related to Mr. Drago's operation of the Kayla Companies.

We note further the tax matters cited below. The facts of each matter concerns a larger tax loss to the Government than that at issue here:

- In 2018, a Souleang Kane, the operator of several temporary staffing agencies, was sentenced to two years in prison and order to pay restation totaling $165,299.44, after she pleaded guilty to failure to report over $4.3 million in employee wages, resulting in the evasion of over $1.3 million in federal taxes and over $431,000 in Massachusetts state taxes.[33]

- Argyrios Mavros, the owner of a Massachusetts-based construction company, pleaded guilty in March 2022 to a scheme to defraud the IRS and his workers' compensation insurance carrier by failing to disclose his true number of employees.  Mavros cashed customer checks at a local check cashing business and used the funds to pay his employees in cash; he was sentenced to 18 months in prison and ordered to pay restitution of over $1 million to the IRS and over $150,000 to his insurance carrier.[34]

- In 2022, Shoua Yang, the owner of a Minnesota-based staffing agency, pleaded guilty to the filing of false tax returns that understated her agency's gross receipts and payroll taxes, resulting in a tax loss by the IRS of over $1 million; Yang received a sentence of 15 months' imprisonment and was ordered to pay restitution equal to the lost taxes.[35]

- John Zourdos, his wife Helen Zourdos, and his son Dimitrios Zourdos, who operated three "Dippin Donuts" shops in New York,  were convicted by a federal jury in November 2021

---

[33] *U.S.  v. Kane*, No. 17-cr-10258-DPW-1 (D. Mass.).
[34] *U.S. v. Mavros*, No. 20-cr-10215-WGY-1 (D. Mass.).
[35] *U.S. v. Yang*, No. 21-cr-00087-ECT-BRT-1 (D. Minn.).

of hiding approximately $4.5 million in cash sales from the IRS over a five-year period, and paying employees off-the-books cash wages, resulting in their evasion of over $2 million in personal and corporate taxes.  John Zourdos was sentenced to a prison term of 30 months, Helen Zourdos to 20 months, and Dimitrios Zourdos to 10 months, and the family was ordered to pay over $2 million in restitution to the United States.[36]

We ask the Court to consider these cases in determining Mr. Drago's sentence, and to impose its sentence on the tax count to be served concurrently with any other jail sentence imposed.

### F.       The Court Should Consider Alternatives to Incarceration

In 2009, the Sentencing Commission issued a report on alternative sentencing that recognized that "[e]ffective alternative sanctions are important options for federal, state, and local criminal justice systems. For the appropriate offenders, alternatives to incarceration can provide a substitute for costly incarceration." The 2014 ABA Shadow Guidelines for Economic Offenses concluded that "a sentence other than imprisonment is generally appropriate" for defendants charged with non-serious economic offenses that have no criminal history.

In October 2014, Judge Gleeson cited then-Deputy Attorney General Sally Yates' comment that "[w]hile it's true that there are dangerous defendants from whom society needs to be protected, there are others . . . for whom alternatives to incarceration make a lot more sense." *United States v. Dokmeci*, No. 13-CR-00455 (JG), 2016 WL 915185, at *10 (E.D.N.Y. Mar. 9, 2016).  Courts too have recognized the need to consider alternative sentences. *United States v. Murphy*, 108 F.R.D. 437, 439 (E.D.N.Y. 1985) (Judge Weinstein reasoning that "For most crimes of white-collar corruption it may not be necessary to provide substantial prison terms."); *United States v. Pippin*, 903 F.2d 1478, 1484 (11th Cir. 1990) (noting that, after "extensive study," the

---

[36] *U.S. v. Zourdos et al.,* No. 20-cr-00298-DNH-1 (NDNY).

Sentencing Commission recommend leeway for the sentencing judges to impose non-custodial sentences in white collar cases with low Guidelines ranges).

## II.   CONCLUSION

We respectfully ask this Court to consider all of the facts regarding Mr. Drago's background, nature, and character in imposing sentence. He is extremely ashamed and remorseful about the conduct for which he stands convicted and since his arrest has worked hard to turn his life around. For all of the foregoing reasons, Mr. Drago most respectfully requests that this Court impose a sentence of no more than 6 months in jail, i.e., a sentence below the recommended Guidelines sentence and consider alternatives to incarceration.

Respectfully Submitted,

/s/Arthur D. Middlemiss
Arthur D. Middlemiss
Lewis Baach Kaufmann Middlemiss pllc
405 Lexington Avenue
64th Floor
New York, New York 10174
(212) 826-7001
*Counsel for John Drago*

Dated: October 12, 2022