

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

BTK/BTR
F. #2018R01591

*610 Federal Plaza*
*Central Islip, New York 11722*

October 13, 2022

By ECF

The Honorable Gary R. Brown
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

      Re:    United States v. John Drago
                  Criminal Docket No. 18-CR-394 (S-1) (GRB)

Dear Judge Brown:

      The government respectfully submits this letter regarding defendant John Drago, whose sentencing is scheduled for October 21, 2022. The defendant, the former owner of several check-cashing businesses (collectively, the "Kayla Companies"), pleaded guilty to structuring financial transactions in violation of Title 31, United States Code, Sections 5324(a)(3) and 5324(d)(1), and to failing to pay payroll taxes to the Internal Revenue Service ("IRS") in violation of Title 26, United States Code, Section 7202. (See May 17, 2022, United States Probation Dep't ("Probation") Presentence Investigation Report ("PSR") at ¶ 1).

      Between 2010 and 2013, the defendant, who was the Kayla Companies' owner-operator and purported "compliance officer" orchestrated a scheme to prevent the filing of Currency Transaction Reports ("CTRs") under the Bank Secrecy Act. The defendant did this to generate millions in fees for the Kayla Companies, which were eagerly paid by the defendants' "top customers," who sought to avoid the governmental scrutiny that would inevitably follow the proper filing of CTRs. (See PSR at ¶¶ 11-13). Compounding this fraud, the defendant further cheated the government by filing false quarterly payroll tax forms with the IRS, in which the defendant underreported the cash income that he paid to his employees and by filing false personal income tax returns. Combined, the defendant's tax fraud resulted in losses of more than $590,000 to the IRS. (Id. at ¶¶ 9-10, 15). The defendant's sole motive was greed; he sought to line his pockets will ill-gotten fees, regardless of the consequences to the IRS's enforcement efforts and the government's attempt to collect taxes to pay for critical social service programs, such as Social Security and Medicaid. (Id. at ¶ 9).

Under the parties' Plea Agreement, the government and defendant agree that the appropriate offense level is 28 and that the defendant's Criminal History Category is I. This yields an agreed upon Sentencing Guidelines range of 63-to-78 months' imprisonment. (Id.)[1]  For the reasons stated below, the government submits that the relevant sentencing factors demonstrate that the Court should impose a Guidelines sentence of between 63-78 months' imprisonment to be followed by two years' supervised release, along with the agreed upon forfeiture of $253,191 and restitution of $593,600.32.  See 18 U.S.C. § 3553(a).

I. Procedural Background

On September 9, 2021, the defendant pleaded guilty to Counts 4 and 8 of the Superseding Indictment, which charged him with, respectively, structuring financial transactions to avoid the filing of CTRs and payroll tax evasion.  (PSR at ¶ 1).  The defendant's plea followed years of protracted litigation concerning the propriety of a Search Warrant for the Kayla Companies that was issued after an undercover operation exposed the defendant's fraudulent check cashing operation.  (See generally ECF No. 154 (Report and Recommendation)).  Ultimately, the defendant pleaded guilty after this Court adopted the Report and Recommendation issued by the Honorable Anne Y. Shields, which found that there was an independent source for nearly all of the numerous exhibits that the government intended to introduce against the defendant at trial.  (Id.).

II. The Defendant's Fraudulent Structuring and Tax Evasion Scheme

From 2010 to 2013, the defendant, who had decades of experience in the heavily-regulated check cashing industry, and who served as the Kayla Companies' purported Compliance Officer, operated a scheme to fraudulently structure the cashing of more than $9.5 million in checks.  (PSR at ¶¶ 8, 11-13).  Essentially, the defendant directed his employees to assist favored, or "top customers," who were his prime sources of fees, in fraudulently preventing the filing of CTRs by: (1) cashing multiple checks totaling more than $10,000 in a single day without filing CTRs; (2) processing checks provided on a single day over the course of multiple days, so that they did not appear to have been provided to the Kayla Companies on the same day; (3) holding checks received on a single day, but bearing different dates, and then presenting them separately on different dates; and (4) telling certain customers who presented checks in amounts over $10,000 to return with multiple checks in amounts less than $10,000, thereby avoiding filing required CTRs.  (Id. at ¶ 13).  This benefitted the defendant by generating fees for himself and his business.  And it benefitted the "top customers" by allowing them to avoid the inevitable increased scrutiny from the IRS and other government regulators that would have followed from the filing of numerous CTRs by a check casher.  (Id. at ¶¶ 11-12).  The defendant directed his employees to take these blatantly illegal actions despite—as the pretrial hearing record established—his having

---

[1] Probation has recommended that the Court impose a 60-month sentence, along with two years' of supervised release.  (May 17, 2022 Probation Sent. Rec. at 1).

2

purportedly authored voluminous company anti-money laundering manuals that condemned just such behavior.

An IRS undercover investigation exposed the defendant's fraud by showing that Kayla Companies' employees were instructed by the defendant, or "the boss," to engage in structuring activities. During the operation, a cooperating witness (the "CW") cashed more than $130,000 in checks that should have resulted in numerous CTRs being filed over an approximately eighteen-month period, but which resulted in just one such report, a level of documentation that vastly understated the amount of check cashing activity subject to the filing of CTRs that the CW actually conducted at the defendant's business. Ultimately, a search warrant executed at the Kayla Companies' principal office in Farmingdale on August 6, 2013, resulted in the seizure of voluminous records that ultimately led to the convictions of more than two dozen of the defendant's clients for tax evasion.

But the defendant's fraud was not limited to assisting his "top customers," who sought to evade government scrutiny of their shadowy bookkeeping practices. Indeed, at the same time that he was assisting dozens of customers who were bent on shielding their income from the public fisc, the defendant was evading payroll and personal income taxes by operating an off-the-books payroll and underreporting his personal income. (PSR at ¶¶ 9-10, 15).

In a particularly egregious example, the defendant assisted Kenneth Hendrick, a Kayla Companies employee, who had previously worked as a New York City Police Officer in avoiding income taxes and a reduction in his disability pension by giving him cash payments of more than $597,000, between 2010 and 2012, while providing him with false earnings statements, showing an income of approximately just $52,000 per year.[2] Unsurprisingly, Hendrick was a former employee of another check cashing company that closed under a cloud of suspicious activity. Working for the defendant under a "commission" arrangement, which calculated his pay as a percentage of the fees charged to clients whose accounts Hendrick managed, he was responsible for recruiting many of the defendant's "top customers," who ultimately pleaded guilty to using the defendants' services to evade taxes. Indeed, after the defendant hired Hendrick, the Kayla Companies' check cashing business, as measured by commercial check transactions, more than doubled, rising from approximately $46 million in 2010 to more than $93 million in 2012. Ultimately, the defendant's personal and payroll tax fraud cost the IRS to lose more than $590,000. (PSR at ¶ 15).

---

[2] Hendrick pleaded guilty to tax evasion and was recently sentenced by Your Honor to six months' imprisonment and three years' supervised release.

III.    The Defendant's Guidelines Range

As explained above, under the Plea Agreement, the parties' agree that: the total offense level is 28, the defendant is a Criminal History Category I and that the applicable Sentencing Guidelines range is 63-78 months' imprisonment.

IV.    A Guidelines Sentence Is Appropriate

   A. Legal Standard

In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences but also may tailor the sentence in light of other statutory concerns. 125 S. Ct. 738, 743 (2005); see 18 U.S.C. § 3553(a). After Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

Later, in Peugh v. United States, the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." 569 U.S. 530, 536 (2013) (quoting Gall v. United States, 552 U.S. 38, 49 (2007)). Next, a sentencing judge should "consider the arguments of the parties and the factors set forth in § 3553(a). . . [and the Court] may not presume that the Guidelines range is reasonable." Id. (quoting Gall 552 U.S. at 50). The Court must make an individualized assessment in sentencing based on presented facts. Id. (quoting Booker 125 S. Ct. at 767).

   B. Argument

The government respectfully submits the Court should impose a sentence within the Guidelines range of 63-78 months' imprisonment. Such a sentence is appropriate to account for the "nature and circumstances of the offense" and to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(1)-(2)(A). A sentence within the advisory Guidelines will also promote specific and general deterrence. See id. at § 3553(a)(2)(B).

1. Nature and Circumstances of the Offense

In pursuit of greed, the defendant—who was supposedly a trained "compliance" officer—concocted a scheme to structure more than $9.5 million in check cashing transactions and to defraud the IRS of more than $590,000 in personal and payroll taxes. The defendant's motive is amply demonstrated by his decision to cheat on his personal income taxes; the defendant wanted to line his pockets with cash regardless of truth or consequences. In deciding to benefit himself at the expense of society, the defendant made the Kayla Companies a haven for more than two dozen convicted tax cheats, who used the defendant's corruption to defraud the government of millions of dollars in desperately needed revenues.

Knowing the rules that regulate all check cashers, the defendant crafted a manipulative scheme to benefit himself and other fraudsters. This wasn't a one-off occurrence either—the defendant structured over $9.5 million in fraudulent transactions and benefitted directly from the millions of dollars in fees that his "top customers" paid him because of these unlawful practices. Not only did the defendant's scheme harm the public at large, it almost certainly impacted other reputable check cashers, who played by the rules, but who lost out on business to the defendant's fraudulent operation. In short, the nature and circumstances of the offense are egregious and demand a Guidelines sentence of between 63 and 78 months' imprisonment.

2. Seriousness of the Offense and Deterrence

A Guidelines sentence is also necessary to reflect the seriousness of the offense, promote respect for the law and to provide both specific and general deterrence. The defendant was entirely in control of the Kayla Companies as both its owner and the chief Compliance Officer. That he wantonly abused these positions for personal gain demonstrates that the defendant needs the significant deterrence inherent in a Guidelines sentence to ensure he never again abuses his discretion in any manner.

Additionally, given that criminal conduct like the defendant's is typically difficult to detect and prosecute, there is a greater need for general deterrence. See, e.g., Harmelin v. Michigan, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties"). Moreover, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." See, e.g., United States v. Zuckerman, 897 F.3d 423, 429 (2d Cir. 2018) (quoting United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.")); United States v. Cavera, 550 F.3d 180, 196 (2d Cir. 2008) ("Where the profits to be made from violating a law are higher,

the penalty needs to be correspondingly higher to achieve the same level of deterrence"); Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

Congress recognized the need to afford adequate deterrence as "particularly important in the area of white-collar crime" when it adopted Section 3553. See S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259. Congress rightly was disturbed that "white collar criminals often are sentenced to small fines and little or no imprisonment," and noted that, "[u]nfortunately, this creates the impression that certain offenses . . . can be written off as a cost of doing business." Id.

In adopting the Section 3553 sentencing factors, Congress emphasized the essential deterrent value of imprisoning white-collar criminals, even when those criminals themselves might be unlikely to re-offend:

> The Committee is of the view that in the past there have been many cases, particularly in the instances of major white collar crime, in which probation has been granted because the offender required little or nothing in the way of institutionalized rehabilitative measures . . . and because society required no insulation from the offender, without due consideration being given to the fact that the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance. The placing on probation of [a white-collar criminal] . . . may be grossly inappropriate . . . in cases in which the circumstances mandate the sentence's carrying substantial deterrent or punitive impact.

Id. at 91-92.

Here, a Guidelines sentence will help to deter other businesspeople, like the defendant, who self-servingly believe that they can reap profits to benefit themselves and their companies through evading reporting requirements, intentionally structuring transactions to avoid government oversight, and by cheating on payroll and income taxes. The Bank Secrecy Act and the Internal Revenue Code are predicated upon the reasonable belief that check cashers and taxpayers will comply with the law. As such, those, like the defendant, who greedily seek to profit from fraud and deception should know that their actions will result in the stern consequences that are reflected in a Guidelines sentence.

3. Promote Respect for the Law and Provide Just Punishment

A Guidelines sentence should be imposed to reflect the seriousness of the offense, promote respect for the law and provide just punishment. Although the defendant elected to plead guilty, he played a significant role as the organizer of a longstanding

fraudulent scheme, which resulted in: a loss of over $590,000 to the IRS, the fraudulent structuring of more than $9.5 million in transactions by numerous customers, including more than two dozen convicted tax cheats, and millions of dollars that the defendant generated in illicit profits. In essence, the defendant operated his check cashing business as a haven for tax evasion and fraud, actions that demand the significant punishment that is reflected in Guidelines sentence.

V.  Conclusion

For the reasons discussed above, the government respectfully requests that the Court impose a sentence within the Guidelines range of 63-78 months' imprisonment to be followed by two years' supervised release, as well as a forfeiture money judgment of $253,191 and a restitution order of $593,600.32.

    Respectfully submitted,

    BREON PEACE
    United States Attorney

By: /s/_____
    Bradley T. King
    Burton R. Ryan
    Assistant U.S. Attorneys
    (631) 715-7900

cc:    Arthur D. Middlemiss, Esq. (by ECF and E-mail)
       United States Probation Officer Gregory Giblin (by E-mail)